**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, the Commonwealth of MASSACHUSETTS, VIRGINIA, the DISTRICT OF COLUMBIA, and the policyholders of XYZ Nos. 1-10 Insurance Companies, <br><br> *ex rel.* RICHARD GARDNER, <br><br>                 Plaintiffs, <br><br>    v. <br><br> VANDA PHARMACEUTICALS, <br><br>                 Defendant. | Civil Action No. l:17-cv-00464 (APM) <br><br> **SECOND AMENDED COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

The United States of America (the "United States") and the Plaintiff States (defined below) (the United States and Plaintiff States are collectively referred to herein as the "Government"), by and through their *qui tam* Relator, Richard Gardner ("Relator"), bring this action under the Federal False Claims Act (the "False Claims Act" or "FCA"), 31 U.S.C. § 3729 *et seq.*, and the false claims acts and analogous statutes of the respective Plaintiff States[1] against

---

[1] Specific citations for relevant state *qui tam* statutes are as follows: California False Claims Act, Cal. Gov't Code § 12650 *et seq.*; California Insurance Frauds Prevention Act, Cal. Ins. Code §§ 1871 *et seq.*; Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*; Connecticut False Claims Act, Conn. Gen. Stat. § 4-274 *et seq.*; Delaware False Claims and Reporting Act, 6

Vanda Pharmaceuticals ("Vanda" or "Defendant" or "Company") to recover all damages, penalties, and other remedies provided by the aforementioned statutes, and for their Second Amended Complaint ("Complaint") allege:

1. Based on the Relator's personal knowledge and further investigation, sufficient evidence exists to allege that Defendant has violated and continues to violate the False Claims Act, 31 U.S.C. § 3729, state false claims acts, and applicable regulatory and ethical guidance by submitting fraudulent bills to the government (and/or through its conduct in causing others to submit fraudulent bills to the government) as a result of off-label marketing and other prohibited marketing strategies.

2. This is also an action to recover treble damages and civil penalties from Defendant for knowingly and/or recklessly presenting or causing to be presented false or fraudulent health care claims to the States of California and Illinois, and to presently unknown private insurance companies (captioned as XYZ Nos. 1-10 Insurance Companies) operating or

---

Del. C. Ann. tit. 6 § 1201 *et seq.*; Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*; Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*; Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*; Illinois False Claims Act, 740 ILCS 175/1 *et seq.*; Illinois Claims Fraud Prevention Act, 740 I.L.C.S §§ 92/1 *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*; Iowa False Claims Law, I.C.A. § 685.1 *et seq.*; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.*; Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*; Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*; Montana False Claims Act, MCA § 17-8-401 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*; New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*; North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*; Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*; Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*; Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*; Virginia Fraud Against Tax Payers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; and District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-381.02 *et seq.*

insuring policyholders in those states, pursuant to the California Insurance Frauds Prevention Act ("CIPFA"), Cal. Ins. Code §§ 1871 *et seq.*, and the Illinois Claims Fraud Prevention Act ("ICFPA"), 740 I.L.C.S. §§ 92/1 *et seq.*

3.     Throughout the world, there is a continued debate over whether pharmaceutical companies should be allowed to charge extremely high prices for life saving drugs, in some cases charging six figures or more. The drugs involved in this matter, Fanapt and Hetlioz, are not life saving drugs, however, Hetlioz does come with a $180,000 price tag for an annual supply. Hetlioz is an orphan drug for a rare disease called Non-24, which generally only affects blind individuals. During FDA approval and in other statements, Vanda and its CEO, Mihael Polymeropoulos, repeatedly stated that this drug was intended for use in only blind individuals. However, shortly after the release of the drug, Vanda quickly realized that the patient population of blind patients with Non-24 was very small, and started targeting psychiatrists treating sighted patients for Hetlioz, while simultaneously increasing the price. As discussed herein, these patients did not have Non-24, and it was only due to Vanda's fraud that Hetlioz claims for such patients were submitted to and paid by Government healthcare programs. With such a high price tag, Vanda has been able to bring in millions of dollars from Hetlioz prescriptions for sighted patients, without Non-24, reimbursed by the federal and state governments, while only having to convince a relatively small number of doctors to prescribe the drug.

4.     Further demonstrating Vanda's intent is its promotion of Fanapt, an anti-psychotic indicated for the treatment of schizophrenia. Realizing that this drug was inferior to many in the market, Vanda embarked on a quest to promote this drug for conditions outside its indication, while concealing the drug's dangerous side effects. As a result, the government, which reimburses for Fanapt, has been paying for a less effective treatment which poses greater dangers

to patients, over commonly used and less expensive treatments.

5.      The illegal acts alleged herein began in at least December 2014 and continue through the present ("Covered Period").

## PARTIES

6.      Relator worked at Vanda as a Regional Business Leader ("RBL") for the mid-west region from November 16, 2015 until August 5, 2016.  Relator's territory included Illinois, Wisconsin, Michigan, Ohio, Western Pennsylvania, West Virginia, and Indiana. Prior to joining Vanda, Relator worked in the pharmaceutical industry for over 23 years, including ten years at Pfizer/Pharmacia where he served as Regional Sales Trainer, Corporate Sales Trainer, and District Manager. Relator has held several key pharmaceutical leadership roles throughout his exemplary career including Corporate Training Leader, Senior Regional Manager, and Senior Regional Manager of Government Accounts.  Relator is an original source and has direct, personal, and independent knowledge of the information upon which the allegations herein are based.

7.      Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*. ("Medicare").

8.      The Plaintiff States are the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Washington, the Commonwealths of Massachusetts and Virginia, and the District of Columbia.  They each bring claims for Defendant's violations of their

respective state false claims acts, as set forth in detail in the Counts below.

9.     Vanda is a pharmaceutical manufacturer based out of Washington, D.C., and its CEO is Mihael Polymeropoulos. Vanda owns and markets its drugs Fanapt and Hetlioz. According to Fanapt's prescribing information:

> FANAPT is an atypical antipsychotic agent indicated for the acute treatment of schizophrenia in adults. In choosing among treatments, prescribers should consider the ability of FANAPT to prolong the QT interval and the use of other drugs first. Prescribers should also consider the need to titrate FANAPT slowly to avoid orthostatic hypotension, which may lead to delayed effectiveness compared to some other drugs that do not require similar titration.

10.    Fanapt has been in development since 1995, and had an initial anticipated market release date of 2001, however, in May 1996 Vanda discontinued research on the drug and in June 1997 Fanapt's research rights were given to Titan Pharmaceuticals ("Titan").  In August 1998, Titan sold Fanapt's worldwide development, manufacturing, and marketing rights to Novartis.

11.    Fanapt was approved by the United States Food and Drug Administration ("FDA") in May 2009 and, at the time, the drug was marketed by Novartis. In December 2014, Vanda took over the marketing responsibilities for Fanapt.

12.    Hetlioz (Tasimelteon) is a circadian regulator and is only approved to treat Non-24-Hour Sleep-Wake Disorder ("Non-24"). Hetlioz resets the master body clock and aligns it with the 24-hour day.  On January 19, 2010, the FDA granted Hetlioz orphan drug designation status for Non-24-Hour Sleep-Wake Disorder in blind individuals without light perception.[2] At the time, Vanda expected Hetlioz to become commercially available in the second quarter of

---

[2] The FDA's Orphan Drug Designation program provides "orphan" status to drugs defined as those intended for the safe and effective treatment, diagnosis, or prevention of rare diseases/disorders that affect fewer than 200,000 people in the United States, or that affect more than 200,000 persons but are not expected to recover the costs of developing and marketing a treatment drug.  As a result of being granted orphan drug status, Vanda was provided with an additional seven years to sell Hetlioz free from generic competition.

2014. On January 31, 2014, Vanda announced that the FDA had approved Hetlioz 20 mg capsules for the treatment of Non-24. Hetlioz is the first FDA-approved medication for Non-24. In 2019, a year supply of Hetlioz costs approximately $188,000.

13.    Non-24 is a circadian rhythm sleep disorder ("CRSD").  CRSDs result from a misalignment of the sleep/wake cycle and an individual's daily activities or lifestyle.  Examples of CRSDs include jet lag, delayed sleep phase disorder, shift work sleep disorder, and Non-24.

14.    As discussed herein, Vanda's marketing strategy was to target primarily sighted patients for Hetlioz.  It is extremely rare for sighted patients to have Non-24.  In fact, in Hetlioz's clinical studies for FDA approval, Vanda only studied the drug on blind patients.

15.    The original FDA approval for Hetlioz was for "Non-24 sleep-wake disorder in blind patients without light perception." However, the FDA corrected this by sending a correction letter stating that its actual indication was simply for "Non-24 hour sleep-wake disorder."

16.    The FDA clarified its position in a January 27, 2020 memo in response to a June 11, 2015 citizen petition to the FDA requesting, among other things, that the FDA change Hetlioz's indication to apply only to blind individuals without light perception. Letter from FDA, Janet Woodcock, M.D., to Elizabeth Bardehenn *et al*, Docket No. FDA-2015-P-2142 (Jan. 27, 2020).

17.    The FDA denied the petition. Although the FDA memo stated that "visual impairment is not a component of the [Non-24] diagnosis," it clarified that its basis for approving Hetlioz for sighted patients was primarily because "the drug would be effective in the closely related group of Non-24 patients with severe visual impairment who are not totally blind." *Id.* In other words, the FDA stated that the reason it granted Hetlioz an indication that included sighted

patients was, primarily, due to the fact that patients with severe visual impairment may also suffer from Non-24. The FDA concluded that "[g]iven the rare occurrence of Non-24 in sighted individuals, the broadening of the indication originally proposed by the applicant to include sighted and totally blind individual does not significantly expand the indicated population." *Id*. As of 2020, the FDA's position remained unchanged regarding the small population of people with Non-24, stating that it "is estimated that over half of totally blind individuals suffer from Non-24 and that approximately 100,000 people in the United States have the disorder." *Id.*

18.    As discussed below, Vanda has used fraudulent tactics to convince prescribers that their patients have Non-24, when they do not. In doing this, Vanda has expanded its potential patient population to over three million. Tellingly, Vanda is not targeting blind patients. Vanda is not targeting visually impaired patients. Rather, Vanda is targeting psychiatric patients with sleep issues, of which there are millions, and misleading their doctors into believing Non-24 is the same as other circadian rhythm disorders.

19.    Moreover, Vanda's CEO, Polymeropoulos, is a psychiatrist, and therefore keenly aware that such professionals were not trained on Non-24. Indeed, this is demonstrated by the fact that Vanda's promotional efforts for Hetlioz revolved around "educating" psychiatrists on the disease state of Non-24, using sales representatives with no real experience or training in Circadian Rhythm Sleep-Wake Disorders. If Vanda believed that psychiatrists sufficiently understood the condition and how to diagnose it, there would be no reason for it to attempt to educate them. But this was not the case, and Vanda preyed on their ignorance, costing the Government millions of dollars.

## JURISDICTION AND VENUE

20.    Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).

This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

21. The Court may exercise personal jurisdiction over the Defendant, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. § 3729 *et seq*., and complained of herein took place in part in this District and the Defendant transacted business in this District as described herein.

22. In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed in camera and will remain under seal for a period of at least 60 days and shall not be served on the Defendant until the Court so orders.

23. Pursuant to 31 U.S.C. § 3730(b)(2), Relator prepared and will serve the Complaint on the Attorney General of the United States, and the United States Attorney for the District of Columbia, as well as a statement of all material evidence and information currently in its possession and of which he is the original source. These statements are supported by material evidence known to the Relator at the time of filing, establishing the existence of Defendant's false claims. Because the statements include attorney-client communications and work product of Relator's attorneys, and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relator understands these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

24. Relator is not aware that the allegations in this Complaint have been publicly disclosed. Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures. In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" and has knowledge which is both direct and independent of any public disclosures to the extent they may exist.

## BACKGROUND

### *The False Claims Act*

25.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States.  Further clarifying amendments were adopted in May 2009 and March 2010.

26.     The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
>
> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;
>
> (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;
>
> (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil

9

penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

27.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74, Sec. 701, False Claims Act civil penalties were increased to a minimum of $10,781, and a maximum of $21,563, for violations occurring on or after November 2, 2015.  *See also* 28 C.F.R. § 85.5.

28.     Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard" or "in deliberate ignorance of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required."  31 U.S.C. § 3729(b)(1).

## SUBSTANTIVE ALLEGATIONS

## I.     Overview of Medicare and Its Benefits

29.     Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.

30.     Medicare Part D began January 1, 2006 and pays for prescription drug benefits for the elderly and disabled. 42 U.S.C. § 1395w-101 *et seq*.  All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D. HHS, through its component agency, CMS, contracts with private companies (or "sponsors") authorized to sell Part D insurance coverage. Such companies are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

31.     The Medicare Part D prescription drug benefit is offered by private prescriptions drug plans ("PDP") and Medicare Advantage  prescriptions drug plans. Medicare beneficiaries have a choice among many different plans in each state. Medicare reimburses the private plans for its coverage of Medicare beneficiaries.

32.     Medicare Part D requires all participants in the program – prescription drug plan ("PDP") sponsors, Pharmacy Benefit Managers ("PBM"), and pharmacies – to adhere to all federal laws and regulations, including those designed to prevent fraud, waste, and abuse. 42 C.F.R. § 423.505(h)(1).  Under CMS regulations, PDP sponsors' subcontracts with PBMs and pharmacies must contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(3)(v).

33.     The federal government's target is to pay 74.5% of the actual costs of basic prescription drug coverage (as defined at 42 U.S.C. § 1395w-1029(a)(3)).  42 U.S.C. § 1395w-115(a).  Rather than a straight reimbursement, however, the government uses economic incentives and disincentives to encourage both beneficiaries and Part D Plan sponsors to reduce costs.  42 U.S.C. § 1395w-115.

34.     For beneficiaries, the disincentives for running-up high drug expenditures include requiring them to pay certain amounts out-of-pocket (in the aggregate referred to as a beneficiary's True Out-Of-Pocket ("TrOOP")).  Those sums include:

    a) a beneficiary premium equal to 25.5% of the national weighted average plan bid, as adjusted (approximately $350), 42 U.S.C. § 1395w-113(a);

    b) a deductible defined as 100% of the first $250, as adjusted (although 90% of Part D Plans eliminate the deductible and use a tiered co-pay), 42 U.S.C. § 1395w-102(b)(1);

    c) thereafter a 25% copay on all costs up to the coverage gap, 42 U.S.C. § 1395w-102(b)(2);

d) 100% of costs between $2,250 and $3,600, as adjusted, 42 U.S.C. § 1395w-102(b)(3) & (4) (the "coverage gap" or "donut hole"); and

e) whereafter, the beneficiary enters the catastrophic coverage phase and only pays a copay of 5%, or $2 for a generic drug and $5 for any other drug. 42 U.S.C. § 1395w-102(b)(4)(A)(i).

35.     Because beneficiaries are required to pay a significant copay, and 100% of the cost of drugs while they are in the deductible and coverage gap phases of the program, Medicare Part D provides certain protections to beneficiaries.  For example, sponsors must make the negotiated prices available to beneficiaries regardless of what "phase" of the Part D benefit an enrollee is in (i.e., deductible, ordinary coverage, coverage gap or catastrophic coverage).  In addition, that negotiated price must also remain uniform within a particular pharmacy regardless of what phase of the program the beneficiary is in. Prescription Drug Benefit Manual, Ch. 5 "Benefits and Beneficiary Protections," § 20.6 ("the negotiated price for a particular covered Part D drug purchased at a particular pharmacy must always be the same regardless of what phase of the Part D benefit an enrollee is in").

36.     Another beneficiary protection is that, while they are in the deductible or coverage gap phases where they pay 100% of the costs, beneficiaries may avail themselves of a cash price that is better than their PDP's negotiated price if the pharmacy is offering a "'special' price or other discount for all customers, or if the beneficiary is using a discount card." Prescription Drug Benefit Manual, Ch. 14 "Coordination of Benefits," at 50.4.2.  If the beneficiary makes such a purchase outside of their plan, their expenditure will still count toward their TrOOP if they report it to their plan. *Id.*

37.     For Part D plan sponsors, the program is a quasi-free market model that uses a variety of incentives which are part of the structure of the program.  The starting point is that the program only pays the sponsor "interim payments . . . based on the Secretary's best estimate of

amounts that will be payable after obtaining all of the information." 42 U.S.C. § 1395w-115(d)(1).  In other words, Medicare Part D is not a capitated federal insurance program, but rather an actual cost program.  *Id.*; *see* 42 U.S.C. § 1395w-112(g) (prohibiting states from imposing premium taxes on Part D subsidy since, unlike Part C, the payments are not capitated premiums); *compare to* 42 U.S.C. § 1395w-114(c)(2) (expressly authorizing capitated payment only for those Part D beneficiaries in the lowest income tier who qualify for greater subsidy).

38.     In a nutshell, the sponsor submits a bid based on actuarial data estimating the actual cost of providing prescription drugs to its pool of beneficiaries.  The government then makes "interim payments" to the Sponsor on a monthly basis.  As an express condition of receiving those interim payments, the Sponsor is required to submit to the government truthful and complete data, including actual cost, for every prescription filled.  At the end of each year the government then compares its interim payments to the actual cost data, and determines whether the sponsor owes a refund to the government, or whether the government is required to pay more money in order to meet its subsidy target.  In order to further incentivize the Sponsor to keep costs down, however, the refund or additional payment is first subject to risk corridors which penalize the sponsor if actual costs exceed its bid, and reward the Sponsor if actual costs are below its bid. 42 U.S.C. § 1395w-115(e).  As a practical matter, these risk corridors would only slightly increase or decrease the total percentage paid by the government for each prescription.

39.     Medicare will not cover a drug for off-label use unless the drug is prescribed for a "medically accepted indication." 42 U.S.C. §1395w-102(e)(1)(B); *see also* Medicare Prescription Drug Benefit Manual, Ch. 6, Part D Drugs and Formulary Requirements, Section. 10.6.  An off-label use is not a "medically accepted indication" under Medicare unless the off-

label use is indicated in at least one of three compendia: the American Hospital Formulary Service-Drug Information, the United States Pharmacopoeia-Drug Information (or its successor publications), and the DRUGDEX Information System.[3]   42 U.S.C. §1395w-102(e)(4)(B); 42 U.S. Code § 1395x(t)(2)(B).   Further, under the Medicare statute, even if an off-label use is supported by a citation to one of the identified compendia, the off-label use is not eligible for reimbursement if such use has an adverse citation in another identified compendia. 42 U.S.C. § 1395x(t)(2)(B).

40.   Thus, according to the Medicare statute itself, when a drug is prescribed for an off-label use, it is a material condition of payment that such use appears in at least one of the three identified compendia as a "medically accepted indication."   At all relevant times, as discussed herein, the off-label uses for which Vanda promoted its drugs are not supported by the compendia and/or are not reasonable or necessary to treat the conditions for which Vanda promoted its drugs.

41.   In sum, Part D drug coverage excludes drugs not approved by the FDA, and those not for use for a medically accepted indication. At all relevant times herein, the costs of providing Fanapt and Hetlioz were not covered Medicare drugs where they were misbranded and/or prescribed off-label.

42.   Medicare eligible beneficiaries are also eligible to obtain drug coverage through Medicare Part C, also known as Medicare Advantage. Medicare Part C is not a separate benefit, but rather a provision that authorizes what is known as Medicare Advantage Plans offered by

---

[3]  The drug compendia are privately owned, written and published indices of various pharmaceuticals products.  For each product, a compendia includes  information about the product's pharmacologic and pharmacokinetic properties (such as adverse effects, and drug interactions) and the FDA-approved indications for that drug.   The compendia also, however, include information about studies of the product in diseases not approved by the FDA and not listed on the label (i.e., "off-label" uses).

private insurance companies that contract with Medicare to provide beneficiaries with coverage under Medicare Parts A (hospital) and B (physician & durable medical supplies), and, in most plans, Part D (drugs), along with enhanced benefits for an additional premium. Medicare Advantage Plans include Health Maintenance Organizations, Preferred Provider Organizations, Private Fee-for-Service Plans, Special Needs Plans, and Medicare Medical Savings Account Plans. If beneficiaries are enrolled in a Medicare Advantage Plan, most Medicare services are covered through the plan even though they might not be paid for under Original Medicare.

43.     Further, Medicare (as well as Medicaid and other Government Health Care Programs) only reimburses for "reasonable and necessary" medical services, including drugs. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1). That is, Medicare and other Government Health Care Programs only cover medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." *Id.* At all relevant times, prescriptions for Fanapt and Hetlioz for off-label uses and/or as a result of Defendant's false and misleading promotions were ineligible for Medicare reimbursement as they were not "reasonable and necessary" for the treatment of patients.

44.     As alleged, herein, Vanda engaged in a host of techniques designed to promote the use of its drugs for off-label uses that were not medically indicated and thus not covered by government healthcare programs.  Had the government known that Vanda was promoting its drugs for such uses, and that prescriptions purportedly covered by its health care programs were being written as a result of Vanda's off-label marketing thereof, it could not, and would not, have paid for those drugs as discussed in the below-referenced CMS guidance, for example.

**II.**     **Overview of Medicaid and Its Benefits**

45.     Medicaid is a joint federal-state program created in 1965 that provides health care

benefits for certain groups, primarily the poor and disabled.  The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

46.     The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary through CMS. 42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . . ." *See* 42. U.S.C. § 1396b(a)(1).  This federal-to-state payment is known as federal financial participation ("FFP").

47.     The States (and the District of Columbia) are required to implement a State Health Plan containing certain specified minimum criteria for coverage and payment of claims in order to qualify for Federal funds for Medicaid expenditures. 42 U.S.C. § 1396a(a)(30)(A). Benefits for drugs are optional, but all States, including those named herein, have opted to provide Medicaid drug reimbursement coverage.

48.     The Medicaid programs of all states reimburse for prescription drugs.  The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs.  Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter.  CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs

expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R.§ 430.30.

49.      Medicaid drug reimbursement coverage is limited to "covered outpatient drugs" which are drugs used for "a medically accepted indication." A "medically accepted indication" means any use or indication which is approved by the FDA or which is supported by one or more citations in certain drug compendia. *See* 42 U.S.C. § 1396r-8(k)(6) and (g)(1)(B)(i). The relevant drug compendia are: American Hospital Formulary Service (AHFS) Drug Information, United States Pharmacopeia-Drug Information (USP DI) (or its successor publications) and the DRUGDEX Information System. *See* 42 U.S.C. § 1396r-8(g)(1)(B)(i). At all relevant times, the cost of providing Fanapt and Hetlioz for off-label uses to Medicaid recipients was not covered by Medicaid because the off-label uses were neither approved by the FDA nor supported by one or more citations included in any of the specified drug compendia.

50.      Further, Medicaid (as well as Medicare and other Government Health Care Programs) only reimburses for "reasonable and necessary" medical services, including drugs. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1). That is, Medicaid and other Government Health Care Programs only cover medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." *Id*. At all relevant times, prescriptions for Fanapt and Hetlioz for off-label uses and/or as a result of Defendant's false and misleading promotions were ineligible for Medicaid reimbursement as they were not "reasonable and necessary" for the treatment of patients.

### III.    The TRICARE Program

51.    TRICARE, formerly known as CHAMPUS, is a managed health care program established by the Department of Defense. 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.

52.    The regulatory authority establishing the TRICARE program does not cover drugs not approved by the FDA. *See* 32 C.F.R. § 199.4(g)(15)(i)(A). TRICARE does not cover drugs used for off-label indications unless such off-label use is proven medically necessary and safe and effective by medical literature, national organizations, or technology assessment bodies. *See* 32 C.F.R. § 199.4(g)(15)(i)(A)(Note).

### IV.    The Federal Employee Health Benefits Program

53.    The Federal Employees Health Benefits Program ("FEHBP") is a federally funded health care program established by Congress in 1959, pursuant to the Federal Employees Benefits Act, 5 U.S.C.§ 8901 *et seq*.  It provides health insurance coverage for nearly 8.7 million federal employees, retirees and their dependents.

54.    The United States Office of Personnel Management ("OPM") administers and manages the FEHBP and contracts with various health insurance carriers, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, Mail Handlers Benefit Plan and Rural Carrier Benefit Plan, to provide services to FEHBP members, collectively paying billions annually in medical benefits and reimbursements.

55.    The OPM also administers funds for the FEHBP, which are maintained in the Employees Benefits Fund. The Employees Benefit Fund is held and invested by the United States Treasury and is the source of all payments to insurance carriers for services rendered to

FEHBP members.

56.     During the relevant time period, the benefit plans for the major FEHBP insurance carriers specifically provided that they did not cover services, drugs, or supplies that are not medically necessary.  Benefits under the FEHBP are payable only when medically necessary to prevent, diagnose or treat an illness, disease, injury, or condition.

57.     As a result of Vanda's illegal marketing scheme, non-reimbursable claims have been submitted to and paid by the FEHBP.

58.     Each off-label and medically unnecessary claim that Vanda caused to be submitted to the FEHBP for reimbursement constitute a false claim for which the Company is liable under the Federal FCA and its state counterparts.

59.     Vanda submitted off-label, false claims to FEHBPs.  According to internal documents, Fanapt was covered at least by the following FEBHP plans: (a) UPMC Health Plan FEHBP; (b) UnitedHealthcare Plan of the River Valley FEHBP; (c) Health Alliance Medical Plans IL FEHBP; and (d) Optima Health Plan FEHBP.

**V.      The United States Food, Drug, and Cosmetic Act**

60.     The FDA regulates the manufacture, sale, and distribution of drugs and devices in the United States under the authority of the United States Food, Drug and Cosmetic Act ("FDCA"). The FDCA establishes the framework for regulation of, *inter alia*, the sales and marketing activities of pharmaceutical manufacturers in the United States.  This authority includes oversight of promotional labeling and advertising for prescription drugs and restricted devices.  21 U.S.C. § 502.

61.     The FDA regulates drugs based on the "intended uses" for such products. Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the

product is safe and effective for each intended use. 21 U.S.C. § 331(d); 21 U.S.C. §§ 355(a), 360b(a).

62.     The FDA reviews pharmaceutical manufacturers' applications for new drugs to determine whether the drugs are safe and effective for each intended use. *See* 21 U.S.C. § 355.

63.     Once a drug is approved for a particular use, doctors may legally prescribe the drug for any "non-indicated" or off-label purpose. Doctors may independently request information from drug manufacturers about such off-label uses. But with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting drugs for uses (i.e., indications) not explicitly approved by the FDA.

64.     Under the statute, qualified medical professionals may provide purely scientific medical information for uses other than those approved by the FDA; all other presentations, promotions and marketing to physicians for uses other than those approved by the FDA are considered off-label marketing or "misbranding" proscribed by the FDCA. *See* 21 U.S.C. §§ 331(a)-(b), 352(a), (f). This includes any attempts by a pharmaceutical sales representative to initiate discussions with, or solicit questions from, physicians concerning off-label use.

65.     Strong policy reasons exist for strict regulation of off-label marketing. Off-label promotion bypasses the FDA's strict review and approval process. It also removes the incentive to obtain definitive clinical study data showing the efficacy and safety of a product and, accordingly, the medical necessity for its use.

66.     Pursuant to the FDCA, 21 U.S.C. § 301, *et seq*., the FDA strictly regulates the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies to market and sell FDA-approved prescription drugs.

67.     The FDCA defines "label" to mean "a display of written, printed, or graphic

matter upon the immediate container of any article . . . ." 21 U.S.C. § 321(k).  "Labeling" means "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).  For a prescription drug or device to comply with the FDCA's requirement of adequate directions for use, its labeling must contain, among other things, information addressing product hazards and other risk information, as specified in FDA regulations.  21 C.F.R. §§ 201.100(d)(1) & (3) and 801.109(d).

68.     The FDA regulations deem "advertising" to include any media-based activities that appear in magazines, newspapers, professional journals and on television, radio, and telephone communications systems. *See* 21 C.F.R. § 202.1(l)(1). Courts have consistently held that oral statements made by a company's sales representative relating to a pharmaceutical product constitute commercial advertising or promotion.

69.     The FDCA also subjects advertising for prescription drugs and restricted devices to the disclosure of risk and other informational requirements.  Advertisements for prescription drugs must include, among other things, "information in brief summary relating to side effects, contraindications, and effectiveness," as specified in FDA regulations.  21 U.S.C. § 352(n). Advertisements for restricted devices must include "a brief statement of the intended uses of the device and relevant warnings, precautions, side effects, and contraindications . . . ."  21 U.S.C. § 352(r).  Both prescription drug and restricted device advertisements also must not be false or misleading.  21 U.S.C. § 352(q)(1) & 321(n); 21 C.F.R. § 202.1(e)(5).

70.     The FDCA defines both misleading statements and the omission of material facts in a label or product labeling as "misbranding." 21 U.S.C. § 321(n). Labeling includes brochures, booklets, detailing pieces, literature, medical reprints, sound recordings, exhibits and audio

visual material. 21 C.F.R. § 202.1 (l), (2).

71.     Pharmaceutical promotional and marketing materials and presentations lacking in fair balance or that are otherwise false or misleading "misbrand" a drug in violation of the FDCA, 21 U.S.C. §§ 301, 321, 331, 352, 360b, 371; 21 C.F.R. §§ 202.1(e)(6), (e)(7); 21 C.F.R. § 1.21.

72.     Such violations exist where promotional and marketing materials and presentations for an FDA approved drug:

- Minimize, understate, or misrepresent the risks, contra-indications, and complications associated with that drug;

- Overstate or misrepresent the risks, contra-indications, and complications associated with any competing drugs;

- Reference "off-label" uses of the drug — i.e., those uses that have not been approved by the FDA — or expressly or implicitly promote uses and/or dosing regimens for which the drug is not indicated;

- Fail to reveal facts material in light of its representations or material with respect to consequences that may result from the use of the drug as recommended or suggested in the advertisement;

- Contain representations or suggestions, not approved or permitted in the labeling, that is not demonstrated by substantial evidence or substantial clinical experience;

- Present information from a study in a way that implies that the study represents larger or more general experience with the drug than it actually does;

- Use a quote or paraphrase out of context to convey a false or misleading idea; or

- Are otherwise false, misleading or lacking in fair balance in the presentation of

information about the drug being marketed or about any competing drug.

*See* 21 C.F.R. §§ 202.1 (e)(4)(5)(6), (7)

73.     Oral statements and written materials provide evidence of a product's intended use. If these statements or materials promote a use inconsistent with the product's FDA-approved labeling, the product is necessarily misbranded as it fails to provide adequate directions for all intended (i.e. approved) uses.

74.     Disease awareness communications are communications disseminated to consumers or health care practitioners that discuss a particular disease or health condition, but do not mention any specific drug or device or make any representation or suggestion concerning a particular drug or device. FDA Guidance for Industry (draft guidance), *"Help-Seeking" and Other Disease Awareness Communications by or on Behalf of Drug and Device Firms* (January 2004).[4]   Help-seeking communications are disease awareness communications directed at consumers. *Id.*

75.     Help-seeking and disease awareness communications constitute neither labeling nor advertising.   *Id.*   Therefore, help-seeking and disease awareness communications are not subject to the disclosure of risk information and other requirements for labeling and advertisement communications under the FDCA.   *Id.*

76.     The FDA will treat as a disease awareness communication any communications by or on behalf of a manufacturer, distributor, or retailer of a drug or device that:

       i.   discuss a disease or health condition;

---

[4] On May 6, 2015, the FDA announced that it was withdrawing the draft guidance.  *See* 80 Fed. Reg. 26059.  Thus, pharmaceutical manufacturers can now rely on two previously released industry policy guidance releases: Clarification of Policy on Institutional, Corporate, or Health Message Advertising (September 1985) and Institutional/Disease-oriented Advertisements (June 3, 1988).

ii.  if consumer-directed, advise the audience to "see your doctor" for possible diagnosis and/or treatment;

iii.  if aimed at health care practitioners, encourage awareness of signs of the particular disease or health condition, or otherwise provide information to assist in the diagnosis of the particular disease or health condition;

iv.  do not mention a particular drug or device; and

v.  do not include any representation or suggestion relating to a particular drug or device.

*Id.*

77.    When a disease awareness communication is presented in a combination with a product promotion communication, in a way that causes the audience to perceive the two pieces as an advertisement or promotional labeling piece, a disease awareness communication may be treated by the FDA as labeling or advertising.  *Id.*  For example, a purported disease awareness communication disseminated by or on behalf of a drug manufacturer can be subject to the FDA's labeling or advertising requirements if it mentions a specific drug or contains a representation or suggestion concerning a specific drug or device.  *Id.*

78.    In determining whether a disease awareness communication and promotional communication were disseminated in such a way as to trigger the FDA's advertising or labeling requirements, the FDA focuses on how the audience is likely to perceive the communication. Specifically, the FDA has stated that:

a supposed disease awareness communication could be properly treated as advertising or promotional labeling if presented in combination with a product claim advertisement or promotional labeling piece in a manner that causes the pieces' messages to be linked together by the audience. In such a case, the combined communication would also communicate a particular product's indication and efficacy for a certain medical condition. If the combined communication does not comply with the act and FDA's advertising or labeling regulations, the communication would cause the promoted product to be misbranded.

*Id.*; *see also* Enforcement Letter From FDA's Division of Drug Marketing, Advertising, and Communications to Schering Corp.  (Aug. 18, 2000)[5] (finding that two advertisements, a help seeking advertisement and a reminder advertisement, which immediately followed each other in a magazine, converted the entire presentation into one full product advertisement, subject to the FDA's regulations); FDA Guidance for Industry, *Distributing Scientific and Medical Publications on Unapproved New Uses – Recommended Practices* (February 2014) (stating that scientific or medical journal articles, reference texts and clinical practice guidelines ("CPG") provided by pharmaceutical manufacturers to health care professionals should be distributed "separately from the delivery of information that is promotional in nature.  For example, if a sales representative delivers a CPG to a physician in his or her office, the CPG should not be attached to any promotional material the sales representative uses or delivers during the office visit.  To the extent that the recipients of the CPG have questions, the sales representative should refer the questions to a medical/scientific officer or department, *and the officer or department to which the referral is made should be independent of the sales and/or marketing departments*." (emphasis added)).

79.     Moreover, the FDA has identified two factors which it examines when determining whether two communications together qualify as promotional labeling or advertising.  The two factors are: (1) Are the pieces perceptually distinct in use of graphic, visual, thematic, or other presentation elements; and (2) Are the pieces presented in close physical or temporal proximity?  *Id.*

80.     Of these two factors, the FDA considers the determinant factor to be whether the

---

[5]     *Available     at*     http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatory Information/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharma ceuticalCompanies/UCM166052.pdf

pieces are perceptually distinct.   In addressing this factor, the FDA recommended that manufacturers:

> ensure that their disease awareness communications and reminder promotional pieces or product claim promotional pieces are sufficiently distinctive in terms of their thematic, graphic, visual and other presentation elements so that they will not be perceived as a single promotional piece that includes both a product name and a use, and is thus subject to the requirements for "labeling" or "advertising" mandated by the act and regulations.

*"Help-Seeking" and Other Disease Awareness Communications by or on Behalf of Drug and Device Firms* (January 2004).

## VI.   Medicare and Medicaid Coverage of Off-Label Prescriptions

81.     As discussed above, Medicare and Medicaid will not cover a drug for off-label use unless the drug is prescribed for a "medically accepted indication." 42 U.S.C. §1395w-102(e)(1)(B); *see also* Medicare Prescription Drug Benefit Manual, Ch. 6, Part D Drugs and Formulary Requirements, Section. 10.6.

82.     The reimbursement criteria determined by Congress makes sense as the FDA comprehensively reviews pharmaceutical manufacturers' detailed applications for new drugs to determine whether the drugs are safe and effective for each intended use. 21 U.S.C. § 355. Indeed, Congress requires Medicare and Medicaid to only pay for prescription drugs that are safe and effective for their prescribed use.

83.     The off-label promotion of drugs for indications that are not medically accepted is so material to CMS that it even publishes on its website an "Off-Label Pharmaceutical Marketing: How to Recognize and Report It" fact sheet.[6]   Therein, CMS states:

> Unlawful off-label drug promotion has been the subject of significant health care fraud enforcement efforts by the United States Department of Justice (DOJ) and the States' attorneys general using the Federal False Claims Act (FCA). The

---

[6]     *See*    https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/off-label-marketing-factsheet.pdf (retrieved on June 4, 2020).

theory underlying these efforts is that, by promoting off-label uses that are not medically accepted, the manufacturers caused pharmacies to claim Medicaid payment for drugs used in ways that are not covered by Medicaid. Most, if not all, State Medicaid programs exclude coverage for drugs that are used for off-label indications that are not medically accepted. Such use can waste Medicaid funds on ineffective treatments.

84.     CMS further states, *inter alia,* that "despite U.S. Food and Drug Administration (FDA) restrictions on off-label marketing, some pharmaceutical manufacturers have engaged in extensive efforts to market drugs for off-label uses, including uses that are not medically accepted." *Id.*  Among some of the techniques identified as impermissible by CMS, and most relevant to the instant case, include the dissemination of misleading information promoting off-label use to practitioners and giving advice to prescribers on how to code their claims and document their medical records to support payment for off-label uses.  *Id.*

85.     As alleged, herein, Vanda engaged in a host of techniques designed to promote the use of its drugs for off-label uses that were not medically indicated and thus not covered by government healthcare programs.  Had the government known that Vanda was promoting its drugs for such uses, and that prescriptions purportedly covered by its health care programs were being written as a result of Vanda's off-label marketing thereof, it could not, and would not, have paid for those drugs.

86.     Indeed, the prescribed use of a drug is material to the Government's payment decision under Government funded healthcare programs. The regulatory structure for Medicare and Medicaid, described herein, does not merely set rules that condition payment, but instead categorically excludes from coverage drugs that are not prescribed for a medically accepted indication. Further, it is material to the Government's payment decision that items and services be medically reasonable and necessary to qualify for reimbursement under Government healthcare programs. Goods and services, including pharmaceuticals, are not reimbursable if they

28

are not reasonable and necessary.

87.     The uses Vanda promoted Hetlioz and Fanapt for were not their medically accepted indications. This is material to the Government's decision to pay. Had Government funded healthcare programs known these claims were not prescribed for their medically accepted indication, they would not have reimbursed such claims. Vanda's promotional efforts, as discussed herein, also resulted in claims for Fanapt and Hetlioz that were not medically reasonable or necessary. This is material to the Government's decision to pay. Had Government funded healthcare programs known that these prescriptions were not medically reasonable or necessary, they would not have paid such claims.

88.     That such conduct is material is demonstrated by the fact that the Government consistently refuses to pay claims for pharmaceuticals prescribed for a use which is not a "medically accepted indication" and has signaled no change in this long-standing position.  That the Government does not pay such off-label claims is evident from even a cursory glance at recent enforcement actions by the Department of Justice, pursuant to the FCA, and CMS's directives concerning this issue, particularly where, as here, the off-label scheming targets the vulnerable mental health seeking population.  *See* Ex. A, DOJ Press Release *Johnson & Johnson to Pay More Than $2.2 Billion to Resolve Criminal and Civil Investigations* (Nov. 4, 2013) (recovery under FCA and state FCAs due to false claims submitted to Medicare, Medicaid, Tricare and other programs for off-label promotion of pharmaceuticals), available at https://www.justice.gov/opa/pr/johnson-johnson-pay-more-22-billion-resolve-criminal-and-civil-investigations (last accessed June 9, 2020);  Ex. B, DOJ Press Release *Abbott Labs to Pay $1.5 Billion to Resolve Criminal & Civil Investigations of Off-label Promotion of Depakote* (May 7, 2012) (recovery under FCA and state FCAs due to false claims submitted to Medicare, Medicaid,

TRICARE, the FEHBP, and other programs), available at https://www.justice.gov/opa/pr/abbott-labs-pay-15-billion-resolve-criminal-civil-investigations-label-promotion-depakote (last accessed June 9, 2020);  Ex. C, DOJ Press Release *Pharmaceutical Giant AstraZeneca to Pay $520 Million for Off-label Drug Marketing* (Apr. 27, 2010) (recovery under FCA and state FCAs due to false claims submitted to Medicare, Medicaid, TRICARE, the FEHBP, Bureau of Prisons and other programs), available at https://www.justice.gov/opa/pr/pharmaceutical-giant-astrazeneca-pay-520-million-label-drug-marketing (last accessed June 9, 2020); Ex. D, DOJ Press Release *Eli Lilly and Company Agrees to Pay $1.415 Billion to Resolve Allegations of Off-label Promotion of Zyprexa* (Jan. 15, 2009) (recovery under FCA and state FCAs due to false claims submitted to Medicare, Medicaid, TRICARE and the FEHBP), available at https://www.justice.gov/archive/opa/pr/2009/January/09-civ-038.html  (last accessed June 9, 2020).

89.     Nor does the Government ignore off-label marketing schemes affecting those seeking treatment for non-mental health conditions. *See, e.g.* Ex. E, DOJ Press Release, *Abbott Laboratories and AbbVie Inc. to Pay $25 Million to Resolve False Claims Act Allegations of Kickbacks and Off-Label Marketing of the Drug TriCor* (Oct. 28, 2018) (recovery under FCA and state FCAs due to false claims submitted to Medicare and Medicaid), available at https://www.justice.gov/usao-edpa/pr/abbott-laboratories-and-abbvie-inc-pay-25-million-resolve-false-claims-act-allegations (last accessed June 9, 2020); Ex. F, DOJ Press Release, *Novo Nordisk Agrees to Pay $58 Million for Failure to Comply with FDA-Mandated Risk Program*, (Sept. 5, 2017) (recovery under FCA and state FCAs due to false claims submitted to Medicare and Medicaid due, in part, to "encouraging the sale to and use of Victoza by adult patients who did not have Type II diabetes. The Food and Drug Administration (FDA) has not approved

Victoza as safe and effective for use by adult patients who do not have Type II diabetes."),

available at https://www.justice.gov/opa/pr/novo-nordisk-agrees-pay-58-million-failure-comply-

fda-mandated-risk-program (last accessed June 9, 2020); Ex. G, New York Attorney General's

Office Press Release *A.G. Schneiderman Announces $6 Million Settlement With Illinois-Based*

*Inspire Pharmaceuticals For Illegal Off Label Marketing* (June 18, 2015) (recovery under FCA

and state FCAs due to false claims submitted to New York's Medicaid program), available at

http://www.ag.ny.gov/press-release/ag-schneiderman-announces-6-million-settlement-illinois-

based-inspire-pharmaceuticals (last accessed June 9, 2020); Ex. H, DOJ Press Release

*Boehringer Ingelheim Pharmaceuticals, Inc. To Pay $95 Million To Resolve Off-Label*

*Promotion And Kickback Allegations* (Oct. 25, 2012) (recovery under FCA and state FCAs due

to false claims submitted to Medicare and Medicaid), *available at*

https://www.justice.gov/archive/usao/md/news/2012/BoehringerIngelheimtoPay95MilliontoReso

lveOff-labelPromotionandKickbackAllegations.html (last accessed June 9, 2020); Ex. I, DOJ

Press Release *Novartis Pharmaceuticals Corp. to Pay More Than $420 Million to Resolve Off-*

*label Promotion and Kickback Allegations* (Sept. 30, 2010) (recovery under FCA and state FCAs

due to false claims submitted to Medicare and Medicaid), available at

https://www.justice.gov/opa/pr/novartis-pharmaceuticals-corp-pay-more-420-million-resolve-

label-promotion-and-kickback (last accessed June 9, 2020).

     90.    Off-label marketing is of such great concern to the Government that, since at least

October 2015, CMS has sought to involve the general population in fighting it.  *See* Ex. J, CMS

Publication *Off Label Pharmaceutical Marketing: How to Recognize and Report It*, available at

https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-

Education/Downloads/off-label-marketing-factsheet.pdf (last accessed June 9, 2020).

91.     Even outside the FCA context, State Attorney Generals have pursued consumer protection lawsuits, following a successful action for false claims submitted to Medicaid, based on the exact same off-label marketing alleged herein. Ex. K, PA AG Press Release, *Attorney General Josh Shapiro and 50 AGs Reach $13.5M Settlement with Pharmaceutical Company for Misleading Marketing of Four Drugs* (Dec. 20, 2017) ("'Consumers, particularly senior citizens, rely on doctors and drug manufacturers to provide accurate information about the risks and benefits of prescription drugs,' said Attorney General Shapiro. 'When a company misrepresents the benefit of a drug, it can cause real harm to consumers . . . .'"), available at https://www.attorneygeneral.gov/taking-action/press-releases/attorney-general-josh-shapiro-and-50-ags-reach-13-5m-settlement-with-pharmaceutical-company-for-misleading-marketing-of-four-drugs/ (last accessed June 8, 2020).

92.     At all relevant times, as discussed herein, the off-label uses for which Vanda promoted its drugs are not supported by the compendia and/or are not reasonable or necessary to treat the conditions for which Vanda promoted its drugs.

## VII.     The Medically Reasonable and Necessary Requirement

93.     All Government Healthcare Programs, including Medicare, Medicaid, Tricare, and FEHBP, will not reimburse for goods, including pharmaceuticals, that "are not **reasonable** and **necessary** for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]" 42 U.S.C. § 1395y(a)(1)(A) (emphasis added).

94.     Tricare will similarly only "pay for medically or psychologically necessary services and supplies required in the diagnosis and treatment of illness or injury[.]" 32 C.F.R. § 199.4(a)(1)(i).

95.     CMS defines reasonable and necessary to mean that the item is (1) safe and

effective (2) not experimental or investigational; and (3) Appropriate, including the duration and frequency that is considered appropriate for the item or service, in terms of whether it is:

- Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;

- Furnished in a setting appropriate to the patient's medical needs and condition;

- Ordered and furnished by qualified personnel;

- One that meets, but does not exceed, the patient's medical need; and

- At least as beneficial as an existing and available medically appropriate alternative.

Medicare Program Integrity Manual, Ch. 13, Section 13.5.4.

96.     At all relevant times, as discussed herein, Vanda's illegal marketing and promotion caused the submission of false claims, that were not medically reasonable and necessary, to be submitted to Government funded healthcare programs, in violation of the FCA.

**VIII.   <u>False Certifications Under Government Healthcare Programs</u>**

97.     While each government-funded healthcare program establishes its  own reimbursement criteria, none knowingly pay for medications that are not prescribed for a medically accepted indication or that are prescribed as a result of false or misleading information  disseminated  by   pharmaceutical    manufacturers to    either  payors or healthcare providers.   In addition, none of government-funded healthcare programs reimburse for drugs that are not medically "reasonable and necessary."

98.     Prescriptions covered by Medicare, Medicaid, Tricare, and other federal health care programs are subject to an express certification requirement that they are medically necessary.  *See, e.g.*, 42 U.S.C. § 1395y(a)(1)(A) ("no payment may be made under part A or

part B of this subchapter for any expenses incurred for items or services. . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member"); 42 U.S.C. §1395w-102(e)(1)(B) (covered drugs under Part D must be written for a "medically accepted indication.").  In other words, Medicare and other federal health care programs only cover drugs and medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury."

99.     To be reimbursed by Medicare, Medicaid, Tricare, and other federal health care programs like Medicaid, providers complete a copy of CMS Form 1500 (or its electronic or state-specific equivalent, if extant).  CMS Form 1500 expressly states that the physician or supplier, by their signature, is expressly certifying, *inter alia*, that: (i) "this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment,"; (ii) "the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE"; and (iii) "I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction."

100.     Thus, each time a claim for payment is submitted to a Federal healthcare program, the provider is certifying that the services performed were medically necessary or that the drugs prescribed are "covered outpatient drugs" under Medicaid programs.  *See* 42 C.F.R. 447.502 (expressly excluding from coverage "a drug or biological used for a medical indication which is

not a medically accepted indication").[7]

101.    The failure to comply with the foregoing – including "all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment" or the inclusion of false information on CMS Form 1500 – renders a claim for payment false under the FCA.

## IX.    The California & Illinois Insurance Fraud Prevention Acts

102.    While the federal and state FCA statutes protect *public* insurance entities from fraud, California and Illinois are unique in permitting whistleblowers to bring a *qui tam* action against any person or company that defrauds private insurance companies and share in the recovery.  *See* CIPFA, Cal. Ins. Code §§ 1871 *et seq.*; ICFPA, 740 I.L.C.S §§ 92/1 *et seq.*

103.    Rather than bringing the case on behalf of the government and fellow taxpayers, a CIPFA or ICFPA relator brings the case on behalf of the government *and* the relevant private insurance companies' policyholders.

## X.    Defendant's Fraudulent Conduct

### A.    False Claims Act Violations

104.    Defendant has, since at least November 2015, engaged in a scheme to promote its drugs Fanapt and Hetlioz for off-label uses, in addition to several other prohibited promotional strategies.   Specifically, Defendant: (1) promoted Fanapt for uses outside of treating schizophrenia, the drug's sole indication; (2) promoted Fanapt off-label to pediatric patients; (3) overstated Fanapt's efficacy to providers; (4) made false and misleading statements regarding Fanapt's safety warnings; (5) misled providers about Fanapt's approved dosing schedule; (6)

---

[7] As discussed above, the phrase "medically accepted indication" includes only those indications approved by the FDA, and those "off-label" uses that are "supported by one or more citations included or approved for inclusion in any of the compendia" listed in the statute. 42 U.S.C. § 1396r-8(k)(6); *see also* 42 U.S.C. § 1396r-8(g)(1)(B)(i) (identifying the compendia to be consulted). The existence of a "medically accepted indication" is a precondition of payment of claims for drug treatment by the government under both Medicare and Medicaid.

improperly provided titration packets which did not have adequate instructions for use; (7) promoted Fanapt as a first line therapy; (8) misused Fanapt copay cards; (9) misled doctors on the diagnosis criteria for Non-24; and (10) promoted Hetlioz for off-label uses. These prescriptions were reimbursed by federal health care programs, including Medicare, Medicaid and Tricare, and therefore were issued in violation of the FCA.  As a result of Defendant's misconduct, the Government has been defrauded and suffered a substantial loss.

105.    Relator's allegations are also confirmed by Jeff Bourgeois ("JB").  JB was an RBL at Vanda from November 2015 until June 2018, where he managed the Vanda sales representatives in his territory promoting Fanapt and Hetlioz. When JB was hired, his territory consisted of Louisiana, Arkansas, and Texas. However, in early 2017, JB's territory was changed to Texas and Oklahoma. JB has over 20 years' experience in the pharmaceutical sales industry, including over 15 years selling psychiatric medications.

106.    On February 11, 2019, Aurelius Value ("Aurelius"), issued a report on Vanda's sales promotions which corroborate many of Relator's allegations contained herein.[8] Aurelius is a firm that specializes in researching publicly traded companies "that are deceiving investors, engaging in fraud, or misrepresenting their business in some fashion."[9]  The report specifically referenced Relator's original complaint, stating:

> These new allegations amplify the findings from our own months long

---

[8] *See* Vanda: In the Land of The Blind, The One-Eyed Man is King, *available at* http://www.aureliusvalue.com/research/vanda-in-the-land-of-the-blind-the-one-eyed-man-is-king.

[9] Aurelius' website is Aureliusvalue.com. According to its website, its business is described as follows "Aurelius Value is committed to conducting extremely thorough due diligence into publicly traded companies. We are particularly interested in companies that are deceiving investors, engaging in fraud, or misrepresenting their business in some fashion. Our research process combines forensic, fundamental, and investigative fact patterns to develop research insights that are not widely understood."

investigation which yielded evidence of significant irregularities. They also corroborate certain allegations made by multiple former employees in private calls who described off-label promotion, suspect business practices, and internal turmoil that continued well after the whistleblower's departure

**B.    Overview of Antipsychotic Medication Use by Medicare Beneficiaries**

107.    In the United States, antipsychotic drug treatments are a protected class. According to the Council on Behavioral Health, in 2005, CMS directed that Part D formularies include all or substantially all drugs in six drug classes, including: antidepressant; antipsychotic; anticonvulsant; immunosuppressant (to prevent rejection of organ transplants); antiretroviral (for the treatment of infection by retroviruses, primarily human immunodeficiency virus (HIV)); and antineoplastic. The Medicare Improvements for Patients and Providers Act created the six protected classes and the Affordable Care Act also defined them by name. Today, Medicare Part D plans must carry "all or substantially all" of the chemically distinct drugs in these categories on their formularies. For other categories, the plans can typically carry one brand-name drug and one generic drug.

108.    Millions of people with mental illness rely on Medicare as a health and economic lifeline. About 26% of all Medicare beneficiaries (more than 13 million Americans) experience some mental disorder every year. Severe mental illness, including bi-polar disorder or schizophrenia, is especially prevalent among beneficiaries who are under 65 and eligible for Medicare based on their disability. Approximately 37% of all disabled Medicare beneficiaries have a severe mental disorder. In addition, mood disorders were the second leading cause of disability in 2011. SSA Publication No. 13-11827, P. 25, Table 6 (Sept. 2012).[10] Further, 56% of all Medicare inpatient psychiatric facility patients are dually eligible.  MedPAC.[11]

---

[10] *Available at* https://www.ssa.gov/policy/docs/statcomps/ssi_asr/2011/ssi_asr11.pdf.

[11] *Available at* http://www.medpac.gov/transcripts/IPF presentation--October 2011--final.pdf.

109.    Dually eligible beneficiaries – those with both Medicare and Medicaid – are more likely to have cognitive impairments and mental disorders than people who have only Medicare coverage. Further, more than half of all dual eligible beneficiaries have mental or cognitive impairments. The Kaiser Family Foundation, *Medicare's Role for Dual Eligible Beneficiaries* (April 4, 2012).[12]

**C.    Background Information**

110.    Relator started working for Defendant on November 16, 2015 as an RBL for the mid-west region.  Relator was one of five RBLs hired by Defendant, and they were responsible for Fanapt's relaunch scheduled for November 20, 2015.  The RBLs were responsible for managing Vanda's Fanapt sales force, which consisted of fifty independent contractor sales representatives, hired through a third-party marketing agreement between Defendant and Publicis Touchpoint Solutions ("Publicis").

111.    Relator and the other RBLs attended training at Vanda's headquarters in Washington, D.C. from November 16, 2015 to November 20, 2015.  According to Relator and JB, during this training, Vanda did not provide the RBLs with any product specific information. Rather, this training was primarily focused on familiarizing the RBLs with Publicis and their representatives, as well as other corporate administrative issues such as year-end reviews. Following this training, the RBLs were sent home on November 23, 2015, and shortly thereafter were provided with a binder containing Fanapt product information.

112.    Twelve of the sales representatives, known as the Fanapt 12, had been selling Fanapt since December 2014 in the New York City, New York, and St. Louis, Missouri areas. The Fanapt 12 were primarily managed by David James ("James"), Vanda's National Sales

---

[12] *Available at* http://www.kff.org/medicare/upload/8138-02.pdf.

Director, and Paul Ramirez ("Ramirez"), Defendant's Head of Sales. The other thirty-eight sales representatives were hired around the same time as Relator. The sales representatives, RBLs, and senior management attended a five-day national relaunch meeting in late November/early December 2015 at the Fairmount Hotel in Washington, D.C.

113.   The Fanapt 12 were universally praised by Defendant's senior management. They were viewed as "experts" at selling Fanapt because they had been selling the drug for eleven months before the other sales representatives were hired, and therefore had real-life experience promoting the drug to providers.  Vanda senior management even stated to the other sales representatives that they should thank the Fanapt 12 for their jobs because their success in selling the drug was the main factor which convinced senior management to hire additional sales representatives.

114.   Fanapt sales training consisted of home study followed by a Fanapt national sales training held at the Fairmount Hotel in Washington, D.C. from November 30, 2015 to December 4, 2015.  The sales training was conducted by senior management and a team of six Medical Science Liaisons, who were managed by Dewey McLin, Defendant's Director of Medical Affairs.  During training, sales representatives participated in training workshops, listened to guest speakers, and became certified to sell Fanapt by conducting a sales call "detail" role-play in front of the RBLs. The RBLs were not invited to attend the full National Sales Training meeting but were required to attend the last two days of the meeting where they conducted role-play certification for the newly hired sales representatives.  Significantly, RBLs were expected to certify sales representatives at training.  However, as stated above, the RBLs were not provided any Fanapt product information until days before they were supposed to certify the sales representatives. Relator even commented to Vanda management that he could not get through all

the Fanapt material in time to certify the sales representatives. Vanda senior management simply instructed him to "do his best."  Thus, Vanda tasked its RBLs, who only had a few days to review information specific to Fanapt, to certify its sales representatives to sell the drug in the field.

115.    The diagram below depicts Vanda's Fanapt corporate structure:



### D.    **Defendant Promoted Fanapt for Off-Label Uses**

116.    As discussed above, Fanapt was approved by the FDA solely to treat adult schizophrenia patients.   This limited indication severely decreased the potential patient population that could be prescribed Fanapt on-label, especially compared to its competitors' antipsychotic drugs with more expansive indications.   This is also confirmed by the Aurelius Report which states "One former top-performing sales employee we spoke to explained that Fanapt, which accounts for just over 40% of Vanda's sales, 'was a dud' because it was a second line drug approved solely to treat adult schizophrenia as compared to competitive antipsychotics which have much broader indications." JB corroborates this. According to JB, schizophrenia accounted for a very small percentage of the market for anti-psychotic drugs, which he estimated at about 3% of the market. Therefore, due to Fanapt's sole indication and other issues, increasing Fanapt sales by 2%, as Vanda management required from sales representatives, was impossible to do if promoting the drug on-label.

117.    To overcome this obstacle, Vanda senior management implemented a plan to promote the drug for off-label uses, mainly bi-polar disorder and other conditions treated by competitors' antipsychotic medications. The training, provider targets and compensation, among other things Vanda provided to its sales force, were all designed to secure off-label Fanapt prescriptions.

118.    Specifically, and as discussed in more detail below, Vanda trained its sales force to market Fanapt to providers as an effective substitute for other atypical antipsychotics that have more expansive indications and are commonly prescribed for bipolar disorder rather than schizophrenia. After convincing a provider that Fanapt was an effective substitute for other atypical antipsychotics, regardless of the condition it was prescribed to treat, Fanapt sales representatives were trained to differentiate the drug from other antipsychotics by promoting

41

Fanapt's safety profile. Significantly, during their sales pitch, sales representatives were trained to avoid any discussion of schizophrenia, and if brought up by the provider, to steer the conversation back to Fanapt's efficacy and safety profile messaging. Further, the sales goals, physician target lists and incentive compensation plans all demonstrate that Vanda intended its sales representatives to promote Fanapt off-label.

119.    Vanda was aware that the providers its sales representatives targeted were primarily prescribing atypical antipsychotics for bipolar disorder and conditions other than schizophrenia.  Vanda was also aware that a significant portion of the prescriptions secured by its sales force were for off-label uses. For example, RBL JB states that in his more than two years at Vanda, there was not a single day, for the entire time he was working there that he did not have a doctor tell him either that they do not treat schizophrenia patients or that they were prescribing Fanapt off-label. However, this was Vanda's intended result – to promote Fanapt to physicians prescribing antipsychotics for *any* disorder and convert them to Fanapt prescribers.

### 1.    Off-Label Messaging

120.    Vanda trained its sales force to promote Fanapt off-label for bipolar disorder, as well as other mental health conditions treated by similar drugs, in large part because schizophrenia only accounts for a very small portion of the atypical antipsychotic market, especially when compared to more prevalent conditions like bipolar disorder.[13] Therefore, by targeting bipolar patients and patients with other mental conditions outside of its indicated use, Vanda was able to significantly increase the potential patient population for Fanapt.  And Vanda

---

[13]  Approximately 2.6% of adults in the United States suffer from bipolar disorder, while approximately 1.1% of adults in the United States suffer from schizophrenia.  *See* National Institute of Mental Health, *available at* https://www.nimh.nih.gov/health/statistics/prevalence/schizophrenia.shtml and https://www.nimh.nih.gov/health/statistics/prevalence/bipolar-disorder-among-adults.shtml.

made no secret that Fanapt was to be promoted off-label.  For example, early on in sales training, sales representatives and RBLs were told by Vanda's CEO that schizophrenia was the hardest indication to get approved by the FDA, and therefore providers would understand that if Fanapt had proven effective to treat schizophrenia, then it could also be used and is effective in treating other types of mental health illnesses, such as bipolar disorder.

121.    JB corroborates this allegation. According to JB, the RBLs, including himself, were told several times from Vanda's Medical Department and CEO Polymeropoulos that Fanapt worked well for bipolar disorder and that this was well documented in books and other publications. Sales staff were told that Fanapt was effective for bipolar disorder due to the receptors Fanapt affects. JB also states that Vanda's Senior Medical Director, Paolo Barold, would regularly point to one of the leading researchers on bipolar disorder to support that assertion.  Specifically, Barold would point to the book "Essential Psychopharmacology" by Dr. Stephen Stahl, for support that Fanapt worked well for treating bipolar disorder.

122.    More specifically, sales representatives were trained to tell doctors that Fanapt should have been given the indication for other mental disorders as well because it effectively hits the same receptors, such as dopamine receptors, that are required for successful treatment of these other disorders including bipolar disorder. The sales representatives were told to quote Dr. Stahl, who believed that Fanapt worked well in treating other mental disorders such as bipolar because it hits the same receptors.

123.    Further, JB states that the RBLs were repeatedly told by Barold that they needed to read that book. JB believes that this was done overtly and in contradiction to Fanapt's indication, because Vanda management was trying to give them the impression that this message should be used when promoting Fanapt to physicians.  In fact, Barold provided JB a copy of

Stahl's book so he could read it.

124.    Vanda trained its sales representatives to first promote Fanapt as an effective substitute for drugs such as Risperidone, Saphris and Latuda, all of which are indicated for schizophrenia *and* bipolar disorder. Sales representatives were instructed to make this pitch without regard to whether the provider was prescribing these drugs to treat schizophrenia, bipolar disorder, or some other condition.  And, as discussed below, Vanda intended and was aware that a majority of the providers its sales representatives called on were prescribing Risperidone, Saphris, and Latuda for conditions other than schizophrenia. Further, Vanda was aware that a majority of the Fanapt prescriptions its sales representatives secured from these providers were off-label.

125.    After convincing the physician that Fanapt could be prescribed to any patient currently prescribed to another atypical antipsychotic, regardless of the condition it was prescribed to treat, sales representatives were trained to differentiate Fanapt as the superior choice by focusing on its safety profile and side effects compared to other atypical antipsychotics medications. By using this carefully crafted sales technique, Vanda's sales representatives were able to promote Fanapt to providers without ever mentioning schizophrenia by focusing on Fanapt's efficacy and safety profile compared to other antipsychotic medications.

126.    First, as just discussed, sales representatives were trained and did in fact promote Fanapt as an effective substitute for other atypical antipsychotics, regardless of the condition they were prescribed to treat.  To convey this message, Vanda trained its sales representatives to promote Fanapt as an effective substitute for Risperidone,[14] but with fewer side effects.  Vanda

---

[14]  Risperidone, marketed by Jannsen as Risperdal, is indicated for: (1) treatment of schizophrenia; (2) as monotherapy or adjunctive therapy with lithium or valproate, for the

provided sales representatives with two clinical studies to help demonstrate Fanapt's effectiveness compared to Risperidone. The first was a four-week study which used Geodon as an active control. The second was a six-week study which used Risperidone as an active control. In discussing the six-week study, sales representatives were instructed to tell physicians that Risperidone only *appeared* more effective in that study because Fanapt, unlike Risperidone, had to be titrated. Sales representatives would then show providers the four-week study and explain that when compared to a drug that requires titration, such as Geodon, Fanapt proved just as effective as Risperidone. This was misleading, especially considering that Vanda never conducted any head-to-head trials of Fanapt and Risperidone or Geodon.

127. Moreover, one of the Fanapt marketing pieces shows the graph from the six-week study and states "Comparable efficacy to the active-control, risperidone was demonstrated for patients who remained on treatment for up to 2 weeks."

128. JB corroborates the above allegations. According to JB, Vanda trained its sales force to convince doctors that Fanapt was just as effective as Risperidone, and would use the six-week trial study referenced above to convey this message. JB further states that sales representatives were further trained to convey that due to Fanapt's titration schedule, it was actually more effective than Risperidone. According to JB, psychiatric doctors are very familiar with Risperidone and know that it works for the conditions they treat. Therefore, if a Vanda sales representative convince the doctor that Fanapt was just as effective as Risperidone, the doctor would believe that Fanapt could be used to treat the same conditions they were currently treating with Risperidone. Further, according to JB, Vanda's intent was to have its sales representatives convince a doctor that Fanapt was just as, or more effective than Risperidone, or a similar anti-

treatment of acute manic or mixed episodes associated with Bipolar I disorder; and (3) treatment of irritability associated with autistic disorder.

psychotic, and then tout Fanapt's safety profile to differentiate it from whatever anti-psychotic the doctor was currently prescribing. JB states that Fanapt's safety profile and lack of side effects was the primary message Vanda had sales representatives convey to doctors. This messaging mainly focused on Akathisia and Fanapt's "placebo like" side effect profile. RBLs and sales representatives were given Fanapt promotional pieces that prominently displayed "Akathisia," with "schizophrenia" in much smaller letters in the corner. This was in line with Vanda's overall marketing strategy for Fanapt. For example, at one of the early Fanapt sales meetings, JB recalls Polymeropoulos informing the group that Fanapt was great for Akathisia, and did not mention schizophrenia during the presentation. Similar to Relator, JB also was told by other sales representatives using this marketing material in the field that doctors thought Fanapt was a drug to treat Akathisia, rather than schizophrenia.

129.    According to JB, after convincing a doctor that Fanapt was as or more effective than Risperidone or other anti-psychotics, sales representatives were supposed to convince the doctor to switch the patient to Fanapt by touting the low rate of Akathisia as well as the placebo like safety profile.

130.    In pitching Fanapt to providers, sales representatives were instructed to say:

> If Risperidone was titrated, we'd have equal or better efficacy (pointing to the graph depicting the Geodon data, not Risperdal) but we are much cleaner because we don't cause the serious side effect Akathisia, in fact we are the only atypical that has a placebo-like side effect profile. Fanapt is metabolically neutral and the cleanest treatment option. Why try anything else?

131.    In making this pitch to providers, Fanapt sales representatives were encouraged not to mention schizophrenia. In fact, according to Relator and JB, sales representatives received virtually no training on the disease state of schizophrenia and the condition was rarely mentioned during sales training. For example, during sales training, Relator suggested they create patient

profiles for schizophrenia. In response, Vanda senior management got mad at Relator for suggesting this because promoting Fanapt for schizophrenia was not part of their plan.  And, according to Relator and JB, if asked by a physician about schizophrenia or the proper patient profile, sales representatives were trained to steer the conversation back to a discussion of Fanapt's efficacy compared to other antipsychotics.  Further, as discussed below, Vanda's Fanapt marketing materials similarly failed to discuss, in any meaningful way, schizophrenia, Fanapt's sole indication.

132.    For example, Vanda prepared an overcoming objections sales aide, which demonstrates Vanda's intent to promote Fanapt as a substitute for other atypical antipsychotics prescribed for non-schizophrenia patients. In the overcoming objections sales aide, the *first* provider objection is "*I don't see any/a lot of patients with schizophrenia*."  The canned response to this objection states, "*You don't see a lot of schizophrenia but you do use atypical antipsychotics, correct?*" (emphasis added). This objection demonstrates that Vanda intended its sales force to promote Fanapt off-label for non-schizophrenia patients. The response contained in the sales aide is clearly intended to steer the conversation to a discussion of other atypical antipsychotics the physician prescribes, obviously for non-schizophrenia patients as made clear by the objection, so the sales representative can promote Fanapt as effective for those patients. And although there are other responses listed on the sales aide, Relator states that Vanda focused primarily on this response during sales training.

133.    According to Relator and JB, after convincing a physician that Fanapt was just as effective as other atypical antipsychotics, sales representatives were trained to sell the provider on Fanapt's superior safety/side effect profile compared to other atypical antipsychotics the provider was considering or currently prescribing.  This was necessary because positioning

Fanapt as an effective substitute was not sufficient to convince the physician to prescribe Fanapt because, if the drug provided the same efficacy, there was no reason to switch. Thus, Vanda trained its sales force to convince the physician that Fanapt was just as effective, but with a better safety profile.

134.    To promote its superior safety/side effect profile message, Vanda trained its sales force to tell physicians that Fanapt has a "placebo-like safety profile" (discussed in more detail below) with the primary focus on the drug's "placebo-like rate of Akathisia."[15] Akathisia is a side effect experienced with many atypical anti-psychotics, including Risperidone, Saphris and Latuda. Therefore, by promoting Fanapt as an effective substitute for other atypical antipsychotics, but without the Akathisia side effect and other safety concerns, Vanda was able to position Fanapt as a superior treatment option for non-schizophrenia patients prescribed to a different atypical antipsychotic.

135.    According to Relator and JB, sales representatives were trained to connect Akathisia to lowered efficacy in other atypical antipsychotics.  Specifically, sales representatives were trained to tell physicians that many patients prescribed to atypical antipsychotics stop taking their medications due to Akathisia.  Therefore, by prescribing Fanapt instead of other drugs, patients would have greater compliance on their medication regimen, and therefore greater efficacy, because they do not experience Akathisia. Again, this sales pitch was targeted at capturing prescriptions for any atypical antipsychotic prescribed by the provider, regardless of the reason it was prescribed, as nearly all such drugs cause Akathisia.

136.    For example, in the Fanapt Call Guidance sales aide provided to sales

---

[15] Akathisia is one of the most frequent, common, and distressful adverse effects of treatment with antipsychotic drugs. This syndrome consists of subjective (feeling of inner restlessness and the urge to move) as well as objective components (rocking while standing or sitting, lifting feet as if marching on the spot and crossing and uncrossing the legs while sitting).

representatives, it has an entire section devoted to Akathisia, which states:

> Now that I shared with you these great new data on Fanapt efficacy, I would like to focus your attention on patients on antipsychotics who need to switch therapy due to akathisia. As you know, one common reason for switching schizophrenia patients' antipsychotic treatment is akathisia symptoms . . . .

> Doctor, can you see from these data how Fanapt could provide robust short- and long-term efficacy for your patients who may be experiencing akathisia on another antipsychotic? (wait for response) So, the next time you need to switch patients because they need long-term efficacy and have akathisia, would you choose Fanapt as your primary switch agent?

> Is there a specific patient you can identify right now who might benefit from switching to Fanapt?

137.    As the script above demonstrates, the focus of the sales pitch, after convincing the physician on efficacy, was to position Fanapt as superior due to its low rates of Akathisia, without regard to whether these patients are prescribed to antipsychotic medications for conditions other than schizophrenia.

138.    The Overcoming Objections and Call Guidance sales aides, provided by Vanda, include several references to schizophrenia.  According to Relator, Vanda included numerous references to schizophrenia in the sales aides to prevent allegations of off-label marketing.  However, according to Relator, this was just for show and Vanda senior management never emphasized or instructed its sales representatives to discuss or even mention schizophrenia while making sales calls. Rather, Vanda instructed sales representatives to focus on pushing the efficacy and safety messaging described herein. For example, during sales training sales representatives participated in exercises where they would role-play mock sales calls for Vanda senior management.  On several occasions, the sales representative would fail to even mention schizophrenia when performing the role-play and, according to Relator and JB, Vanda's management team would not correct them or even mention the need to discuss schizophrenia.

139.   Vanda also provided the RLBs with a Reprieve study, which was not approved by the FDA and therefore not allowed to be used in marketing, to promote this message. According to Relator, all of the RBLs were provided multiple copies of these studies and he believes senior management intended they use them when marketing Fanapt to providers.

140.   Even when sales representatives were promoting Fanapt's safety profile, Vanda trained sales representatives to avoid discussing Fanapt's sole indication, and steer the conversation back to a discussion of Fanapt's safety profile.   For example, the overcoming objections sales aide also contains the objection "Fanapt has only one indication." The canned response prepared by Vanda states:

> I understand that other antipsychotics have more than one indication. Can you think of any of your adult schizophrenia patients who are experiencing inner restlessness, agitation or other treatment-induced movement disorders on their current medication?

> The Fanapt efficacy and tolerability profile, including its placebo-like rate of akathisia make it an option for patients who need to switch from one antipsychotic to another.

141.   Further, the overcoming objection sales aide instructs sales representatives, in response to the objection that the provider does not "*see any/a lot of patients with schizophrenia*," to respond by saying, "*Akathisia is a drug-induced side effect that can necessitate a treatment switch*" and "*Fanapt offers atypical antipsychotic efficacy with placebo-like rates of Akathisia.*" (emphasis added).

142.   This messaging further demonstrates Vanda's illegal promotional scheme. This sales technique is designed to steer the conversation with a provider away from Fanapt's sole indication – schizophrenia – and focus on a side effect associated with most atypical antipsychotics. This, again, was a technique designed by Vanda to position Fanapt as a drug that can be prescribed as an effective substitute for other atypical antipsychotics, regardless of the

condition the drug was prescribed to treat.

143.    According to Relator and JB, the goal of this sales technique was to pitch Fanapt without ever mentioning its indicated use.  Sales representatives started the sales pitch by discussing Fanapt's efficacy compared to other antipsychotics, which was followed by a discussion of Fanapt's side effects compared to other antipsychotics. As the sales pitch focused on Fanapt's efficacy compared to other antipsychotics, many providers presumed it would treat the same conditions as the antipsychotics they were currently using or contemplating prescribing. And if the physician brought up schizophrenia, sales representatives were trained to steer the conversation away from that subject.

144.    Vanda's marketing materials for Fanapt also demonstrate that the focus of the promotional scheme was on the drug's efficacy and side effects as compared to other atypical antipsychotics, and not schizophrenia. For example, Vanda's master sales aide has on its cover, in very large letters, "Akathisia" and "Antipsychotic medications are switched due to efficacy and/or side-effect concerns, including drug induced akathisia." And, in an attempt to minimize its significance, the marketing piece states in very small letters at the top, "For adult patients with schizophrenia." According to Relator and JB, the marketing pieces and aforementioned sales techniques resulted in sales representatives promoting Fanapt as a cure for Akathisia, rather than a treatment option for schizophrenia.  In fact, according to Relator, occasionally his sales representatives would inform him that physicians were asking whether Fanapt is a treatment option for Akathisia.

145.    This marketing piece caused internal disputes among Vanda senior management. According to Relator, Kate Holland, Vanda's Vice President and Director of Marketing, vehemently protested this marketing piece because it marketed a side effect, Akathisia, and that

the marketing strategy as a whole falsely presented Fanapt as a cure for Akathisia because that side effect was the main focus of the marketing strategy. However, despite Holland's protests, CEO Polymeropoulos refused to alter the marketing strategy, and as a result Holland resigned in January 2016 along with Thomas Gibbs, Vanda Senior Vice President and Chief Compliance Officer. Vanda subsequently removed the sales piece in March 2016, leaving the sales force without any marketing materials for several months. However, even though the marketing piece was removed, sales representatives were still instructed to continue marketing Fanapt in the same manner.

146.    Relator also recently came across a job posting for a Vanda Neuroscience District Sales Manager, dated January 16, 2017, that further suggests the aim of Vanda's marketing scheme was to promote Fanapt off-label.[16]  The job posting, under the "Requirements" section states, in part "Highly preferred specialty experience in psychiatry, schizophrenia, *bipolar depression*, CNS or pain management. Other Specialty will be considered." (emphasis added). This job posting suggests that Vanda's intent is to promote Fanapt off-label for bipolar disorder because neither Fanapt nor any other drug owned by Vanda is indicated for bipolar depression. Therefore, the only purpose to making this a requirement of a Fanapt District Manager is to better facilitate off-label sales.

### 2.    Targeting Competitors' Drugs

147.    The sales goals and incentive compensation plans Vanda provided to its sales representatives also demonstrates that Vanda intended and encouraged its sales representatives to promote Fanapt off-label. According to Relator, JB, and CW, sales representatives' sales goals and incentive compensation were based on Fanapt's monthly sales' growth rate compared to the

---

[16] *Available at* https://www.linkedin.com/jobs/view/248261922.

growth rate of the rest of the antipsychotic market. Although Fanapt measured sales representatives' performance based on monthly sales growth compared to the entire antipsychotic market, Vanda senior management placed a high priority on targeting high prescribers of Risperidone, Saphris, Latuda, Rexulti, and Vraylar, which are also atypical antipsychotic drugs indicated for schizophrenia *and* bipolar disorder.[17]   In other words, sales representatives were held accountable for Fanapt's growth compared to the atypical antipsychotic market as a whole, and were reprimanded if their prescription growth, measured by monthly prescription growth, was lower. And, tellingly, sales representatives were compensated for all Fanapt prescriptions secured, whether prescribed on-label or off-label.

148.    According to Relator and JB, these sales goals and expectations were set by Vanda senior management and, during sales training, sales representatives were instructed that their main goal was to switch physicians currently prescribing antipsychotics, and specifically Risperidone, Latuda and Saphris, to prescribe Fanapt, regardless of whether or not the provider was prescribing these drugs to treat schizophrenia.

149.    Sales representatives were responsible for growing Fanapt faster than the entire antipsychotic market.  Significantly, Vanda's sales goals were not adjusted to account for the fact that almost all other antipsychotic medications, including Risperidone, Latuda and Saphris, are indicated for schizophrenia *and* bipolar disorder, and Vraylar and Rexulti are indicated for schizophrenia *and* Major Depressive Disorder. And, as stated above, bipolar disorder is more

---

[17] Saphris is indicated to treat: (1) schizophrenia; *and* (2) acute treatment of manic or mixed episodes associated with Bipolar I Disorder as monotherapy or adjunctive treatment to lithium or valproate. Latuda is indicated for: (1) schizophrenia; *and* (2) depressive episodes associated with Bipolar I Disorder (bipolar depression) as monotherapy and as adjunctive therapy with lithium or valproate. Vraylar is indicated to treat: (1) schizophrenia; *and* (2) acute treatment of manic or mixed episodes associated with Bipolar I Disorder; *and* (3) depressive episodes associated with Bipolar I Disorder (bipolar depression).  Rexulti is indicated to treat: (1) schizophrenia; *and* (2) adjunctive therapy to antidepressants in the treatment of major depressive disorder(MDD).

than twice as prevalent in the United States as schizophrenia.  Therefore, by requiring sales representatives to exceed the growth rate of other antipsychotic medication, without discounting Vanda's expectations to account for patients with bipolar disorder, Vanda necessarily required its sales representatives to promote Fanapt off-label to meet their sales goals and receive incentive compensation. Further, according to Relator and JB, Vanda's Fanapt sales goals and expectations could not be met if sales representatives only promoted the drug for schizophrenia.

150.    This allegation is confirmed by JB, who was also an RBL with Vanda during the relevant period. According to JB, Fanapt was only indicated for schizophrenia while other drugs on the market were indicated for multiple disorders. As a result, according to JB, this made it extremely hard to meet Vanda's sales expectations. JB further states that Vanda wanted a 2% prescription increase per quarter. This message was told to the sales force on numerous occasions by Tom Griffin, the national sales manager at the time. However, due to the market, this number was nearly impossible to achieve unless the drug was promoted for conditions other than schizophrenia. JB reports that numerous sales representatives complained that the doctors on their call list did not treat schizophrenia, however, Vanda did not remove these physicians from the call plan.

151.    JB had a meeting with Gian Piero Reverberi, Vanda Senior Vice President, and JB's manager, Russel Marshall, to discuss the sales force's inability to grow Fanapt prescriptions by 2% per quarter. JB explained that the market just was not there to produce that type of increase in schizophrenia patients. He further explained that doctors had been reporting that they were having extreme difficulties getting Fanapt approved by commercial insurers because it was being prescribed off label. Reverberi responded by telling JB that he did not believe him, and asked what his plan was to turn his sales figures around.

152.    On one occasion, Kate Arnold, Vanda's head of compliance, contacted JB after reviewing his field coaching guides. In those reports, JB had written that sales representatives need to "push" doctors to prescribed Fanapt, as Tom Griffin had regularly told the RBLs during calls. Kate asked him to change the wording because it could be misconstrued and Polymeropoulos was worried about being sued by the government. She further told him that he was not the only RBL with this issue, and that she had spoken to other RBLs about changing the language.

153.    From the time of Fanapt's relaunch in November 2015 until early 2016, Vanda had not provided the RBLs or sales representatives with any sales metrics to gauge their sales goals or an incentive compensation plan. The RBLs and sales representatives were, however, informed by Ramirez that the coming incentive compensation plan and sales goals would be based on the "total prescription universe," including off-label prescriptions. According to Relator and JB, when the sales goals and incentive compensation plans were provided, they included off-label prescriptions. And due to the fact that these metrics were measured against other atypical antipsychotics, with more expansive indications, the Fanapt sales force could only meet these expectations through off-label sales. According to Relator and JB, Vanda senior management made it clear to the RBLs and the sales force that they were accountable for the growth of *all* Fanapt prescriptions, including off-label prescriptions, because the national sales goal included off-label prescriptions.

154.    Each week, Veeva CRM (a national prescription data software tool Vanda provided to its sales force) released new sales figures for each region. The Veeva CRM prescription data illustrated to the sales representatives the number of new prescriptions and total prescriptions written by providers in their sales territory each week. This data was also presented

in graphs and charts that showed Fanapt's territory specific growth in prescriptions compared to the total antipsychotic drug market as well as to Risperidone, Latuda and Saphris. Ramirez scheduled weekly calls with the RBLs to discuss these numbers. During such calls, Ramirez would review Fanapt's prescription growth rate compared to the prescription growth rate of other atypical antipsychotic medications in that region.  If a region was declining in Fanapt prescription growth compared to other atypical antipsychotic drugs, it was highlighted in red. If a region's Fanapt prescriptions were growing at a faster rate compared to other atypical antipsychotic prescription medications, it was highlighted in green. Ramirez consistently berated the RBLs for being in the red and told them that their sales representatives would have to be more aggressive in order to grow ahead of the market and "get in the green."

155.    JB corroborates this allegation. According to JB, Vanda executive management were always asking why the prescriptions numbers were not growing and refused to accept that the market was not big enough to produce the type of growth they wanted.

156.    Both Relator and JB took issue with the sales goals being based upon the growth rate of other atypical antipsychotic medications with more expansive indications than Fanapt because it forced sales representatives to promote Fanapt off-label to meet sales expectations and therefore keep their jobs.  On several occasions, Relator brought his concerns to Vanda senior management and suggested that sales goals and incentive compensation be based on approved call targets only (i.e., providers treating adult schizophrenia patients), and eliminate all sales from off-label prescriptions. Relator also expressed that it was unrealistic to expect Fanapt to grow ahead of the entire atypical antipsychotic market because nearly all other antipsychotics have several indications, while Fanapt was only indicated for schizophrenia.  Ramirez, in response to Relator's concerns, would always give a response along the lines of, "the goal is the

goal" and "what are you worried about? We are paying on the total dirt," and that the sales goals included the "total prescription universe."

157.    JB states that he similarly attempted to convince Vanda to adjust sales goals for the same reasons, and was also told that the goal was not changing.

158.    As a result of Vanda's unrealistic sales goals, many sales representatives were unable to achieve their sales targets. As a result, many sales representatives either placed on or threatened to be placed on a performance improvement plan. According to JB, Vanda executive management would also regularly talk about firing sales staff due to low numbers to send a message that sales needed to improve.

159.    On several occasions, a doctor on one of JB's sales representatives' call list would inform the representative that they do not treat schizophrenia patients. When a sales representative told JB this, JB would request that they take the doctor off of his representative's call list. In response, Tom Griffin would tell JB that the doctor could not be removed and that sales representatives were required to call on every doctor on their call list, even if they said they do not treat schizophrenia patients.  Griffin would further state that sales representatives needed to "push" doctors to prescribe Fanapt. After several such requests by JB, and rejections by Griffin, Griffin finally stated "you cannot get them removed. They are going to stay." JB understood this as a directive to stop asking to remove doctors from call lists that do not treat schizophrenia.

160.    The sales goals and incentive compensation plans just discussed also caused recurring issues between the RBLs and Vanda senior management.  Specifically, RBLs were constantly attacked by Vanda senior management over their sales figures to which the RBLs protested because the sales targets were based on prescription rates for other drugs with more

expansive indications.  On one occasion, in June 2016, Relator participated in a conference call with the other RBLs, Senior Vice President Gian Piero Reverberi, Ramirez, and Vanda's National Sales Director, James.  On the call, Reverberi angrily confronted the RBLs about the Fanapt sales results and said, "you are not doing anything to grow this product." Several of the RBLs asked where they were supposed to increase sales when Fanapt only has one indication, to which Reverberi replied, "Doctors can use Fanapt anywhere they want." Reverbi warned the RBLs that their failure to increase sales would jeopardize their jobs. After the conference call, the Southwest region RBL, JB, called Relator and said, "Did we just get threatened?"

161.    Tellingly, Vanda had the ability to remove off-label prescriptions from its sales goals and incentive compensation plans but chose not to remove such prescriptions.  According to Relator, early on in his employment as a Fanapt RBL, Vanda senior management informed him that they would be receiving ICD-9 data which showed, for each Fanapt prescription, the indication it was prescribed for (ICD-9 diagnosis code) and the dosage amount (NDC code). JB corroborates this allegation as well. Despite having access to such information and therefore the ability to remove off-label prescriptions from sales goals and incentive compensation, Vanda continued to compensate sales representatives for off-label prescriptions and refused to adjust its sales goals.  In addition, on one occasion Relator asked Ramirez to extract only the on-label prescriptions for the purposes of determining sales goals and incentive compensation and remove off-label prescriptions. Relator also stated to Ramirez that Vanda's sales goals and incentive compensation were encouraging off-label promotion and therefore "Vanda is paying for off-label promotion" and "the sales goals are based on illegitimately earned prescriptions."  In response, Ramirez stated that Relator was "not acting like a leader" and not to use the word "illegitimate" again.  Ramirez further asked Relator, "are you saying that Vanda is doing something wrong?"

and told Relator not to bring up the off-label topic again and not to send him any emails about the sales goals or incentive compensation plan.

162.    Similarly, JB, on many occasions, requested that Vanda executive management provide him with the ICD-9/10 codes. However, similar to Relator, every time he asked, JB's request was denied. JB believes that Vanda would not provide RBLs with the ICD-9/10 data because it would show that a majority of their sales were off-label.

163.    The provider target lists that Vanda provided to sales representatives also demonstrate its off-label promotion, informing them that they should not rely solely on these lists and should also create their own target lists. The target lists provided by Vanda included providers who prescribed Risperidone, Latuda, Saphris, and other atypical antipsychotic medications.    Sales representatives could identify other physicians prescribing atypical antipsychotics from the Veeva CRM data they were provided.  The Veeva CRM data showed the breakdown of which atypical antipsychotics a physician was prescribing and how many prescriptions for those drugs they wrote each week.

164.    According to Relator and JB, the target lists were a joke and were designed solely to shield Vanda from liability.  Specifically, every provider on the target list had at least two or three schizophrenia patients.  In fact, in November 2015, Head of Sales, Ramirez, told the RBLs, including Relator, that the target lists Vanda provided were just "for show" and in place just in case Vanda was ever questioned about off-label promotion. *Ramirez further stated that if the Company was ever questioned about off-label promotion, it could just show the target lists as proof that the Company only encouraged sales representatives to target physicians treating schizophrenia patients.*

165.    In addition, according to Relator and JB, the target lists provided by Vanda also contained some physicians who could only prescribe Fanapt off-label.  For example, the Vanda target lists contained physicians specializing in internal medicine, who are very unlikely to have any adult schizophrenia patients, and child psychiatrists (discussed below).  According to Relator and JB, his sales representatives would regularly complain that several of the physicians on the Vanda target lists could only prescribe the drug off-label.

166.    According to Relator, the target lists were not useful, as they were in place solely to shield the Vanda from liability, and as a result nearly all of the sales representatives relied almost exclusively on the target lists they personally created.  In fact, according to Relator, if a sales representative were to only call on the providers listed in Vanda's target lists, they would not be able to even come close to meeting Vanda's Fanapt sales expectations.

167.    To create their own target lists, Vanda senior management provided the Fanapt sales force with access to Veeva CRM, which provided historical prescribing information, with a three month lag time, for each physician in their region. The Veeva CRM data showed, by region, the prescribing trends and actual prescribing amounts for all physicians who prescribed any antipsychotic medication, whether or not they were prescribed for schizophrenia.  This prescribing information allowed Fanapt sales representatives to see the amount and type of atypical antipsychotics each physician in their territory was prescribing. However, this information did not allow the Fanapt sales force to see which condition these medications were prescribed to treat, as only senior management was privy to such information.  Vanda senior management instructed sales representatives to use this data to target high volume atypical antipsychotic prescribers and switch them to Fanapt, and specifically to switch Risperidone, Latuda and Saphris prescribers.

168.    Relator, on several occasions, challenged Vanda's use of target lists that did not differentiate between providers prescribing atypical antipsychotics prescribed to treat schizophrenia and those prescribed to treat other conditions. Relator suggested that the ICD-9 data, which Vanda senior management had previously stated it would provide to the RBLs, could be used to remove physicians who do not treat schizophrenia patients from sales representatives' target lists. However, Vanda refused to provide this information to its Fanapt sales force or remove such providers from their target lists. And on several occasions when Relator asked to view the ICD-9 data, Ramirez responded, "you don't need to see [the ICD-9 data] because we are paying you on total dirt." Significantly, the ICD-9 data provided Vanda with the means to remove physicians with no schizophrenia patients from its sales representatives call plans. However, Vanda did not remove these physicians from its sales representatives target lists, and even compensated its sales representatives for off-label prescriptions. Relator believes that after senior management reviewed the ICD-9 data, they discovered that a majority of the targeted providers were not prescribing antipsychotics for schizophrenia, but rather some other condition, mainly bipolar disorder, and therefore did not provide the data to its sales force.

169.    Vanda paid sales representatives based on "total dirt" to encourage off-label sales, and attempt to insulate themselves from liability. At Vanda, being paid based on "total dirt" meant the sales representative was paid for every Fanapt prescription written in their territory, regardless of whether they called on the doctor or the doctor was even on their doctor contact list. Therefore, sales representatives received credit for every Fanapt prescription written in their territory, regardless of the doctor who wrote it and the condition it was written to treat. This allowed Vanda to provide the "just for show" target lists to their sales representatives – in case they were ever investigated for off-label promotion – but still incentivize their sales

representatives to call on other doctors who could only prescribe Fanapt off-label. And as discussed above, not only did Vanda incentivize its sales representatives to call on such physicians, they told them to create their own target lists and provided the data necessary to identify the high prescribers in their territory.

170.     According to JB, the RBLs thought it was odd that sales representatives were paid on total dirt, and in a meeting were discussing whether sales representatives should be paid based on prescriptions from targeted doctors or total dirt. During this discussion, Tom Griffin chimed in and said the decision was made by senior management to pay on total dirt, and it was not changing.

171.     JB estimates that approximately 50% of the Fanapt prescriptions obtained by sales representatives in his territory came from doctors targeted by Vanda and placed on his sales representative's target list. JB states that he would look at the Veeva report and see the prescriptions from the targeted doctors but then when he would look at the sales report summary – which listed all Fanapt prescriptions in the territory  - there were about double the amount of prescriptions than was on the Veeva report.

172.     The fact that Vanda provided its sales force with "just for show" target lists, which alone were insufficient to meet their sales expectations, and instructed them to create their own target lists targeting high volume antipsychotic prescribers demonstrates that the Company intended its sales force to promote Fanapt off-label. Indeed, as demonstrated by the target lists Vanda provided its Fanapt sales force, the Company had the ability to separate physicians prescribing atypical antipsychotics for schizophrenia from physicians prescribing those drugs for other mental disorders but chose not to refine this information.  Further, Ramirez's claim that the target lists were just for show to shield Vanda from liability is confirmed by the fact that Vanda

instructed its sales force to compile target lists which the company knew contained physicians prescribing atypical antipsychotics for non-schizophrenia patients.  By doing this, Vanda attempted to put itself in a position where it could use the Company target lists as proof that it did not encourage off-label promotion, and place blame on sales representatives who it allowed and encouraged to create target lists containing physicians who do not treat schizophrenia patients.

### 3.      Fanapt Internal Sales Projections Included Off-Label Prescriptions

173.    Vanda's internal sales expectations for Fanapt included off-label prescriptions.  In March 2016, Dallas Medenwald, the Fanapt sales representative who covered the state of Indiana, called Relator because the Indiana Medicaid program had changed its coverage policy and it was no longer reimbursing for off-label atypical antipsychotics.  This was a major concern as Indiana was ranked first or second in the nation for Fanapt sales.  Medenwald informed Relator that this coverage change would result in a loss of 400 prescriptions per month in Indiana.  According to Relator, the 400 prescriptions were written off-label for pediatric patients.

174.    Relator contacted James and Ramirez to inform them of Indiana's coverage change, and requested that the off-label sales be removed from Medenwald's sales goals and incentive compensation plan. In response, Ramirez instructed Relator to "just deal with it." Relator continued to discuss the issue out of concern for his sales representative, and expressed his concern that holding Medenwald responsible for off-label prescriptions was akin to forcing him to promote off-label to meet these expectations. Ramirez responded that there was no reason to be concerned because sales representatives were paid on "total dirt" and stated, "fine, if you are worried about your Indiana sales goal, then spread [the 400 lost prescriptions] across your other sales territories."  This solution, of course, was not only unrealistic, but also did not

eliminate the issue that Vanda's sales goals and compensation model accounted for off-label prescriptions and, even in an instance such as here where coverage changes result in non-reimbursement for off-label Fanapt prescriptions, Vanda refused to adjust the sales goals to account for the coverage change.

175.    Relator believes that Vanda's unwillingness to remove these off-label prescriptions from the Indiana territory's sales goal was because doing so would result in Vanda not meeting its internal sales estimates, as these off-label prescriptions were included in Vanda's sales expectations. Relator believes that Vanda's unwillingness to adjust its internal sales estimates was because Vanda feared such action would cause its stock price to drop.  According to Relator, in discussing the Indiana coverage change, he requested that these prescriptions be removed from the sales goal. Ramirez stated that no change would be made because Vanda "already gave the sales expectation number to the Street, and it is not changing." Relator took this to mean that the sales expectation figures had already been provided to analysts on Wall Street, and if Vanda was to lower that number it would cause a drop in stock price.

176.    JB corroborates this allegation. According to JB, Vanda executive management wanted a 2% per quarter increase of Fanapt prescriptions. However, as discussed above, given that schizophrenia is only approximately 3% of the anti-psychotic market, growing on-label prescriptions by 2% a quarter was virtually impossible. Specifically, in a meeting, Tom Griffin told JB that he needed to achieve a 2% increase. When JB explained that this was not possible, Griffin responded that Jim Kelly told people on Wall Street that they should expect a 2% prescription increase, and therefore they needed to deliver on that promise.

###    E.    Vanda Promoted Fanapt Off-Label to Pediatric Patients

177.    Vanda promoted Fanapt off-label to pediatric patients.  As stated above, Fanapt is

only indicated to treat *schizophrenia* in *adult* patients. Vanda encouraged its sales representatives to call on child psychiatrists, in part, by compensating them on all prescriptions secured, whether on-or-off-label.  This, combined with the fact that Vanda held sales representatives accountable for unrealistic sales goals, which included off-label prescriptions, provided significant pressure on the Fanapt sales force to call on and promote the drug to child psychiatrists.

178.    Vanda provided its sales representatives with target lists that included child psychiatrists.  As discussed above, Vanda provided sales representatives with limited target lists that had the primary purpose of shielding the Company from liability due to off-label marketing. According to Relator and JB, the target lists provided by the Company contained child psychiatrists who treat pediatric patients.  Therefore, Vanda must have intended that its sales force would call on and promote Fanapt to child psychiatrists, as they must have known, or it was willfully ignorant of the fact that some of the physicians on the target lists contained child psychiatrists.

179.    In addition, Vanda instructed its sales representatives to call on high-volume writers of atypical antipsychotics, including child psychiatrists.  Vanda senior management required each sales representative to create a list of the top twenty-five prescribers of antipsychotics in their territory, with the instruction to focus their sales efforts on convincing these providers to prescribe Fanapt.  According to Relator, sales representatives compiled this list by requesting a report of the top twenty-five prescribers from Veeva.  These reports from Veeva would regularly contain child psychiatrists.  Significantly, Vanda must have at least known these lists contained child psychiatrists because senior management provided sales representatives with the Veeva data to compile these lists, and, more importantly, these top twenty-five prescriber lists were submitted to and reviewed by senior management.

180.   For example, below are two such lists for the Indiana territory, both of which contain child psychiatrists:



## Top 25 Market Writers 13wk Nrx

| Accounts | Market Volume |
|---|---|
| KALAPATAPU, UMAMAHESWARA | 826.0 |
| CONN, MICHAEL | 491.0 |
| RIDENOUR, CRYSTAL | 470.0 |
| Jones, Mark | 462.0 |
| SINGH, SURJIT | 442.0 |
| GUGGALI, SHILPA | 438.0 |
| MANNON, STUART | 434.0 |
| BOSE, SAJAL | 424.0 |
| MILLER, CHRISTOPHER | 418.0 |
| STITH, RUTHGAYLE | 409.0 |
| GONZALEZ, JOHN | 387.0 |
| BRIONES-RAMILO, TERESITA | 379.0 |
| BUCKLES, CRAIG | 373.0 |
| KEMPF, BROOKE | 365.0 |
| Kettenis, Lia | 335.0 |
| MAY, DORIS | 329.0 |
| PELL, LESLIE | 329.0 |
| Schiltz, John | 302.0 |
| SIDHU, KANWALDEEP | 301.0 |
| COX, JENNIFER | 298.0 |
| GRAY, JANET | 298.0 |
| EL-KHALILI, NIZAR | 297.0 |
| Rau, Naraharisetty | 297.0 |
| COOK, DOUGLAS | 290.0 |
| Bota, Marina | 289.0 |

BELIEVE    VANDA

## Top 25 Fanapt Writers 13wk Nrx

| Accounts | Market Volume | Fanapt NRX | Mkt Share | Growth (%) | % of Product Sales |
|---|---|---|---|---|---|
| GREENWALD, TRINA | 259.0 | 24.0 | 9.3 | 71.43 | 7.92 |
| Hinshaw, Darla | 179.0 | 19.0 | 10.6 | -9.52 | 6.27 |
| BRIONES-RAMILO, TERESITA | 379.0 | 18.0 | 4.8 | 38.46 | 5.94 |
| CONN, MICHAEL | 491.0 | 14.0 | 2.9 | 27.27 | 4.62 |
| GUGGALI, SHILPA | 438.0 | 12.0 | 2.7 | -20.00 | 3.96 |
| Harshawat, Paras | 248.0 | 12.0 | 4.8 | -14.29 | 3.96 |
| COX, JENNIFER | 298.0 | 11.0 | 3.7 | -42.11 | 3.63 |
| MANNON, STUART | 434.0 | 10.0 | 2.3 | -33.33 | 3.30 |
| CONWAY, KENNETH | 252.0 | 10.0 | 4.0 | 100.00 | 3.30 |
| Engel, Emma | 230.0 | 10.0 | 4.4 | 25.00 | 3.30 |
| LOWINSKY, JOSHUA | 118.0 | 8.0 | 6.8 | 33.33 | 2.64 |
| RIDENOUR, CRYSTAL | 470.0 | 6.0 | 1.3 | 500.00 | 1.98 |
| Schiltz, John | 302.0 | 6.0 | 2.0 | 200.00 | 1.98 |
| Robertson, Rick | 185.0 | 6.0 | 3.2 | -14.29 | 1.98 |
| KALAPATAPU, UMAMAHESWARA | 826.0 | 5.0 | 0.6 | 66.67 | 1.65 |
| PELL, LESLIE | 329.0 | 5.0 | 1.5 | 0.00 | 1.65 |
| SWARTZENTRUBER, DEBBIE | 193.0 | 5.0 | 2.6 | 0.00 | 1.65 |
| EHRET, JASON | 160.0 | 5.0 | 3.1 | 100.00 | 1.65 |
| Meshulam, Ryan | 123.0 | 5.0 | 4.1 | -16.67 | 1.65 |
| Bota, Marina | 289.0 | 4.0 | 1.4 | -20.00 | 1.32 |
| Diez Caballero, Hector | 195.0 | 4.0 | 2.1 | 33.33 | 1.32 |
| DICKENS, JEANNE | 186.0 | 4.0 | 2.2 | 300.00 | 1.32 |
| Hilton, David | 179.0 | 4.0 | 2.2 | 33.33 | 1.32 |

BELIEVE   VANDA

181.     As shown above, these lists contain several child psychiatrists.

182.     Further, Vanda had a competition called "10 to win," which pays an additional bonus every four to six weeks to the sales representative who has the most new prescription growth from a list of ten physicians in their territory. Vanda required sales representatives, both through instruction and due to the bonus payments, to focus their sales efforts on these providers. Similar to the top twenty-five target lists, discussed above, the "10 to win" target lists similarly contained child psychiatrists. Below is a picture of the "10 to win" target list from the sales representative in the Indiana territory:



183.    As shown above, the "10 to Win" target lists for the Indiana territory contained the child psychiatrists. Similar to the "Top 25 Writers" target lists, the "10 to win" target lists were also submitted to senior management for their review.

184.    The fact that Vanda included child psychiatrists in its targets lists demonstrates

that the Company intended its sales representatives to promote Fanapt to child psychiatrists. Significantly, Vanda had the ability to remove child psychiatrists from its sales representatives' target lists by using the ICD-9 and Veeva CRM data it possessed, or by simply performing a quick search on the provider; however, they chose not to. And, according to JB, sales representatives were required to call on every doctor on their call list, even if they treated pediatric patients.

185.    CW states that in 2019 child psychiatrists were again added to the  sales representatives' target lists for the Clozapine Target Initiative (CTI) and Vanda required all sales representatives, including approximately 100 new hires, to call on them.

186.    Further, Vanda was also aware that sales representatives were calling on child psychiatrists prescribing Fanapt off-label to their pediatric patients, and took no action to stop this practice.  As discussed above, in early 2016, Indiana Medicaid stopped reimbursing for off-label prescriptions of Fanapt.  This was a major concern for Relator because Indiana was in his territory and due to the coverage change this territory was expected to lose 400 Fanapt prescriptions per month.   Significantly, these 400 Fanapt prescriptions were from child psychiatrists who were prescribing the drug off-label to pediatric patients.  Relator informed senior management that the 400 Fanapt prescriptions from the territory were a result of off-label pediatric prescriptions.  However, and as discussed above, Vanda's senior management refused to remove these prescriptions from the territory's sales goals.  Therefore, Vanda clearly included these off-label prescriptions in their sales goals and intended that their sales representatives would secure such business.

187.    The issues surrounding the Indiana coverage change also indicate that Vanda, at the very least, was aware that Medenwald was promoting Fanapt for pediatric patients.

69

According to Relator, he was made aware of Indiana's coverage change through Medenwald, who was assigned to that territory. Medenwald learned of this coverage change from child psychiatrists located in Indiana, who contacted him directly upon learning of the new coverage rules. Therefore, Medenwald must have had a preexisting relationship with these child psychiatrists prior to this as it is unrealistic to believe they would have sought out and contacted the Fanapt sales representative for their territory had they not had prior dealings. Therefore, the reasonable conclusion is that prior to Indiana's coverage change, Medenwal was calling these child psychiatrists.

188.    Vanda also spent money promoting Fanapt in child psychiatrists' offices. Vanda acquired the United States and Canadian rights to Fanapt in December 2014, but did not relaunch Fanapt until November 20, 2015. Prior to relaunch, Vanda began promoting Fanapt in child psychiatrists' offices. According to CMS OpenPayments, between August 2015 and December 2015, Vanda paid for food and beverages for twenty-five unique child psychiatrists.

189.    For example, in San Antonio, Texas, which was in JB's territory, one physician on the list was Dr. Hector Samaniego, who treated primarily pediatric patients. JB reports that when he went into Dr. Samaniego's office, there were kids toys all over the office. JB entered to the office with his sales representative and during the call Dr. Samaniego actually said he treats mainly children, and for that reason he has to be careful about what he prescribes because the government monitors more closely prescriptions to children and the elderly. According to JB, Dr. Samaniego was not taken off the target list because he was a very large writer of anti-psychotics and therefore had a high potential to prescribe large amounts of Fanapt.

190.    According to JB, in mid-2017, Vanda started taking psychiatrists with a pediatric designation off of the doctor target lists. However, and as explained above, sales representatives

had access to prescribing data for their entire territory, and were not limited to the doctor target list Vanda provided. Therefore, if pediatric psychiatrists had written Fanapt or a similar drug, the sales representative could still call on them, and be compensated for any Fanapt prescriptions written because they were paid on "total dirt."

### F.   Vanda Promoted Fanapt As a First Line Treatment

191.   Fanapt was approved by the FDA as a second line treatment.  Specifically, Fanapt's FDA approved label states, "QT prolongation: Prolongs QT interval and may be associated with arrhythmia and sudden death – consider using other antipsychotics first" and "Prolongation of the QTc interval is associated in some other drugs with the ability to cause torsade de pointes type arrhythmia, a potentially fatal polymorphic ventricular tachycardia which can result in sudden death. In many cases this would lead to the conclusion that other drugs should be tried first." (emphasis added).

192.   Despite the FDA's limitation, Vanda trained its sales force to promote Fanapt as a first line drug. The FDA approved Fanapt as a second-line treatment due to its risk of QT Prolongation.  As discussed in more detail below, Vanda trained its sales representatives to combat this potential objection from providers by stating that there was no longer a risk of QT Prolongation with Fanapt. Further, during sales training, Polymeropoulos, Vanda's CEO, told the Fanapt RBLs that if Fanapt were approved today, it would be approved as a first line drug. Therefore, by downplaying Fanapt's QT Prolongation side effect, thereby mitigating the sole reason Fanapt was approved as a second line drug, Vanda positioned its sales representatives to promote the drug as a first line treatment. In addition, sales representatives received no training and there was no instruction given that potential Fanapt patients should have tried other therapy options before using Fanapt.  Rather, Polymeropoulos told them that most patients will have tried

other drugs prior to being prescribed Fanapt.

193.    JB corroborates this allegation. According to JB, despite the indication, Vanda never instructed sales representatives, when promoting Fanapt to doctors, to mention this or ask whether the patient had tried other therapies. JB states that Vanda executive management never talked about Fanapt being a second-line drug, and it was not written on any of the promotional materials they were provided. It is JB's belief that Vanda did not want its sales force to mention this fact because they did not want the doctor receiving the pitch to think about trying another drug before prescribing Fanapt.

194.    Further, the sales pitch which Vanda's sales force was trained to provide to physicians – focusing on effectiveness and side effects, and avoiding mention of schizophrenia – also required sales representatives to position Fanapt as a first line treatment. This is because if a sales representative could convince a physician that Fanapt was just as effective as other atypical antipsychotics, but without the safety risks, Fanapt should be the provider's "go-to drug" for all patients prescribed to atypical antipsychotics.   For example, Vanda instructed its sales representatives to use the following messaging when calling on providers:

> Doctor, Akathisia is a common and serious risk factor, why even run the risk by trying other atypical antipsychotics when Fanapt has placebo like rates of Akathisia?  Fanapt is the ONLY atypical antipsychotic that does not cause Akathisia.

> Doctor, why induce Akathisia when Fanapt is cleaner than any other atypical antipsychotic on the market?

> Doctor, why would you even consider risking a serious side effect like Akathisia when Fanapt is just as good or better than other atypical antipsychotics in the marketplace, but much cleaner?

> Doctor, Fanapt is a great treatment option for your new start patient because it's the only treatment that doesn't cause Akathisia.

195.    These statements, and other instructions given to sales representatives,

demonstrate that Vanda intended its sales representatives to promote Fanapt as a first-line therapy.

### G.     **False Dosing Message**

196.     Vanda trained its sales representatives to promote Fanapt as a once-a-day medication, despite its FDA approved indication.  Fanapt was approved by the FDA for a dosing amount of 12 to 24 mg per day, administered twice daily.  Therefore, Fanapt must be administered twice a day, unlike other atypical antipsychotic medications on the market.  This put Fanapt at a disadvantage to its competitors because patient compliance with their medication regimen is vital to effective treatment. Further, patients with a mental illness are less likely to stay compliant with their medication schedule, and therefore providers treating such patients typically prefer medications that are administered once a day compared to medications administered twice per day.  To combat this, Vanda trained its sales force to inform providers that because of its 23.5 hour half-life, Fanapt could be administered only once a day and would be just as effective.

197.     Vanda trained its sales representatives to pitch Fanapt to physicians as a once-a-day medication, despite the FDA's approved dosage.  Fanapt sales representatives were taught to tell physicians that because of its long half-life, administering the drug once a day would treat patients' conditions just as effectively as when administered twice a day.  In addition, sales representatives were told that Fanapt was only approved for twice a day dosing because that's how it was studied, and if studied today it would be a once-a-day drug.

198.     Further, to convince physicians that Fanapt was an effective once-a-day treatment option, sales representatives would highlight Fanapt's "23 ½ hour half life."  Indeed, according to Relator and JB, Fanapt's long half-life was repeatedly discussed during sales training.  For

73

example, during sales training, Vanda's senior management emphasized that Fanapt's long half-life was a unique benefit to providers because it offered providers "the flexibility to dose Fanapt any way they want." Also during the national Fanapt relaunch meeting, CEO Polymeropoulos told the RBLs and sales representatives that Fanapt should have been approved for once-a-day dosing and "many people have told me that I should go back to the FDA and request approval for QD [once a day] dosing for Fanapt because Fanapt's half-life of 23 ½ hours is so long." Polymeropoulos continued, stating, "Doctors will ask you if Fanapt can be dosed once daily because of the long half-life and you know what the answer to that question is? It can be!" Indeed, Polymeropoulos' comments make clear that Vanda intended its sales force to promote Fanapt for once-a-day dosing. And that's exactly what the sales force did.

199.    JB corroborates this allegation. According to JB, Vanda's sales force was aware that medications with once a day dosing have higher compliance rates for patients and as a result, doctors prefer once a day drugs over drugs that need to be administered twice a day. This presented a challenge to sales representatives promoting Fanapt to doctors. According to JB, Vanda trained its sales force to stress to doctors that Fanapt has an 18 to 26 hour half-life, and that by saying this the doctor would determine that it can be used once a day. Further, JB states that the sales force was told that the only reason it was dosed twice a day was to combat orthostatic hypertension. And, JB states that many physicians did in fact prescribed their patients to Fanapt with a once a day dosing due to the long half-life.

200.    Fanapt's dosing schedule was of such importance to Vanda that it even provided its sales force with sales aides to train them how to address this objection from providers in the field.  For instance, in the sales aide entitled "Overcoming Objections," one of the objections states, "BID dosing is not practical for schizophrenia patients."  The "Key Points" section under

that objection then states, "Fanapt half-life is 18-26 hours." This messaging is intended to indicate to providers that Fanapt, due to its long half-life, can be prescribed once per day and led the physician to ask whether Fanapt could be dosed once per day, to which sales representatives were trained to respond, "It can be." Further, sales representatives were instructed to tell providers concerned about Fanapt's twice-a-day dosing that "with that kind of half-life, Doctor, I will let you decide." And if a physician decided to prescribe the drug once-a-day, sales representatives were instructed to tell them to "dose it at night because it has a calming effect."

201.    This scheme was so successful that during a February 2015 earnings call, Polymeropoulos announced that Vanda would be increasing the price of 10 mg and 12 mg tablet prices 100% to account for once-a-day dosing.  Specifically, Polymeropoulos stated:

> Fanapt comes in several doses -- 1 milligram, 2, 4, 6, 8, 10, 12 and a titration pack. Based on the demand and understanding how the product is used, we took a price increase on the 6 and 8 milligrams, which was a significant jump of about 30% or so. **The 12 milligrams was adjusted in what appears to be 100% but actually it is consistent with the use of 12 milligrams as once a day, and therefore it was adjustment for usage.** Now, the net Fanapt increase overall is actually small. It is about a 15% net, taking into account that 40% of the patients are on Medicaid, and price increases based on the legislation result in additional rebates leading to actually a decrease, a net decrease of the Medicaid channel.

(Emphasis added).

202.    Vanda made this pricing change to protect it from losing revenue as a result of physicians prescribing Fanapt once per day instead of twice per day. Further, the decision to increase the price of the 10 mg and 12 mg tablets in February 2015, many months before Vanda trained its Fanapt sales force, was a result of the success the Fanapt 12 had at convincing physicians to prescribe Fanapt once a day.

**H.    Downplaying Safety Profile**

203.    In order to gain FDA approval, Fanapt was required to give certain safety

warnings to patients and providers. Knowing Fanapt's safety profile may cause providers to prescribe their patients a different antipsychotic. Vanda implemented sales techniques to downplay the safety risks associated with its drug. This messaging was false and misleading, and ranged from broad claims about Fanapt's safety profile to messages tailored to address specific side effects caused by the drug.

204. That Vanda downplayed or completely omitted safety information for Fanapt and Hetlioz is confirmed by an October 22, 2018 FDA Warning Letter to Polymeropoulos regarding Vanda's failure to include safety information in an online advertisement on its website. Specifically, the letter states in part:

> The webpage is false or misleading in that it presents information about the benefits of Fanapt and Hetlioz, but fails to include **any** risk information about either drug . . . . Of particular concern is that Fanapt is a drug that bears a Boxed Warning due to serious, life-threatening risks, including increased mortality in elderly patients with dementia-related psychosis, as well as numerous other warnings.

> Promotional materials misbrand a drug if they are false or misleading with respect to risk . . . . This misleading presentation is especially problematic from a public health perspective due to the serious and potentially life-threatening risks associated with the drugs, such as those contained in Fanapt's Boxed Warning.

> Because the violation described above is serious, we request, further, that your submission include a comprehensive plan of action to disseminate truthful, non-misleading, and complete corrective messages about the issues discussed in this letter to the audience(s) that received the violative promotional materials.

### 1. Placebo-Like Safety Profile

205. One of the core messages taught to sales representatives during training was that Fanapt had a "placebo-like" safety profile and that in clinical studies the side effects experienced by patients taking Fanapt were similar to the side effects experienced by patients given a placebo. This messaging, however, is false and misleading because in its clinical trials Fanapt was shown to have a greater safety risk than a placebo.

206.     During sales training, sales representatives were told to use the phrase "placebo-like" when discussing Fanapt's safety profile, even though Fanapt's side effect profile was not "placebo-like" across the board for all side effects.  And this is demonstrated in Vanda's own sales aides.  The Fanapt master sales aide demonstrates the side-effect rate for each of Fanapt's side effects and the rate at which patients taking a placebo in clinical studies suffered the same side effects.  As the sales aide demonstrates, the side effect rate for Fanapt was higher for almost all side effects than a placebo. For example, for weight gain, in the clinical studies, patients receiving a placebo lost 0.1kg on average while patients taking 20-24 mg per day of Fanapt gained 2.7kg and patients taking 10-16 mg per day gained 2.0kg. Further, Ramirez instructed sales representatives to tell providers, when reviewing all patients participating in clinical studies, that "Fanapt only showed a *2.1 increase in weight*." (Emphasis added).  Ramirez then explained that physicians would think this was in reference to 2.1 pounds when in reality it was in reference to kilograms (approximately 5 pounds).

207.     Vanda also instructed its sales force to claim that Fanapt was "metabolically neutral," when referring to Fanapt's effect on lipid levels as a placebo, which was false. The use of the phrase "metabolically neutral" insinuates that Fanapt causes no change in fasting lipid measures, but, in fact, in a four-week clinical trial, 1.4% of patients taking a placebo experienced a shift from normal-to-high in fasting cholesterol measures compared to 3.6% of patients taking Fanapt. Thus, Fanapt had twice the effect on cholesterol compared with the placebo.  Further, 8.3% of patients taking a placebo experienced a shift from normal-to-high in fasting triglyceride measures compared to 10.1% of patients taking Fanapt. In fact, Vanda's own marketing materials demonstrate this is false. On the Fanapt Patient Profile sales aide under the section "Consider Fanapt when it's time to switch" it states, "Low adverse metabolic impact in the

majority of patients."

208.    To demonstrate, below is a chart showing Fanapt side effect frequency during the clinical trials as compared to the placebo:

| Side Effect | Fanapt 10-16 mg/day (%) (n=483) | Fanapt 20-24 mg/day (%) (n=391) | Placebo (%) (n=587) |
|---|---|---|---|
| Dizziness | 10 | 20 | 7 |
| Dry Mouth | 8 | 10 | 1 |
| Fatigue | 4 | 6 | 3 |
| Nasal Congestion | 5 | 8 | 2 |
| Somnolence | 9 | 15 | 5 |
| Tachycardia | 3 | 12 | 1 |
| Orthostatic Hypotension | 3 | 5 | 1 |
| Weight Increase | 1 | 9 | 1 |

209.    A similar chart is contained in one of Vanda's Fanapt master sales aides. As the chart demonstrates, side effects, across the board, were much more prevalent in patients taking Fanapt than patients taking a placebo.  Therefore, Vanda's messaging about its "placebo-like" safety profile is false and misleading.

### 2.    QTc Prolongation

210.    The FDA-approved Fanapt label states that Fanapt is associated with prolongation of the QTc interval. Other drugs that have been associated with prolongation of the QTc interval have caused torsade de pointes-type arrhythmia, a potentially fatal polymorphic ventricular tachycardia, which can result in sudden death.  Due to this severe safety risk, Fanapt's label advises providers to "consider using other antipsychotics first."  Vanda sought to minimize the QTc Prolongation safety warning required by the FDA, and convince providers that Fanapt did not cause QTc Prolongation.

211.    Sales representatives were trained to downplay the risk of QTc Prolongation in patients taking Fanapt.  Specifically, sales representatives were instructed to tell providers:

if Fanapt was approved today, it would not have received the QTc Interval Prolongation warning. When the FDA approved Fanapt years ago, there was very little data about QTc Interval Prolongation so it was blown out of proportion. Now, it is no longer a concern and if Fanapt were approved today it would not have the QTc Prolongation side effect warning.

212.    Further, when comparing Fanapt to Latuda or Saphris, sales representatives were trained by CEO Polymeropoulos to say that those drugs did not have the QTc Interval Prolongation warning because they were approved years after Fanapt.  And, if Fanapt were approved today, it similarly would not have the QTc Prolongation warning. Polymeropoulos, who is also a psychiatrist, further explained to the Fanapt sales force that doctors would laugh at Fanapt's QTc Prolongation safety warning because it was approved years ago and it is no longer an issue.

213.    Such messaging is confirmed in Relator's notes from a manager meeting he participated in while at Vanda.  Relator's notes state:

Any A-Typical launched post Latuda will no longer have QT Prolongation as part of the [package insert] as [the] FDA realizes [QT Prolongation] is no long worth noting. [The number of patients experiencing QT Prolongation] are too small to be an issue.

214.    In addition, the overcoming objections sales aide specifically addressed this potential physician objection.  In the sales aide, one of the objections states, "I am concerned about QT Prolongation." Under this objection in the "Additional Data and Support" section, it directs sales representatives to tell the provider that "no arrhythmias or torsade de pointes were observed with Fanapt . . . ."  According to Relator, this response is meant to imply that while QT Prolongation can be serious, it was not serious with Fanapt.  Further, this message is in direct contradiction to Fanapt's FDA approved package insert which states, "[w]hether FANAPT will cause torsade de pointes or increase the rate of sudden death is not yet known."

215.    JB corroborates Relator's allegations. According to JB, Vanda did not address QT

Prolongation with the Fanapt sales force, other than Polymeropoulos mentioning early on that it was not a big deal or something to worry about. In fact, according to JB, at a Fanapt sales meeting in early 2017, a sales representative asked what QT Prolongation was because he did not know. Polymeropoulos then asked Paollo to conduct a training session on QT Prolongation with the Fanapt sales force because they did not know much if anything about it.

**I.**      **False Titration Messaging**

216.       The FDA-approved Fanapt label states that patients starting on the drug should use titration to achieve the target dose.  Specifically, Fanapt's label provides:

> The recommended target dosage of FANAPT tablets is 12 to 24 mg/day administered twice daily. This target dosage range is achieved by daily dosage adjustments, alerting patients to symptoms of orthostatic hypotension, starting at a dose of 1 mg twice daily, then moving to 2 mg, 4 mg, 6 mg, 8 mg, 10 mg, and 12 mg twice daily on Days 2, 3, 4, 5, 6, and 7 respectively, to reach the 12 mg/day to 24 mg/day dose range. FANAPT can be administered without regard to meals.

217.       The FDA, in approving Fanapt, also approved the titration schedule shown above. The official Fanapt titration pack, however, does not follow the FDA's approved titration schedule. Rather, the pack contains two 1 mg tablets for day one, two 2 mg tablets for day two, two 4 mg tablets for day three, and two 6 mg tablets for day four, as shown below.

218.       Relator learned that Fanapt sales representatives in some territories were ignoring the FDA-approved titration schedule and giving providers two or three titration packs, rubber banded together, to give to their patients starting Fanapt.  In some instances, multiple titration packs were provided to physicians as samples, however, in most cases they were provided for the purposes of titrating a patient.

219.       Relator became aware of this scheme when he was certifying sales representatives from the New York region during the Fanapt launch meeting in November/December 2015. Specifically, Relator and Dewey McLin, Vanda's Director of Medical Affairs, were certifying

one of the Fanapt 12, who during the role-play exercise stated:

> Doctor, you can give your patients more than one Fanapt titration pack[] to eliminate the risk of orthostatic hypotension, I will leave you a bunch of titrations packs today so you can get your patients started.

220.   Relator and McLin failed the sales representative for using this unapproved titration message.  Relator explained to the sales representative that he was not being certified because he was prohibited from telling the physician that he could titrate his patients using multiple titration packs, and that this would eliminate orthostatic hypotension.  In response, the sales representative stated that *all* of the sales representatives in the Northeast Region were putting rubber bands around multiple titration packets and giving them to physicians with the same instructions.

221.   Relator then met with the sales representative's direct supervisor, Northeast RBL Jennifer Hedden, who managed 8 of the Fanapt 12.  Hedden told Relator that "this is what we have been doing in our region" and explained that providing multiple titration packs offered a cost benefit to the provider and was convenient for the patients. However, Hedden further stated that her sales representative would never use this messaging in a certification role-play because "he knows better than that." Relator reported this to Ramirez (Head of Sales) and James (National Sales Director), however, no action was taken to prevent this conduct from continuing.

222.   Hedden then complained to James and Ramirez that Relator refused to certify her sales representative. James agreed to allow the sales representative to conduct the certification role-play again in front of him instead of Relator. According to Relator and JB, Vanda's senior management made no attempt to correct the off-label message regarding the titration packs even though he told James and Ramirez that the sales representative from New York told him that everyone was using this sales message, including RBL Hedden. Ramirez and James subsequently

certified the sales representative that Relator failed to certify.

223.   This same messaging was included in a slide deck that senior management selected Hedden to prepare and present to the other RBLs, entitled "Influenced Selling."  The purpose of this presentation was to share with the other RBLs the best practices used in her region to drive sales.  When giving the presentation, Hedden explained that in her region, sales representatives rubber band two or three titration packs together for "convenience and cost savings."  The cost savings message was that if sales representatives provided multiple titration packs, it would save the physician from having to write the patient a prescription for days five, six and seven because Vanda's titration packs only provided enough Fanapt for the first four days.  The slide deck containing this false messaging was distributed to and approved by Vanda's senior management before being shown to the RBLs.

224.   This scheme had the effect of increasing the target dose for patients receiving the bundled titration packs.  Fanapt's package insert states,  "[e]fficacy was demonstrated with FANAPT in a dose range of 6 mg to 12 mg twice daily . . ." and "[p]rescribers should be mindful of the fact that patients need to be titrated to an effective dose of Fanapt . . . ."  The Fanapt titration pack, providing patients with tablets for days one to four, was designed to slowly titrate a patient to 6 mgs twice daily, with titration to continue only if needed.  By providing several titration packs, Vanda helped ensure patients would titrate above the 6 mg effective mark, and therefore increase their target dose to a 12 mg tablet twice daily.  Even though a patient may have been adequately treated with 6 mg twice daily, Vanda instructed its sales representatives to give every provider three Fanapt titration packs rubber banded together which ensured that most patients would be prescribed the higher 12 mg twice daily dose.  Further, Vanda wanted patients to take the highest dose, 24 mg/daily, because, according to Relator, he heard from several

providers that Fanapt was not a very effective drug, and therefore if the patient did not titrate up to 24 mg/daily, the chances the drug would be effective were much lower.

225.     Vanda also did not provide any instructions for how to use multiple titration packets to properly titrate Fanapt.  The titration packet is shown below:



226.     As shown above, Vanda only provided titration instructions for the first four days. Specifically, the directions Vanda provided for its titration pack instructs patients to take: (1) one 1 mg pill in the morning and evening on day one; (2) one 2 mg pill in the morning and evening on day two; (3) one 4 mg pill in the morning and evening on day three; and (4) one 6 mg pill in

the morning and evening on day four. Vanda did not include instructions on how a patient should properly use multiple titration packs to properly titrate Fanapt. This is especially concerning given that patients prescribed Fanapt (i.e., patients with mental illness) may struggle to figure out, on their own, how to properly administer these titration packs without proper instructions. More pointedly, if a patient, who was given three Fanapt titration packs, followed Vanda's instructions printed on the titration packets, the result would be: (a) six 1 mg pills on day one; (b) six 2 mg pills on day two; (c) six 4 mg pills on day three; and (d) six 6 mg pills on day four.

227.    The approved FDA label for Fanapt states,

FANAPT is an atypical antipsychotic agent indicated for the acute treatment of schizophrenia in adults. In choosing among treatments, prescribers should consider the ability of FANAPT to prolong the QT interval and the use of other drugs first. Prescribers should also consider the need to titrate FANAPT slowly to avoid orthostatic hypotension, which may lead to delayed effectiveness compared to some other drugs that do not require similar titration.

228.    The Fanapt FDA package insert states under the Warnings section: "Orthostatic Hypotension and Syncope: Fanapt can induce orthostatic hypotension associated with dizziness, tachycardia, and syncope. This reflects its alpha1-adrenergic antagonist properties. More rapid titration than recommended would be expected to increase the rate of orthostatic hypotension and syncope." The insert further states under the "Approved Dosing and Administration" section that Fanapt must be titrated slowly from a low starting dose to avoid orthostatic hypotension due to its alpha-adrenergic blocking properties.

229.    The distribution of multiple titration packs, rubber banded together, can result in patients dosing the titration packs according to the written instruction on the package, causing the patients to rapidly titrate Fanapt, thus increasing the risk for orthostatic hypotension and defeating the entire purpose of the FDA warning to slowly titrate Fanapt.

230.    Fanapt's FDA-approved titration schedule states that to effectively titrate a

84

patient, daily dosage adjustments should not exceed 2 mg twice daily.  Therefore, titrating a patient to 24 mg/daily would require 86 mg of Fanapt.  However, the titration packs only contained 26 mg of Fanapt, and therefore a provider would need four titration packs to properly titrate the patient to 24 mg/daily.  As such, if a provider wanted to titrate a patient to 24 mg/daily, the patient would have to mix and match the various pills in the titration pack to achieve the daily titration dosage. Vanda, however, provides no instructions to achieve such a target dose.

J.    **False and Misleading Drug Comparisons**

231.    Vanda regularly promoted, falsely, that the clinical studies demonstrate that Fanapt is just as effective as Risperidone (Risperdal). This comparison is not true, however.  As discussed above, sales representatives were trained to make this comparison using the four-week study, which used Geodon as an active control, and the six-week study that used Risperidone as an active control. Sales representatives were trained to use these studies to show that in the six-week study Fanapt only *appeared* less effective than Risperidone because it did not require titration, and the four-week study shows comparable efficacy because the active control was Geodon, which requires titration.

232.    Vanda prepared for physician objections to Fanapt's efficacy message, and sales representatives were specifically instructed to "attack the efficacy objection."  For example, in Vanda's Fanapt Call Guidance sales aide, sales representatives are instructed to tell providers, when discussing the two studies, the following:

> At both doses Fanapt appeared to have comparable efficacy to risperidone for patients who remained on treatment longer than the first two weeks. What is interesting, is that because of the study design, risperidone appeared to have superior efficacy during the first two weeks, a finding that may in part be explained by risperidone's more rapid titration while patients were achieving steady state on Fanapt.

233.    This sales pitch was false and misleading because it states that the study results

show that Fanapt is just as effective as Risperidone, however, these studies were active control studies, and not studies comparing the two drugs head-to-head.  In such a study, the active control is used to ensure the study worked because the active control has proven in previous studies to be more effective than a placebo.  Active control studies do not compare the drug being studied against the active control. *See* OPDP Untitled Letter to The Medicines Company, Apr. 13, 2012 ("In general, claims of superiority must be supported by adequate and well-controlled head-to-head clinical trials comparing appropriate doses and dose regimens of your drug and the comparator drug or drugs . . . Non-inferiority trials are not designed to demonstrate superiority over other agents. Rather, they are intended to show that the effect of a new treatment is not worse than that of an active control by more than a specified margin.")

### K.    Misuse of Copay Cards

234.    In March 2016, Relator discovered a fraudulent scheme to misuse Fanapt copay cards which Vanda helped conceal.  Specifically, in March 2016, Relator was on a field ride with one of his sales representatives, LaShonda Harris, who was responsible for the Detroit, Michigan sales territory.  During the ride along, Relator reviewed the Veeva historical prescribing data for Harris' territory when he noticed a large spike in Fanapt prescriptions among a certain group of physicians in Detroit.  These physicians historically prescribed only 2-3 Fanapt prescriptions per month, but the Veeva data showed that in October and November 2015, these physicians wrote over seventy Fanapt prescriptions.

235.    This increase in prescriptions in October and November 2015 was not noticed until March 2016 because the Veeva historical prescribing information has a three-month lag time for reporting.

236.    Relator suspected this was an error and called James and Ramirez to inform them

of the error.  To Relator's surprise, Ramirez instructed him to tell Harris not to call on those physicians' offices again and cancel all lunches and appointments she had scheduled with them. Relator, believing this was an error, asked how it would affect Harris' sales goals and incentive compensation plans, as both were based on historic prescription growth.  In response, Ramirez stated that Harris would be paid 100% of her goal regardless of what happened with the group of physicians in Detroit, and he further instructed Relator to tell her "you're welcome."

237.    Relator then followed up with Ramirez regarding this issue.  Ramirez conceded that the increase in prescriptions was the result of a fraudulent scheme between the physicians and local pharmacists to submit hundreds of Fanapt copay cards and prescriptions, receive reimbursement from the insurance provider, and then pocket the money because the prescriptions were never dispensed.  Ramirez instructed Relator not to discuss the matter with anyone and not to email him or anyone else about the issue. Further, in regards to Harris, Ramirez stated, "we are removing [Harris] from the account. The less she knows the better."  Vanda was an active participant in this scheme. According to Relator, Fanapt copay cards can only be provided by a Fanapt sales representative or manager. Therefore, in order for these physicians to obtain such a large quantity of copay cards, Vanda must have supplied the copay cards and subsequently sought to cover it up after others took notice.  And, as Fanapt's copay cards can be used by Medicare and Medicaid, which itself is a violation, the payments for these fake prescriptions were incurred by the Government.

238.    JB confirms that the situation with the copays occurred. And, although he did not have as much information as Relator because it did not occur in his territory, JB states that as a result of this scheme Harris' quota was artificially inflated because Vanda refused to remove the Fanapt historic prescribing information from her quota calculation. And JB recalls Relator

informing Ramirez that Harris' quota was inflated and needed to be reduced, and Ramirez responding that he did not want to discuss it again and Harris was expected to meet the inflated sales goal.

### L.    The Aurelius Report

239.    As discussed above, the research firm Aurelius issued a report on Vanda's sales practices which specifically referenced Relator's original complaint.

240.    The Report states that Aurelius' "research indicates that Vanda has had an extremely difficult time attracting and keeping blind patients on Hetlioz, the population the drug was tested on and designed to treat."

241.    The Report further states that its research indicates that "Hetlioz has unfavorable levels of front-end patient churn, meaning patients who begin treatment often drop off in the first six months." A former Vanda manager quoted in the Aurelius Report states that patients "might have stayed on the drug [Hetlioz] for three or four months, and there's probably some that are still on it from initial launch. The others, there was big turnover . . . because of efficacy, I would think." This is supported by the FDA Adverse Event Reporting System, which contains information on mediation error reports submitted to the FDA. The most frequently reported adverse event about Hetlioz is "drug ineffective." The Aurelius Report further states that when combined with similar complaints about efficacy, it totals 888 complaints since 2014, an amount which exceeded the total number of patients currently taking Hetlioz as of the date the Report was published.

### M.    Off-Label Promotion of Hetlioz

242.    Vanda also promoted its drug Hetlioz for off-label purposes. Hetlioz was granted orphan drug status by the FDA on January 19, 2010 for Non-24 in blind patients without light

perception.  On January 31, 2014, Vanda announced that the FDA had approved Hetlioz 20 mg capsules for the treatment of Non-24.

243.    As discussed in more detail herein, Vanda illegally promoted Hetlioz by misrepresenting Non-24 to encompass several additional CRDs, thereby expanding the potential patient population, to mislead prescribers, mainly psychiatrists, into believing their patients had Non-24, when in actuality they did not.

244.    Non-24 is a serious, rare CRD that affects a significant portion of totally blind individuals who lack light perception and cannot reset their body clocks to the 24-hour day. In the United States, this disorder affects approximately 90,000 totally blind individuals.  Although Non-24 does affect some sighted patients, the vast majority of patients with Non-24 are blind.

245.    In fact, according to Vanda's Hetlioz marketing piece, there are approximately 130,000 totally blind individuals with no light perception.  And of that group, 70%, or up to 95,000 according to Vanda, are affected by Non-24.

246.    Non-24 is extremely rare in sighted individuals. According to the National Sleep Foundation ("NSF") "[a]s many as half to three-quarters of totally blind patients (i.e., having no light perception) are considered to have Non-24, representing approximately 65 to 95 thousand Americans. The number of sighted people with Non-24 is unknown." The NSF further states that "The exact cause of Non-24 in sighted people is unknown." Further, Robert Sack, MD, of Oregon Health and Sciences University, a respected expert on the condition of Non-24, told MedPage Today that there have been fewer than 100 cases of sighted people with Non-24 sleep-wake disorder reported in the scientific literature.

247.    Vanda sought FDA approval for Hetlioz for treatment of Non-24 in totally blind individuals. Vanda's clinical trials for Hetlioz only included blind individuals. In fact, during the

Hetlioz FDA Advisory Committee Meeting (Nov. 2013), Polymeropoulos even stated "Now, for patients that don't have non-24, we don't recommend it, **and it's actually easy to keep the drug only in the hands of blind people** . . . ." (emphasis added). However, and as explained in more detail below, after releasing the drug, Vanda quickly turned to sighted patients as their primary target for Hetlioz. This strategy has been successful, as Vanda admits that currently two out of every three patients prescribed Hetlioz are not blind.

248.    According to Relator and JB, prior to Fanapt sales training in November/December 2015, he and the other RBLs were told that they needed to come to training with a full understanding of Vanda's Hetlioz marketing materials. During sales training, the RBLs, including Relator, were instructed to tell their sales representatives that they were required to introduce Hetlioz to the provider at the end of every sales call. However, outside of the marketing materials, the sales force received no training on Non-24 or Hetlioz. The sales representatives may have had some *minimal* Hetlioz product and disease state training during National Sales Training in November/December 2015 prior to the RBLs arriving for the certification portion of the training meeting.

249.    Initially, to pitch Hetlioz to providers, CEO Polymeropoulos instructed the RBLs to direct their sales representatives to ask providers, "do you have any blind patients?" Regardless of the answer, sales representatives were instructed to state, "Hetlioz is a drug that is effective in treating circadian rhythm disruption" and to leave the provider with the Hetlioz slim-jim sales packet.

250.    Polymeropoulos also told the RBLs that psychiatrists would connect the dots and easily determine that if Hetlioz treats circadian rhythm disruption in Non-24 that it would also be able to treat their non-blind patients with other sleep disorders caused by circadian rhythm

disruption, such as shift work sleep disorder, jet lag, and insomnia. According to Relator, the RBLs and sales representatives were to focus on Hetlioz's ability to treat circadian rhythm disruption when pitching the drug to providers.  Polymeropoulos continued that Vanda was also currently seeking additional indications for Hetlioz.  Relator believes that Polymeropoulos said this to the RBLs with the intent that they would share this information with their sales representatives, who could use it in the field while promoting Hetlioz.

251.    After a sales representative pitched Hetlioz to a provider, they were required to pass the account over to a Hetlioz sales representative to close the sale.  Internally at Vanda, these were referred to as "pass-alongs."  Sales representatives were told that they would be held accountable for how many "pass-alongs" they provided to the Hetlioz sales team. The number of pass-alongs a sales representative secured was then documented in their company-issued laptop following every sales call.

252.    According to JB, when Helioz was first launched, Vanda set a sales quota of two prescriptions per quarter, however, that was raised shortly after the drug launched. JB further states that a majority of the sales representatives were having trouble achieving Vanda's sales expectations for Hetlioz. One sales representative, Scott Grontkowski, out of Rockville, Illinois, had doctors write over 50 prescriptions in a quarter, none of which were for blind patients. This was far more prescriptions than any of sales representative had obtained. At the 2018 national sales meeting, Vanda had Grontkowski do a presentation to the entire sales staff to demonstrate his pitch. According to JB, Grontkowski's sales pitch contained nothing about the drug's efficacy for Non-24. Instead, he simply said he tells doctors that if they have patients who cannot sleep, they should prescribe them to Hetlioz and get them sleeping right now.

253.    One sales representative obtaining 50 Hetlioz prescriptions in a single quarter

demonstrates the concentration of prescriptions among physicians. An Oppenheimer Equity Research Update on Vanda (dated Oct. 29, 2017) states that there were only "600 total patients on Hetlioz at the end of 2016 . . . ."  This is corroborated by the Aurelius Report which quotes a former sales representative, who expressed doubt that large amounts of Hetlioz prescriptions are being obtained lawfully by one representative in a single area. Specifically, he/she states "Look across the country, how come one guy can have 50, 60, 70, 80 [Hetlioz prescriptions] and a whole state can only have 3? . . . Do they have 70 more blind people, all in one little-pocketed area, coming from one or two doctors, three blocks from each other?"

254.    In May 2016, Ramirez held a meeting with the RBLs and reprimanded them because the sales force was not producing enough pass-alongs.  Ramirez stated that it was mandatory for the Fanapt sales representatives to introduce Hetlioz on every sales call.  Several of the RBLs, including Relator and Charles Rathmann, responded that it was hard to expect sales representatives to promote Hetlioz because sales of that drug were not included in their incentive compensation plans.  Further, the RBLs stated that many of the providers that sales representatives call on do not have any blind patients.  Ramirez responded that the sales representatives' job security was compensation for promoting Hetlioz and insisted that it was mandatory that they promote this drug on every sales call.  Ramirez continued that in promoting Hetlioz to providers, sales representatives should focus on the fact that Hetlioz, unlike most other sleep aides, was not classified as a schedule drug by the FDA.  In this way, Vanda was able to differentiate Hetlioz from other sleep aides. This is corroborated by the Aurelius Report which states "Our research indicates that Vanda has had an extremely difficult time attracting and keeping blind patients on Hetlioz, the population the drug was tested on and designed to treat. In order to meet growth targets, we believe Vanda's 'secret sauce' is a product of Polymeropoulos

harnessing the Fanapt sales force to begin selling Hetlioz to psychiatrists as a sleep aide alternative to Ambien and Lunesta for sighted patients."

255.   Indeed, the patient population for Non-24 is very small. One former Vanda sales representative stated in the Aurelius Report that finding any patients with Non-24 was the classic "needle in the haystack" exercise. Further, demonstrating how rare Non-24 is, the Aurelius report further states "that Vanda had to cut patient enrollment of its FDA trials of Helioz in half because it could not identify enough patients with the condition [Non-24]."

256.   Gertie Kass, former sales representative at Vanda, also experienced pressure to promote Hetlioz off-label. According to Kass, Vanda was forcing sales representatives to promote Hetlioz off-label and convincing doctors to share patient information, such as patient medical records, without any type of release, in violation of HIPPA. She complained to her manager, Carlos Morris about the off-label promotion and HIPPA violations. In response, Morris stated that she was "paid to do this job, do it." In addition, according to Kass, Vanda was requiring her to obtain 6-8 Hetlioz prescriptions per quarter. Kass, however, was only able to obtain approximately one per quarter, which was on par for most sales representatives.

257.   In addition, Kass states that Vanda wanted its Hetlioz sales force to focus primarily on psychiatrists, a group which does not treat patients with Non-24. For example, one doctor on her call list was an internist, who ended up writing six Hetlioz prescriptions. Kass does not believe that the internist should have been on the list.

258.   In addition, while Kass was promoting Hetlioz, she convinced several doctors to prescribe Hetlioz, however, none of the patients were blind. And the doctors she convinced to write such prescriptions were all on the Vanda doctor call list she was provided.

259.   Kass also had issues with the sales quota requirement, which was very high given

that they were promoting an orphan drug. She complained about this to Morris, but nothing changed.

260.    Vanda's off-label intent for Hetlioz is also demonstrated by its "Hetlioz to Psychiatrists Initiative," ("HPI") announced by Vanda in 2017. Vanda announced HPI its third quarter earnings conference call on November 7, 2017. On the call, Polymeropoulos announced that Fanapt sales representatives would call on psychiatrists to promote Hetlioz. Despite announcing this practice in 2017, Vanda had been using Fanapt sales representatives to promote Hetlioz to psychiatrists for years prior to this announcement. As discussed herein, Vanda was able to target sighted patients by promoting Hetlioz to psychiatrists.

261.    HPI was a success. Polymeropoulos, during Vanda's 2018 fourth quarter earnings call (Feb. 14, 2019), stated:

> Our efforts to commercialize Tasimelteon for Non-24 [ph] were expanded in 2018, with the aim to create broader awareness of the disorder among psychiatrists. As it is known Non-24 is commonly present among totally blind individuals. But it is also found with low prevalence among sighted individuals. This low prevalence of Non-24 among sighted individuals, presents a significant challenge in identifying physicians will likely see this patients. However, Non-24 is reported to be co-morbid with certain conditions that are typically treated by psychiatrists.
>
> This include bipolar disorder, depressive disorders and traumatic brain injury. In the fourth quarter of 2017, we launched a new initiative, HPI where our Fanapt psychiatrist sales force began creating awareness for non-24 among psychiatrists. HPI has been a productive initiatives through 2018, significantly increasing demand. When monthly new scripts increasing by approximately three-fold as compared to months prior to the HPI launch.

262.    Thus, according to Polymeropoulos, 2 out of every 3 Hetlioz prescriptions come from psychiatrists and are written for sighted patients.

263.    According to Relator and JB, the marketing scheme for Hetlioz was designed to produce off-label prescriptions beyond Hetlioz's sole indication of Non-24.   First, sales

representatives were instructed to focus their sales pitch primarily on Hetlioz's ability to treat circadian rhythm disruption.  Circadian rhythm disruption is the cause of many sleep disorders, including shift work sleep disorder, insomnia, advanced sleep phase disorder, delayed sleep phase disorder, irregular sleep-wake rhythm, and Non-24, among other conditions.   By instructing sales representatives to focus on Hetlioz's ability to treat circadian rhythm disruption, Vanda intended to secure off-label prescriptions because it knew this sales pitch would cause physicians to ask whether Hetlioz could treat other sleep disorders caused by circadian rhythm disruption.  In this way, Vanda positioned Hetlioz as a treatment option for all sleep disorders caused by circadian rhythm disruption.  According to Relator, 90% of the time the physician would ask whether Hetlioz could treat other sleep disorders caused by circadian rhythm disruption.

264.    Further, by promoting Hetlioz as a sleep aide that was not classified as a schedule drug by the FDA, Vanda intended to convince physicians to use Hetlioz instead of other sleep aides.  As a significant majority of scheduled sleep aides are prescribed for conditions other than Non-24, and sales representatives were required to promote Hetlioz regardless of whether the provider had blind patients, it is obvious that Vanda intended its sales representatives to promote Hetlioz as an effective substitute for all sleep aides to treat conditions outside of its indicated use (i.e., Non-24). The Aurelius Report confirms that Vanda promoted Hetlioz as an alternative to other – and much less expensive – sleep aids. In the Report, a former Vanda employee states that "We were [internally] saying 'give it to everyone who doesn't sleep well.'" Another former Vanda sales manager interviewed for the Report stated that "basically the training was creating the story or creating the plausible idea that this could be happening really commonly in our psychiatry office." Further, an experienced sleep doctor interviewed for the Report was

"flabbergasted" to learn about Vanda's initiative to target psychiatrists, stating that Non-24 in sighted patients is "as rare as angels on the head of a pin" and that "they are prescribing this off label and calling it's something it's not. I'll tell you that, Absolutely."

265.    JB corroborates that Vanda's intent was to promote Hetlioz off-label for conditions other than Non-24. JB states that sales representatives were trained to ask doctors if they have patients with sleeping disorders, which according to JB every psychiatrist did have. After this question, sales representatives were trained to say that circadian rhythm disorder is caused by light not being processed through the eye so the master body clock cannot reset and if the light does not get to their master body clock, they cannot reset their circadian rhythm and therefore cannot sleep. Sales representatives were then trained to say that if the patient had tried other sleep aides, such as Ambien, and failed, then they probably should be prescribed to Hetlioz. The training did not involve discussion of Non-24, the indication for Hetlioz. Hetlioz sales representatives were trained that if asked by a doctor if the drug was only for blind patients to respond that even if a patient can see, but does not have normal sleep habits, then they should use Hetlioz.

266.    JB further states that some doctors would ask how they could tell if their patient had Non-24. Vanda trained its sales force to respond to this by telling the doctor if their patient had tried other sleep aides and were still experiencing sleep issues, they probably have Non-24.

267.    JB also states that Vanda has no formal training department. Rather, Polymeropoulos would simply pick someone to train the sales force. According to JB, for Hetlioz, sales representatives were provided two weeks of home study, and then most of their training was conducted in the field by the RBL or on sales calls or at sales meetings.

268.    Further, JB reports that there were Hetlioz sales representatives who had concerns

about selling Hetlioz to sighted people and were asking to see data that supported the efficacy in such a population. Vanda management responded by telling the sales force that Non-24 happens in blind people but also those with mental conditions so if the psychiatrist has patients who have trouble sleeping, and have tried Ambien and it did not work, that they should prescribe Helioz.

269.    In addition, JB states that Vanda's promotional pieces for Hetlioz were also misleading, and targeted to obtain off-label prescriptions. As stated above, the Hetlioz clinical studies were all performed using blind patients. However, the promotional pieces for Hetlioz showed patients with mental disorders, concussions, or other head trauma.

270.    The Hetlioz Call Guidance sheets provided to JB further demonstrates Vanda's intent to promote Hetlioz to any psychiatric patients with sleep disorders, as opposed to patients with Non-24. The call guidance sheet instructs sales representatives to tell physicians "Non-24 has been associated with traumatic brain injury and depressive and bipolar mood disorders. Blindness is also a risk factor."

271.    Further, the fact that Vanda required its Fanapt sales representatives to promote Hetlioz on every sales call also demonstrates its intent to promote the drug off-label.  As stated above, Non-24 is not a common condition and is primarily associated with blind patients.  If Vanda wanted to promote Hetlioz only for its indicated use – Non-24 – it would have very carefully targeted providers known to treat blind patients.  This was not Vanda's strategy. Rather, Hetlioz, which based on its indicated use has a very small potential patient population, was promoted on every Fanapt sales call. The only reason to do so, given its very small patient population and without regard to if the provider treats blind patients, was to market the drug for all sleep disorders caused by circadian rhythm disruption. Therefore, Vanda's marketing scheme was aimed at promoting Hetlioz off-label.

272.    According to JB, in 2017, Vanda started offering sales representatives $1,000 for each Hetlioz prescription they obtained, regardless of whether it was filled or not.  JB further states that right before he left Defendant in June 2018, Vanda lowered the amount per Hetlioz prescription from $1,000 to $500.

273.    According to JB, many sales representatives quit over being forced to promote Hetlioz to sighted patients as a substitute for other sleep aides. This allegation is corroborated by the Aurelius Report, which states that many employees left during 2017. Further, the Report states that one employee stated he/she left because "Offloading the drug to patients that don't have the disorder . . . I couldn't do it, ethically."

274.    According to Confidential Witness ("CW"), a current Vanda sales representative, Vanda is still pressuring sales representatives to sell Hetlioz at all costs, including off-label sales. CW reports that sales representatives are being pressured to bring up the "depressed patient" on every call. According to CW, Vanda is telling sales representatives to tell doctors that depressed patients who are on Selective Serotonin Reuptake Inhibitor ("SSRI") therapy typically develop insomnia as a side effect and these patients are perfect for Hetlioz. This is off-label promotion.

### N.    Vanda Misled Prescribers on How To Diagnose Non-24

275.    In 2017, Vanda began to focus more heavily on "educating" prescribers, mainly psychiatrists, on the disease state of Non-24, in hopes that this "education" would make them believe they had patients with Non-24. As discussed, below, the "education" provided was false and misleading and designed improperly to induce off-label prescriptions of Hetlioz. Specifically, Vanda provided sales representatives with information purportedly to assist prescribers diagnose Non-24 patients but this information was false and misleading and was actually tailored to a much broader class of Circadian Rhythm Sleep-Wake Disorders

("CRSWDs)", only one of which is Non-24.  Thus, Vanda misled prescribers to believe that if certain broad criteria were met (*i.e.*, the criteria for any one of a host of CRSWDs generally), then a Non-24 diagnosis (and prescription for Hetlioz) was proper.  As a result, unsuspecting clinicians misdiagnosed patients and prescribed Hetlioz, thinking they had Non-24, when they did not. Claims for these Hetlioz prescriptions were then submitted to Government funded healthcare programs, in violation of the FCA. Government Healthcare Programs would not have paid these claims had they known that the prescribing doctors were misled into believing their patients had Non-24, when they did not.

276.     To achieve this end, Vanda provided its sales force with educational materials purporting to contain Diagnostic and Statistical Manual of Mental Health Disorder, 5th edition ("DSM-5") criteria for identifying and diagnosing Non-24. The criteria listed in the educational materials apply to several CRDs, not solely Non-24, Hetlioz's only indication. Specifically, Vanda provided its sales force with an "educational" sales aide purporting to contain the DSM-5 diagnostic criteria for Non-24. DSM-5 is a resource from the American Psychiatric Association, and is one of the primary resources in the psychology field used to classify and define mental health disorders. At nearly a thousand pages, DSM-5 is a very comprehensive manual, discussing 22 broad categories of disorders. Disorder categories are then broken down into numerous diagnostic groups and within each such group are a varying number of applicable conditions. DSM-5 also provides coding information for ICD-9 and ICD-10, identifying the applicable code for a specific condition.

277.     One category section in DSM-5 is "Sleep-Wake Disorders." This entire section is attached to this Complaint as Exhibit L. "Sleep-Wake Disorders" is broken down into eleven diagnostic groups: (1) Insomnia disorder; (2) Hypersomnolence disorder; (3) Narcolepsy; (4)

Obstructive sleep apnea hypopnea; (5) Central sleep apnea; (6) Sleep-related hypoventilation; (7) Circadian rhythm sleep-wake disorders; (8) Non–rapid eye movement sleep arousal disorders; (9) Nightmare disorder; (10) Rapid eye movement (REM) sleep behavior disorder; and (11) Restless legs syndrome and substance-/medication-induced sleep disorder. Relevant here is the "Circadian rhythm sleep-wake disorders" category.

278.     The first portion of the CRSWD section lists three diagnostic criteria under its heading. The criteria follow:

> A. A persistent or recurrent pattern of sleep disruption that is primarily due to an alteration of the circadian system or to a misalignment between the endogenous circadian rhythm and the sleep–wake schedule required by an individual's physical environment or social or professional schedule.
>
> B. The sleep disruption leads to excessive sleepiness or insomnia, or both.
>
> C. The sleep disturbance causes clinically significant distress or impairment in social, occupational, and other important areas of functioning.

Ex. L at 390.

279.     The first CRSWD section then lists and describes the specific conditions under the CRSWD category. DSM-5 classifies the following conditions as CRSWDs: (i) Delayed sleep phase type ("DSPT"); (ii) Advanced sleep phase type ("ASPT"); (iii) Irregular sleep-wake type ("ISWT"); (iv) Non-24-hour sleep-wake type; (v) Shift work type; (vi) Unspecified [CRSWD] type. *Id.* at 390-91.

280.     Following the first CRSWD section, discussed above, are additional sections for each of the six specific conditions which are categorized as CRSWDs by DSM-5, including Non-24.

281.     Vanda's "educational" piece used an excerpt of DSM-5's CRSWD section in a misleading way to convince prescribers that patients had Non-24 if they met the three diagnostic

criteria applicable to *all* CRSWDs, and was not specifically tailored to Non-24. The educational piece, attached to this Second Amended Complaint as Exhibit M, includes the CRSWD diagnostic criteria and condition identification page, but omits the pages describing the other CRSWD conditions, and only includes the section related to Non-24.

282.    Vanda instructs its sales force to inform prescribers that patients who meet the CRSWD diagnostic criteria have Non-24, and therefore should be prescribed Hetlioz. This is currently Vanda's primary sales message for Hetlioz.

283.    Therefore, Vanda is and has been fraudulently convincing prescribers to prescribe Hetlioz by misleading them into believing that their patients' actually have Non-24, but in reality their patients merely show symptoms consistent with a *general* class of CRSWDs for which Hetlioz is not approved. Thus, Vanda's fraudulent conduct caused unsuspecting prescribers to incorrectly represent that their patients had Non-24. Had Government Healthcare Programs known that Vanda misled these prescribers, and their patients merely had symptoms consistent with numerous other CRSWDs, only one of which is Non-24, they would have denied such claims.

284.    In addition, due to the high cost of Hetlioz, the lack of objective testing to determine if a patient has Non-24, and the fact that sleep issues many times have multiple causes, prescribers are required to rule out other potential causes before diagnosing Non-24 and prescribing Hetlioz. However, such information was not contained in Vanda's "educational piece." And, the instruction to sales representatives was to tell prescribers if the general CRSWD criteria was met, the patient had Non-24, and they could prescribe Hetlioz.

285.    That the DSM-5 CRSWD diagnostic criteria is not intended to constitute a diagnosis of Non-24, and especially not for establishing coverage of Hetlioz under Government

Healthcare Programs, is beyond dispute. Simply put, the CRSWD section of DSM-5 specifically states that the Diagnostic Criteria apply to all the conditions listed in that section. Ex. L at 390-91. If the federal Government intended to cover Hetlioz for all CRSWDs, it would have stated so when it approved the drug. But it did not. Therefore, Vanda caused false claims to be submitted by fraudulently instructing prescribers that a Non-24 diagnosis is appropriate if a patient satisfies the CRSWD diagnostic criteria.

286.    Confirming that the CRSWD diagnostic criteria Vanda used to convince doctors to falsely diagnose their patients with Non-24 was actually misleading is that, under Vanda's misleading criteria, there would be well-over three million potential individuals with Non-24 in the United States, alone.

287.    For example, in DSM-5's subsection for DSPT, one of the six conditions listed under the CRSWD diagnostic criteria, states that "[p]revalence of delayed sleep phase type in the general population is approximately .17% . . . ." If this percentage is applied to the United States, approximately 557,600 individuals suffer from delayed sleep phase type. Ex. L at 391.  Further, in DSM-5's subsection for ASPT, one of the seven conditions listed under the CRSWD diagnostic criteria, states that the "estimated prevalence of advanced sleep phase type is approximately 1% in middle-age adults." Ex. L at 393, Even if we assume that ASPT is *only* present in middle-age adults (35-59 years old), in the United States, 1% of that population is approximately 1,048,500.  For ISWT, DSM-5 states that its prevalence in the general population is unknown. Ex. L at 395.

288.    For Non-24, DSM-5 states that "[p]revalence of non-24-hour sleep-wake type in the general population is unclear, but the disorder appears rare in sighted individuals. The prevalence in blind individuals is estimated to be 50%." Ex. L at 396.   However, Vanda

estimates the United States Non-24 patient population to be at least 100,000.

289.    For Shift Work Type, DSM-5 states that it is "affect[s] 5%–10% of the night worker population (16%–20% of the workforce)." Ex. L at 397. According to the United States Bureau of Labor Statistics, in January 2020, the United States workforce contained 164,606,000 individuals. Even if the lowest estimated figure is used (e.g., 5% and 16%), Shift Work Type has a potential United States population of 1,316,848.

290.    Thus, there is, at an absolute minimum, a potential patient population of *3,022,848* for all of the conditions listed under the CRSWD diagnostic criteria. And the real number is certainly higher, as the above calculations assumes that there are no patients with ISWT or CRSWD Unspecified, and ASPT is limited only to middle-age adults. Surely, some patients have ISWT, and ASPT is present in some patients who are not middle-age adults.

291.    Thus, Vanda misled prescribers by falsely telling them that the CRSWD diagnostic criteria establishes a diagnosis for Non-24, which resulted in prescribers incorrectly diagnosing patients, who may have met the CRSWD diagnostic criteria, with Non-24 and prescribed Hetlioz.

292.    The fraudulent nature of Vanda's use of the CRSWD diagnostic criteria as a sufficient test for diagnosing Non-24 is also shown by Hetlioz's FDA approval status as an orphan drug. By definition, orphan drugs are those which treat conditions affecting fewer than 200,000 patients. It would be illogical for the FDA to grant Hetlioz orphan drug status to treat Non-24, and then permit Non-24 to be diagnosed using a standard that would, at a minimum, result in over 3,000,000 potential Non-24 patients.

293.    This is further supported by the fact that, as of 2020, the FDA stated that it believes Hetlioz's potential patient population, currently, is approximately 100,000. Letter from

FDA, Janet Woodcock, M.D., to Elizabeth Bardehenn *et al*, Docket No. FDA-2015-P-2142 (Jan. 27, 2020).

294. The American Academy of Sleep Medicine ("AASM"), International Classification of Sleep Disorders – Third Edition ("ICSD-3") also conclusively establishes that the DSM-5 diagnostic criteria are intended for CRDWS, generally, and is not sufficient to establish a Non-24 diagnosis.

295. ICSD-3, along with DSM-5, are two of the three major resources to classifying conditions. ISCD-3's introduction section is attached as Ex. N. According to ICSD-3 "[h]istorically, there have been three major classifications systems for sleep disorders. Although the International Classification of Sleep Disorders system has, for many years, been the primary nosology for sleep medicine specialists, both the Diagnostic and Statistical Manual of Mental Health Disorder (DSM) of the American Psychiatric Association and the International Classification of Diseases nosology of the World Health Organization have also classified sleep disorders." Ex. N at 17.

296. Just like DSM-5, ICSD-3 classifies numerous conditions under different disorders, including CRSWDs. Within the CRSWD classification are the following conditions: (i) DSWPD; (2) ASWPS; (3) ISWRD; (4) Non-24-Hour Sleep Wake Rhythm Disorder; (5) Shift Work Disorder; (6) Jet Lag Disorder; and (7) Circadian Sleep-Wake Disorder Not Otherwise Specified (NOS). ICSD-3's CRSWD section, and subsections, are attached as Ex. O.

297. In discussing the similarities between ICSD-3's and DSM-5's classification of Circadian Rhythm Sleep-Wake Disorders, ICSD-3 states "Circadian Rhythm Sleep-Wake Disorder diagnoses are *identical within the two systems* with the exception that DSM does not include a *jet lab disorder*." Ex. N at 17 (emphasis added).

298. In ICSD-3's general CRSWD section, prior to discussing each of the aforementioned conditions, it states "General Criteria for Circadian Rhythm Sleep-Wake Disorder," "Criteria A-C must be met." For the "General Criteria" for all CRSWDs, *ICSD-3 lists the exact same three diagnostic criteria which Vanda promotes as the criteria for establishing a Non-24 diagnosis.*

299. Further, under the CRSWD sub-section for Non-24, it states "Diagnostic Criteria," "Criteria A-D must be met[.]" ICSD-3 then lists the following diagnostic criteria, *specific to Non-24*:

A. There is a history of insomnia, excessive daytime sleepiness, or both, which alternate with asymptomatic episodes, due to misalignment between the 24-hour light-dark cycle and the non-entrained endogenous circadian rhythm of sleep-wake propensity.

B. Symptoms persist over the course of at least three months.

C. Daily sleep logs and actigraphy for at least 14 days, preferably longer for blind persons, demonstrate a pattern of sleep and wake times that typically delay each day, with a circadian period that is usually longer than 24-hours.

D. The sleep disturbance is not better explained by another current sleep disorder, medical or neurological disorder, mental disorder, medication use, or substance use disorder.

Ex. O at 209.

300. Vanda's educational piece omits these additional criteria. Vanda's sales representatives are not trained on the ICSD-3 criteria, nor is this information provided to doctors. And Vanda is well aware of the ICSD-3 criteria, and even cite to ICSD-3 on its website. However, Vanda does not even mention, let alone "educate," its sales representatives or doctors on the ICSD-3 criteria. Instead, Vanda only provides the misleading DSM-5 "educational" handout, as discussed herein.

301. And, there can be no dispute that Vanda knows that the diagnostic criteria,

applicable to all CRSWDs, is not proper for diagnosing Non-24. ***Vanda is currently conducting clinical trials for Hetlioz to obtain an FDA indication for Delayed Sleep Phase Disorder, a CRSWD in the same DSM-5 and ICSD-3 category as Non-24. If a patient who met the general DSM-5 CRSWD diagnostic criteria could correctly be diagnosed with any CRSWD, then there would be no reason to seek the additional indication of DSPD.*** But, as Vanda knows, to *legally* promote Hetlioz for DSPD, and have it reimbursed by Government funded healthcare programs, it must first obtain the indication from the FDA.

302. As discussed above, Vanda's fraudulent conduct in causing doctors to misdiagnose patients with Non-24 caused the submission of Hetlioz prescriptions to Government funded healthcare programs. The FDA gave Hetlioz a very specific indication, pursuant to an orphan drug application. As discussed in more detail below, the Government funded healthcare programs, had they known that the Non-24 diagnosis was brought about through fraud, would not have paid the claim, as these programs do not cover such off-label uses.

### 1. Vanda Focused its Efforts Largely on Convincing Psychiatrists to Misdiagnose Non-24

303. Vanda's scheme to promote Hetlioz for all CRSWDs was primarily aimed at psychiatrists, for a variety of reasons. This is significant because very few, if any psychiatrists are trained on the disease state of Non-24, let alone have knowledge sufficient to see the deception in Vanda's "educational message."

304. First, Non-24, as a recognized and accepted medical condition, is a relatively new disease. Non-24 was first recognized by the AASM in 2005 in its ICSD-2. DSM-5 did not recognize Non-24 as an actual disease state until 2013. Therefore, Non-24 is not a disease which has been well-studied and reviewed over decades, and was not even recognized as a disease state in any notable publication until 2005.

305.     Second, even after Non-24 became recognized, prior to Hetlioz, psychiatrists did not treat this condition. Until Hetlioz was launched, nearly all Non-24 patients were blind. To treat their Non-24, these patients would almost always see a pulmonologist, or other doctor specializing in sleep issues, to treat the condition, not a psychiatrist. Much of the treatment involved altering and monitoring the patient's sleep patterns. Thus, in addition to the extremely new nature of the Non-24 disease state, even after the disease state became recognized, psychiatrists would have no reason to become educated on the topic, let alone diagnose it, *because they generally do not treat such conditions*.

306.     Further, Vanda was not targeting psychiatrists it believed were likely, at all, to have patients *actually* suffering from Non-24. Rather, it used its Fanapt sales force to promote Hetlioz by pitching the drug to the same psychiatrists to whom they were promoting Fanapt. And Vanda knew, for the reasons stated above, that these psychiatrists would have little to no knowledge of Non-24, and therefore Vanda could use its false information to convince them their patients had Non-24, when they did not, and prescribe Hetlioz.

307.     Third, DSM-5 has credibility amongst psychiatrists. It is a well-known resource in the field.  Although Non-24 was new, by using DSM-5, in the misleading fashion discussed above, psychiatrists were willing to accept Vanda's false statements as true because they appeared to be supported by DSM-5.

308.     And, Vanda trained its sales staff to educate psychiatrists on both Non-24 and the DSM-5 diagnostic criteria, as shown in the sales training slide below, which clearly states under "Messaging" to "With confidence *educate* Psychiatrists on Non24 and the DSM 5[.]" (emphasis added).

## Messaging
- Utilize Vanda OSS to sharpen your HCP interaction and messaging
- Engage the Psychiatrist/Office Staff in a dialogue describing a patient type
- With confidence educate Psychiatrists on Non24 and the DSM 5
- Execute a full fair balanced product presentation on the features and benefits of Hetlioz® and ISI

## Intake Pull-through:
- Ensure SRF forms are getting faxed in correct and COMPLETE. Inquire about past SRFs with office staff to ensure the intake form is completely filled out
- If information is missing (intake incomplete) ensure office staff identifies what is missing, inserts missing information and refaxes the form to Hetlioz Solutions
- Gain commitment with HCP/Office Staff to connect with patient once SRF is completed and faxed to let them know intake will be going in for them and they will get a welcome call from 240 number

## Teamwork:
- Dual Offices-collaboration between AM and NSR to be sure we are doing the right thing for the office and patient(sharing lunches/appointments)
- Share your success stories!

*Confidential - Internal Use Only*

309.     Moreover, Vanda's CEO, Polymeropoulos, is a psychiatrist, and therefore keenly aware that such professionals were not trained on Non-24, as demonstrated by the fact that Vanda's promotional efforts for Hetlioz revolved around "educating" psychiatrists on the disease state of Non-24, using sales representatives with no real experience or training in CRWSDs. If Vanda believed that psychiatrists sufficiently understood the condition and how to diagnose it, there would be no reason to for it to attempt to educate them. But this was not the case, and Vanda preyed on their ignorance, costing the Government millions of dollars.

### 2.   Vanda's Primary Sales Pitch for Hetlioz is the DSM-5 Factors

310.     According to CW, the DSM-5 diagnostic criteria are currently the primary sales tactic Vanda uses to convince prescribers that their patients have Non-24. JB corroborates that the DSM-5 was the primary sales tool while he was employed at Vanda. Further, CW reports that Vanda hired approximately 95 sales representatives to sell Hetlioz, a majority of whom are under the age of 24, and selling Hetlioz is their first real job out of college. Therefore, unlike seasoned pharmaceutical sales representatives, who have undergone compliance training on numerous occasions, many of the sales representatives employed by Vanda are ignorant of their fraudulent

conduct.

311.    Moreover, CW states that the sales representatives are trained by Vanda on Non-24 and taught to explain how it is diagnosed using the DSM-5 diagnostic criteria. But, according to CW, the Non-24 training by Vanda is fraudulent, in that they train them that Non-24 can be diagnosed solely by meeting the DSM-5 criteria. As a result, according to CW, the young sales representatives have no clue that they are illegally broadening the indication for Non-24.

312.    As stated above, misleading prescribers using the DSM-5 criteria is the primary sales pitch for Hetlioz, and Vandra requires sales representatives to make this pitch on every sales call. For example, in a March 19, 2018 power point presentation, titled "West Region Web-Ex," slide 17, titled "Hetlioz Multi-layered questions" states the following:

---

## Hetlioz Multi-layered questions

1.   How many patients do you have in your practice that, despite your best effort, are still struggling with disruptive sleep patterns even after you have tried every medication to help them?
• What are you doing now to manage these patients?
• So, what is the next step for these patients?
        Listen and let the doctor talk
Are there any concerns about side effects when using that product?

2.   Based on everything that you have told me it sounds like these patients fit the DSM-5 criteria for Non-24 as shown here.  Hetlioz is the only product approved to treat Non-24.
    Other medications may provide temporary relief but they will not resolve the real issue of Non-24.

3.   Present supporting efficacy data and gain agreement on efficacy



17

---

313.    In a November 2018 power point presentation, titled "Hetlioz Workshop Nov 2018 Meeting" slide 2 is as follows:

## Ensure Practitioners Know How to Diagnose Non 24

- Ask Proper Questions to Patients with Suspected Non 24. (P. 9 in MVA)
- Explain the DSM-5 Criteria Needed for Proper Diagnosis of Non 24. Go to the DSM handout and read the criteria.
- Discuss the Non 24, ICD-10 Code to Include on Intake Form. Make sure practitioners check the box on the form and give the handout with the ICD code
- Identify Appropriate Patient Profiles of Non 24.
- Focus on Health Care Plans where Hetlioz has coverage.
- Have a conversation with all office staff members who would handle the Intake process.

FOR TRAINING PURPOSES ONLY

2



314.    Indeed, there is no doubt that Vanda relied on this misleading diagnosis to identify and profile patients. For example, in a May 24, 2019 power point presentation, a slide titled "Q2 Business Plan" under "Hetlioz" states "Stronger focus on patient identification and profiling through DSM 5."

315.    According to CW, Medicare is the "Health Care Plan[] Where Hetlioz has coverage" referred to in the slide above.

316.    Further, in a January 31, 2020 power point presentation, titled "South District Business Tactics – Feb/March," slide nine states "Utilize DSM-5 Diagnostic Questions to Identify Appropriate Hetlioz Patients and Gain a Prescribing Commitment. Follow up until Intakes are Submitted[.]"

317.    Vanda's fraudulent strategy has been successful. For example, in a May 21, 2020 email, CW's regional business manager states "**There have been 19 Hetlioz Intakes submitted**

**in the Thebe System, over the last 7 Days. 4 of those Intakes have been generated by The South District. (Over 20% of ALL Intakes Nationally)**. Way to Go Team!!  - Our strategy of gaining agreement from practitioners to utilize the DSM 5- Non 24 screening questions to appropriately diagnose Non 24 and start patients on Hetlioz, is really paying off!!" (emphasis in original).

318.    According to CW, due to COVID and limited access to prescriber's offices, Vanda is sending out flash cards containing the DSM-5 diagnostic criteria, and asking doctors to make it an office protocol to ask these questions to every patient presenting with sleep issues. And, if they satisfy the criteria, to prescribe Hetlioz.

319.    As a result, CW states that nearly none of the patients prescribed Hetlioz have Non-24, but were misdiagnosed by their doctor due to Vanda's fraud.

O.    **Reimbursement for Hetlioz**

320.    According to JB, Hetlioz prescriptions for sighted patients quickly became very difficult to get approved by commercial insurance. This is also corroborated by the Aurelius Report.

321.    According to JB, reimbursement for Hetlioz for sighted patients was very difficult. JB states that many times there would be two or three appeals to a sighted patient's commercial insurance provider trying to get the drug approved. JB states that Vanda would tell doctors to tell the insurance provider that the patient had tried Ambien and failed. JB estimates that only 20-40% of the patients prescribed Hetlioz actually obtained the drug. According to JB, the low approval rate is one of the primary reasons that Vanda started offering sales representatives $1,000 per Hetlioz prescription they obtained. This allegation is corroborated by the Aurelius Report which states "Multiple former employees have told us that virtually all

111

prescriptions would automatically be rejected for reimbursement for sighted people by commercial insurers. This is consistent with numerous insurance forms we reviewed . . . that state that all patients must be completely blind."

322.    As a result, Vanda decided to create an internal reimbursement hub to assist doctors in getting their Hetlioz prescriptions filled. The hub would assist with reimbursement of Hetlioz and Fanapt, performing tasks such as prior authorization and insurance denial appeals. The hub would also help connect patients to co-pay assistance foundations, discussed below. Upon information and belief, Vanda is using the hub to get Fanapt and Hetlioz prescriptions approved which should not be approved.

323.    According to JB, prior to bringing the hub in-house, Vanda used a third party to operate a reimbursement hub.  Both before and after the hub was brought in-house, Hetlioz sales representatives were provided virtually no information regarding the status of Hetlioz prescriptions. According to JB, this included the patient insurance type and whether the prescription was eventually approved. This created issues for Vanda sales representatives because doctors would frequently ask about the status of their patients' Hetlioz prescription, but the sales representative could not provide any information. According to JB, if a sales representative asked Vanda executive management about the status of a prescription, they would not tell them.

324.    More specifically, a doctor would typically inform the sales representative that they submitted a prescription, and the sales representative would send a report to Vanda providing the patient name. Vanda would then confirm with the sales representative that the doctor submitted a prescription. After that, the sales representative would receive no additional information regarding the prescription until Vanda informed them of whether or not the patient

received the drug. Other than that, they were provided no additional information. This was the situation both before and after Vanda brought the hub in-house.

325.    In addition, as Hetlioz is a very expensive drug, patient copayment amounts also became an obstacle to patients receiving the drug. According to JB, Vanda executive management would regularly say that Vanda has patient assistance programs through foundations that help pay patient copayment amounts. One such foundation was openly discussed at Vanda was Patient Services Incorporated ("PSI"). Further, in the summer of 2017, as the price of Hetlioz was rising, was the first time JB heard of PSI being used by Vanda for Hetlioz. Upon information and belief, Vanda donated money to PSI and other similar foundations to ensure that patients copayments for Hetlioz would be covered, in violation of the Anti-Kickback Statute.

326.    Further, every Hetlioz prescription claim must list the ICD-10 code for Non-24, G47.24. This code is also listed on the DSM-5 educational piece Vanda uses to mislead prescribers. According to CW, Vanda tells sales representatives that if ICD-10 code G47.24 is not on the claim, it will not be reimbursed, and the representative will not receive sales credit for the prescription.

327.    According to CW, Vanda is instructing sales representatives to target Medicare and Medicare dual-eligible patients for Hetlioz. According to CW, many private insurance plans will not reimburse for Hetlioz unless a patient is blind. However, Medicare will reimburse Hetlioz for sighted patients with Non-24. Moreover, some Medicaid plans will not reimburse for Hetlioz at all, but even in such states, Medicare will still cover the drug for dual-eligible patients.

328.    This focus on Medicare patients has resulted in Vanda's new initiative to target nursing homes and other long term care facilities ("LTCFs"). LTCFs have large Medicare

populations. Moreover, patients at such facilities are likely to have several conditions, along with sleep issues. Vanda is now infiltrating these facilities, with the same misleading message, and are falsely "educating" healthcare professionals at LTCFs on the disease state of Non-24, causing false Non-24 diagnoses, as discussed above.

329.    CW further states that Hetlioz appeals to LTCFs because it is not a scheduled-drug so they are more likely to prescribe it.

330.    Further, Hetlioz typically requires prior authorization before a prescriptions will be approved. Vanda's internal reimbursement hub performs the Hetlioz prior authorization.

331.    According to Vanda sales training presentations, in the Hetlioz prior authorization process, Vanda Benefits "act as the Authorized Representative for the patient and help navigate the hurdles insurance companies and PBMs put into place."

332.    According to CW, after the prescription is submitted, it is almost always denied because the patient is not blind. Upon receiving the denial, the doctor sends it over to Vanda Benefits – a service provided by Vanda's internal hub – to work with the insurance company to get the prescription approved. A Vanda Benefits support staff member will then contact the doctor, get the necessary information, fill out the prior authorization, and submit it directly to the insurance provider. In some cases this required a letter of medical necessity be submitted. According to CW, Vanda previously wrote the letter for the doctor, but no longer does this.

**P.    Government Reimbursement of Fanapt and Hetlioz**

333.    Although commercial insurance plans were pushing back against off-label prescriptions of Fanapt and Hetlioz, government healthcare payors were viewed as an easier target to approve these off-label prescriptions. The numbers below confirm that a majority of Fanapt and Hetlioz prescriptions were reimbursed by Medicare and Medicaid.

334.    In 2015, the government paid $9,261,253.95 for 948 prescriptions of Hetlioz under Medicare Part D.

335.    In 2015, the government paid $3,298,378.16 for 335 prescriptions of Hetlioz under Medicaid.

336.    In 2016, the government paid $21,337,958.01 for 1,649 prescriptions of Hetlioz under Medicare Part D.

337.    In 2016, the government paid $7,450,570.33 for 598 prescriptions of Hetlioz under Medicaid.

338.    In 2017, the government paid $23,709,378.17 for 1,708 prescriptions of Hetlioz under Medicare Part D.

339.    In 2017, the government paid $11,579,568.75 for 830 prescriptions of Hetlioz under Medicaid.

340.    In 2018, the government paid $90,316,945.88 for 5,525 prescriptions of Hetlioz under Medicare Part D.

341.    In 2018, the government paid $14,469,959.26 for 958 prescriptions of Hetlioz under Medicaid.

342.    In 2015, the government paid $47,002,608.63 for 52,908 prescriptions of Fanapt under Medicare Part D.

343.    In 2015, the government paid $51,185,330.90 for 55,839 prescriptions of Fanapt under Medicaid.

344.    In 2016, the government paid $48,646,740.91 for 47,149 prescriptions of Fanapt under Medicare Part D.

345.    In 2016, the government paid $47,477,248.83 for 44,224 prescriptions of Fanapt

under Medicaid.

346.    In 2017, the government paid $49,504,037.28 for 44,623 prescriptions of Fanapt under Medicare Part D.

347.    In 2017, the government paid $37,580,317.45 for 35,607 prescriptions of Fanapt under Medicaid.

348.    In 2018, the government paid $71,865,739.27 for 57,518 prescriptions of Fanapt under Medicare Part D.

349.    In 2018, the government paid $45,919,549.76 for 41,127 prescriptions of Fanapt under Medicaid.

350.    In addition, JB has identified several physicians from his territory who received the off-label Fanapt pitch, and prescribed Fanapt to patients that was reimbursed by Medicare. Specifically:

      a.  Dr. Frank Floca: According to JB, Dr. Floca was repeatedly put on and taken off JB's sales representative's call list. JB states that the sales representative in Dr. Floca's territory was Gary Foster, who told him that Dr. Floca was prescribing Fanapt off-label. In 2015, Dr. Floca was responsible for 261 Fanapt claims for which Medicare paid $229,461.83. In 2017, Dr. Floca was responsible for 198 Fanapt claims for which Medicare paid $233,195.98.

      b.  Dr. Boris Rubashkin: Dr. Rubashkin and his Nurse Practitioner, Bernadette Williams, both prescribed large amounts of Fanapt.  According to JB, William's prescribed under Dr. Rubashkin and a lot of the prescriptions listed under his name were actually prescribed by Williams. In fact, JB states that Williams was actually producing most of the Fanapt prescriptions in the

practice. JB's sales representative in this territory did not have much access to Dr. Rubashkin so she met with the NP, Bernadette Williams instead. According to JB, during every performance or sales review with Gian Pierro, Pierro would ask him "how can we get more Fanapt scripts from Dr. Rubashkin?" JB would respond that Dr. Rubashkin and Williams informed his sales representative, Brandy Barrington, that they were already using Fanapt in *every* Schizophrenic patient that he had. Pierro pushed JB to get more Fanapt prescriptions from them, and instructed JB to tell them to switch every patient they had to Fanapt, even though he was aware that they would not be schizophrenic patients because all of these patients were already on Fanapt. In 2017, Dr. Rubashkin was responsible for 173 Fanapt claims for which Medicare paid $222,296.61.

c.   Dr. Robert Morton: Dr. Morton was a top prescriber but when his prescription numbers started to decrease, Paul Ramirez went in with the sales representative in that territory, Brett Parrett, to tell Dr. Morton that Polymeropoulos wanted to have a call with him. Ramirez set up this call with Dr. Morton and Polymeropoulos, and JB believes the intent of the call was to convince Dr. Morton that Fanapt should have been indicated in bipolar because it hits the same receptors that are affected in bipolar disorder, such as the Dopamine receptors so it will obviously work. Immediately following the call, the sales reports showed a spike in Dr. Morton's Fanapt prescriptions which had been declining. In 2015, Dr. Morton was responsible for 357 Fanapt claims for which Medicare paid $299,595.09. In 2016, Dr. Morton was

responsible for 246 Fanapt claims for which Medicare paid $233,595.20. In 2017, Dr. Morton was responsible for 216 Fanapt claims for which Medicare paid $219,134.35.

351.    In addition, JB has in his possession an email which demonstrates that Vanda was billing Texas Medicaid for Fanapt. The email was from Peter Reed, Vanda's Senior Director of US and Global Market Access, Reimbursement and Trade, to Tom Griffin, and is dated May 8, 2018. According to JB, Reed was Vanda's primary reimbursement specialist. The email is in regards to Texas Medicaid adding a prior authorization ("PA") requirement to claims for Fanapt. Specifically, the email states:

> Biggest change is Medicaid now requires a PA to document the DX for Fanapt. Looks like it went into effect at the beginning of the year. I checked it late last year and at that time Fanapt was still preferred. Found that surprising since we terminated the supplemental rebate. Looks like they changed to a PA as we anticipated with the removal of the supplemental.

352.    According to JB, Novartis, who originally owned Fanapt, had negotiated the supplemental rebate agreements with state Medicaid plans. At the end of 2017, the contracts expired and Vanda did not reapply for several states, including Texas. Thus, Vanda stopped paying Texas supplemental rebates on Fanapt prescriptions. As a result, Texas Medicaid implemented a PA requirement for Fanapt prescriptions and JB's sales in Texas suffered substantially.

353.    In addition, the email contained various charts demonstrating Fanapt sales in Texas and comparing Texas Fanapt sales to the rest of the country. These charts are as follows:



| TX | Total | Comm | Med D | FFS | Managed |
|---|---|---|---|---|---|
| Q1 17 | 1,008 | 265 | 348 | 22 | 369 |
| Q2 17 | 1,040 | 251 | 383 | 25 | 374 |
| Q3 17 | 968 | 236 | 371 | 25 | 327 |
| Q4 17 | 994 | 238 | 404 | 15 | 334 |
| Q1 18 | 879 | 208 | 351 | 14 | 301 |

354.    Underneath these two charts, Reed wrote "Business down in Q1. Greatest decline was in D (-53) followed by Managed Medicaid (-33) and Commercial (-30)".

| | Mix | Total | Comm | MED D | FFS | Managed |
|---|---|---|---|---|---|---|
| US | Q1 18 | 100% | 19% | 45% | 23% | 13% |
| TX | Q1 18 | 100% | 24% | 40% | 2% | 34% |
| | | | 5% | -5% | -21% | 21% |

355.    Underneath this chart, Reed wrote "Mix – Higher Commercial and Managed Medicaid vs Nation. Lower Med D and FFS."

| TX Trend - Q1 18 vs. | Total | Comm | Med D | FFS | Managed |
|---|---|---|---|---|---|
| Q4 17 | 88% | 87% | 87% | 93% | 90% |
| Q3 17 | 91% | 88% | 95% | 56% | 92% |
| Q2 17 | 85% | 83% | 92% | 56% | 80% |
| Q1 17 | 87% | 78% | 101% | 64% | 82% |

| Nation Trend - Q1 1 | Total | Comm | MED D | FFS | Managed |
|---|---|---|---|---|---|
| Q4 17 | 98% | 96% | 95% | 106% | 98% |
| Q3 17 | 101% | 104% | 98% | 105% | 104% |
| Q2 17 | 100% | 107% | 97% | 104% | 94% |
| Q1 17 | 99% | 96% | 99% | 108% | 92% |

356.    Under this chart, Reed wrote "Trend – Texas Q1 18 vs. Q4 17 – Commercial and Med D off the most at 87% in Q1 vs Q4. Managed Medicaid Q1 90% of Q4."

357.    The captions in these charts mean the following: "Comm" means commercial insurance; "Med D" means Medicare Part D; "FFS" means Medicaid Fee For Service; and "Managed" means managed Medicaid.

358.    In addition, CW reports that Vanda is coaching sales representatives to instruct doctors to get Fanapt approved for Medicaid patients by demonstrating failures on other medications.

**Q.    False Claims Were Submitted**

359.    Throughout the relevant time period, Defendant knowingly caused the submission of false claims for reimbursement of Fanapt and Hetlioz. As alleged in detail above, Defendant marketed Fanapt and Hetlioz in a false and misleading way by promoting them for uses that are not medically accepted uses (e.g., pediatric patients, bipolar patients), lying about how to

diagnose the Non-24 disease state, misrepresenting the drugs' side effects, marketing Fanapt for once-a-day dosing and as a first-line drug.. This conduct illegally misbranded the drugs and constituted off-label promotion because the uses promoted by Vanda are neither approved by the FDA, nor supported by a citation is any compendia. Such promotion, and the resulting prescriptions, also resulted in claims for Hetlioz and Fanapt that were not medically reasonable or necessary.  Relator knows these claims were submitted to Government healthcare programs, indeed such payors were specifically targeted by Vanda, and knows the Government was unaware of their falsity because, as described herein, Vanda took numerous actions to hide its conduct and the falsity of the resulting claims from Government.

360.    Vanda also used false statements by lying to doctors about how to diagnose Non-24. Relator knows the resulting claims are false because Hetlioz is only prescribed to treat Non-24, and as a result of lying to doctors about how it is diagnosed, caused claims to be submitted that misrepresented that such prescriptions were prescribed to treat Non-24. The Government was unaware that claims for Hetlioz, submitted and paid by Government healthcare programs, were for patients that did not have Non-24. As discussed herein, the Government could not have known of the false nature of such claims because prior authorizations stated the patients had Non-24, but this was false and caused by Vanda's illegal conduct. Whether a patient has Non-24 is material to the Government's payment decision, and had it known that such patients did not have Non-24, it would not have paid those claims.

361.    As a result of Defendant's false and misleading messages regarding Fanapt and Hetlioz, Defendant caused false claims to be submitted to the Government Health Care Programs for reimbursement. Each of the claims for Fanapt and Hetlioz included an express and/or implied certification of compliance with federal and state law and regulations. Those certifications were

false because the drugs were misbranded in violation of the FDCA and/or off-label. Further, those certifications were false or fraudulent because they falsely represented that Fanapt and Hetlioz were "reasonable and necessary" for the treatment of the patients and, therefore, the associated claims are ineligible for reimbursement.

362.    These false certifications were also material to the Government's payment decision. Government funded healthcare programs do not reimburse for drugs not prescribed for a medically accepted use. Further, Government funded healthcare programs do not reimburse for any good or service, including pharmaceuticals, that are not reasonable and necessary.

363.    While the cost of providing Fanapt and Hetlioz for on-label and non-misbranded uses to Government Health Care Program recipients is covered by the Government Health Care Programs, including Medicare and Medicaid, the cost of off-label and misbranded prescriptions is not. Since Fanapt and Hetlioz were promoted off-label, were not "reasonable and necessary" for the treatment of some patients and misbranded, claims for prescriptions caused by this misconduct are not reimbursable.

364.    Knowingly submitting or causing the submission of claims for prescription drugs which are not reimbursable creates liability under the FCA. Thus, these claims to the government for reimbursement caused to be submitted by Defendant's unlawful conduct constitute violations of the FCA and relevant State FCAs.

## COUNT I
### (False Claims Act, 31 U.S.C. § 3729 *et seq.*)

365.    Relator repeats each allegation in each of the preceding paragraphs of this Complaint with the same force and effect as if set forth herein.

366.    As described above, Defendant has submitted and/or caused to be submitted false or fraudulent claims to Medicare, Medicaid, FEHBP, and TRICARE by submitting fraudulent

bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of improper marketing practices. As discussed herein, Government funded healthcare programs do not reimburse for drugs that are not prescribed for their medically accepted indication. Further, Government funded healthcare programs do not reimburse for drugs that are not medically reasonable or necessary. Had these Government funded healthcare programs known of Vanda's illegal marketing, resulting in Hetlioz and Fanapt prescriptions prescribed for uses that are not medically reasonable or necessary or prescribed for their medically accepted indication, they would not have paid such claims. Therefore, Vanda is liable under the FCA.,

367.    By virtue of the acts described above, Defendant has violated:

(1)    31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)    31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

368.    To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator realleges that Defendant knowingly violated 31 U.S.C. §§ 3729(a)(1)-(2), prior to amendment, by engaging in the above-described conduct.

369.    By reason of the foregoing, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

WHEREFORE, Relator prays that the Court enter judgment against Defendant as follows:

(a)    that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., provides;

(b)      that civil penalties of $21,730 be imposed for each and every false claim that Defendant caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendant made, used, or caused to be made or used that was material to a false or fraudulent claim;

(c)      that attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case be awarded;

(d)      that Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act; and

(e)      that this Court order such other and further relief as it deems proper.

## COUNT II
### (California False Claims Act, Cal. Gov't Code § 12650 *et seq.*)

370.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

371.    This is a *qui tam* action brought by Relator on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*

372.    Cal. Gov't Code § 12651(a) provides liability for any person who:

(1)      Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2)      Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

(3)      Conspires to commit a violation of this subdivision.

(4)      Has possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less than all of that property.

(5)     Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used.

(6)     Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property.

(7)     Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

(8)     Is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

373.   Defendant violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be made, used and presented to the State of California by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded health care programs.

374.   The California Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the California Medicaid program, and is therefore liable under California False Claims Act.

375.   The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendant's conduct, paid the claims submitted by health care providers and third party payers in connection therewith.

376.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of California

in connection with Defendant's conduct.  Compliance with applicable California statutes was also a condition of payment of claims submitted to the State of California.

377.    Had the State of California known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

378.    As a result of Defendant's violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

379.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

380.    This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF CALIFORNIA:

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of California;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

<u>**COUNT III**</u>
**(California Insurance Fraud Prevention Act, Cal Ins. Code §§ 1871.1 *et seq.*)**

381.    All of the preceding allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

382.    This is a claim for treble damages and penalties under the CIFPA § 1871.7, as amended.  The CIFPA provides for civil recoveries against persons who violate the provisions of the California Penal Code sections 549 or 550, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim. CIFPA § 1871.7(b).

383.    Subsection (e) of Cal. Ins. Code §1871.7 provides for a qui tam civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud. Cal. Ins. Code §1871.7(e).  The qui tam provision was patterned after the Federal False Claims Act, 31 U.S.C. §§3729-32, and the California False Claims Act, Cal. Gov't Code §§12650 *et seq.*

384.    Subsection (b) of Cal. Ins. Code §1871.7 permits any interested person to bring a civil action in the name of the State of California for violation of CIFPA §1871.7 as well as

Penal Code sections 549 or 550.

385.    Section 549 of the California Penal Code provides criminal penalties for anyone who:

> solicits, accepts, or refers any business to or from any individual or entity with the knowledge that, or with reckless disregard for whether, the individual or entity . . . intends to violate Section 550.

386.    Section 550 of the Penal Code prohibits the following activities, among others:

(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

> (5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

> (6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

> (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

> (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

> (3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

387.    As discussed herein, Defendant violated the laws and regulations discussed herein in violation of the CIFPA.

388.     Private healthcare insurers operating in California do not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to California insurers, and is therefore liable under the CIFPA.

389.     By virtue of the acts described above, Defendant knowingly utilized a scheme by which it presented, or caused to be presented, false or fraudulent claims to private insurers in California, or for patients in California that those insurers covered (*i.e.,* patients who hold private insurance contracts and against whom Defendant could file claims for payment or approval) in violation of each patient's private health insurance contract and California law.

390.     By virtue of the act described above, Defendant knowingly made, used or caused to be made or used, false records and statements and omitted material facts to induce the private insurers of California, or for patients in California covered by those insurers, to approve or pay such false and fraudulent claims.

391.     By virtue of the acts described above, Defendant conspired to violate the CIFPA and each patient's private health insurance contract.

392.     The private insurers in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continue to pay the claims that are non-payable as a result of Defendant's illegal conduct.

393.     Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease obligations to return overpayments to these private insurance companies.

394.     By reason of Defendant's acts, these private insurance companies have been

damaged, and continue to be damaged, in a substantial amount to be determined at trial.

395.    Each claim for reimbursement that was a result of Defendant's schemes represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

396.    The State of California is entitled to the maximum penalty of $10,000 per violation, plus an assessment of three times the amount of each false and fraudulent claim for compensation made, used, presented or caused to be made, used or presented by Defendant.

## COUNT IV
### (Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*)

397.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

398.    This is a *qui tam* action brought by Relator on behalf of the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*

399.    Colorado's Medicaid False Claims Act, C.R.S.A. § 25.5-4-305, provides for liability for any person who:

   (a)  Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

   (b)  Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

   (c)  Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

   (d)  Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

   (e)  Knowingly buys, or receives as a pledge of an obligation or debt,

public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"; or

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

400.    Defendant violated the Colorado Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

401.    The Colorado Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Colorado Medicaid program, and is therefore liable under Colorado's Medicaid False Claims Act.

402.    The State of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

403.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Colorado in connection with Defendant's conduct. Compliance with applicable Colorado statutes was also

a condition of payment of claims submitted to the State of Colorado.

404. Had the State of Colorado known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

405. As a result of Defendant's violations of the Colorado Medicaid False Claims Act, the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

406. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Colorado Medicaid False Claims Act on behalf of himself and the State of Colorado.

407. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF COLORADO:

(1) Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Colorado, except that this upper limit on liability is subject to an automatic adjustment in accordance with the federal Civil Penalties Inflation Adjustment Act of 1990 ("CPIAA");

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Colorado Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT V
### (Connecticut False Claims Act, Conn. Gen. Stat. § 4-274 *et seq.*)

408. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

409. This is a *qui tam* action brought by Relator on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*

410. Conn. Gen. Stat. § 4-275 imposes liability as follows:

(a) No person shall:

(1) Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program;

(2) Knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program;

(3) Conspire to commit a violation of this section;

(4) Having possession, custody or control of property or money used, or to be used, by the state relative to a state-administered health or human services program, knowingly deliver, or cause to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the state relative to a state-administered health or human services program and intending to defraud the state, make or deliver such document without completely knowing that the information on the document is true;

(6) Knowingly buy, or receive as a pledge of an obligation or debt, public property from an officer or employee of the state relative to a state-administered health or human services program, who lawfully may not sell or pledge the property;

(7) Knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program; or

(8) Knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the state under a state-administered health or human services program.

411.   Defendant violated the Connecticut False Claims Act and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

412.   The Connecticut Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Connecticut Medicaid program, and is therefore liable under the Connecticut False Claims Act.

413.   The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted

by healthcare providers and third party payers in connection therewith.

414.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Connecticut in connection with Defendant's conduct. Compliance with applicable Connecticut statutes was also a condition of payment of claims submitted to the State of Connecticut.

415.    Had the State of Connecticut known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

416.    As a result of Defendant's violations of the Connecticut False Claims Act, the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

417.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Connecticut False Claims Act on behalf of himself and the State of Connecticut.

418.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF CONNECTICUT:

> (1) Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Connecticut, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Connecticut False Claims Act, Conn. Gen. Stat. § 4-275 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT VI</u>
### (Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*)

419.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

420.    This is a *qui tam* action brought by Relator on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*

421.    6 Del. C. § 1201(a) in pertinent part provides for liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of paragraph (a)(1), (2), . . . or (7) of this section; or

* * *

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

422.   Defendant furthermore violated the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

423.   The Delaware Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Delaware Medicaid program, and is therefore liable under the Delaware False Claims and Reporting Act.

424.   The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

425.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and  also an express condition of payment of claims submitted to the State of Delaware in connection with Defendant's conduct. Compliance with applicable Delaware statutes and regulations was also an express condition of payment of claims submitted to the State of Delaware.

426.   Had the State of Delaware known that Defendant was violating the federal and

state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

427.    As a result of Defendant's violations of the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

428.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, on behalf of himself and the State of Delaware.

429.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF DELAWARE:

(1) Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Delaware;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

    (1) The maximum amount allowed pursuant to Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201, and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## <u>COUNT VII</u>
### (Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*)

430.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

431.    This is a *qui tam* action brought by Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

432.    Fla. Stat. § 68.082(2) provides liability for any person who:

    (a) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

    (b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; or

    (c) Conspires to commit a violation of this subsection.

433.    Defendant further violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

434.    The Florida Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not

medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Florida Medicaid program, and is therefore liable under the Florida False Claims Act.

435.   The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

436.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Florida in connection with Defendant's conduct. Compliance with applicable Florida statutes was also a condition of payment of claims submitted to the State of Florida.

437.   Had the State of Florida known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

438.   As a result of Defendant's violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

439.   Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida.

440.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF FLORIDA:

    (1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's conduct;

    (2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Florida;

    (3) Pre- and post-judgment interest; and

    (4) All costs incurred in bringing this action.

To Relator:

    (1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT VIII
### (Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq*.)

441.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

442.    This is a *qui tam* action brought by Relator on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*

443.    The Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168-1, imposes liability on any person who:

    (1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of paragraph (1), (2), (4), (5), (6), or (7) of this subsection;

(4) Has possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and knowingly delivers, or causes to be delivered, less than all of such property or money;

(5) Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Georgia Medicaid program who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program.

444.   Defendant violated the Georgia False Medicaid Claims Act and knowingly caused false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

445.   The Georgia Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Georgia Medicaid program, and is therefore liable under the Georgia False Medicaid Claims Act.

446.    The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

447.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Georgia in connection with Defendant's conduct. Compliance with applicable Georgia statutes was also a condition of payment of claims submitted to the State of Georgia.

448.    Had the State of Georgia known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

449.    As a result of Defendant's violations of the Georgia False Medicaid Claims Act, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

450.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Georgia False Medicaid Claims Act on behalf of himself and the State of Georgia.

451.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF GEORGIA:

    (1) Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendant's conduct;

    (2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Georgia;

    (3) Pre- and post-judgment interest; and

    (4) All costs incurred in bringing this action.

To Relator:

    (1) The maximum amount allowed pursuant to Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168, and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT IX
### (Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*)

452.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

453.    This is a *qui tam* action brought by Relator on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

454.    Section 661-21(a) provides liability for any person who:

    (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

* * *

    (6) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or

property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State; or

\* \* \*

(8)  Conspires to commit any of the conduct described in this subsection.

455.    Defendant violated Haw. Rev. Stat. § 661-21(a) and knowingly caused false claims to be made, used and presented to the State of Hawaii by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

456.    The Hawaii Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Hawaii Medicaid program, and is therefore liable under the Hawaii False Claims Act.

457.    The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

458.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Hawaii in connection with Defendant's conduct. Compliance with applicable Hawaii statutes was also a condition of payment of claims submitted to the State of Hawaii.

459.    Had the State of Hawaii known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were

premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

460.    As a result of Defendant's violations of Haw. Rev. Stat. § 661-21, the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

461.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-21 on behalf of himself and the State of Hawaii.

462.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF HAWAII:

(1) Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Hawaii;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-21 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT X
**(Illinois False Claims Act, 740 ILCS 175/1 *et seq.*)**

463.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

464.    This is a *qui tam* action brought by Relator on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1 *et seq.*

465.    740 ILCS 175/3(a)(1) provides liability for any person who:

    (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

    (C)    conspires to commit a violation of subparagraph (A), (B) . . . .

466.    Defendant violated 740 ILCS 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

467.    The Illinois Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Illinois Medicaid program, and is therefore liable under the Illinois False Claims Act.

468.    The State of Illinois, by and through the Illinois Medicaid program and other state

healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

469.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Illinois in connection with Defendant's conduct. Compliance with applicable Illinois statutes was also a condition of payment of claims submitted to the State of Illinois.

470.    Had the State of Illinois known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

471.    As a result of Defendant's violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

472.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 ILCS 175/3(b) on behalf of himself and the State of Illinois.

473.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF ILLINOIS:

> (1) Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Illinois;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XI
### (Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat.  §§ 92/1 *et seq*.)

474.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

475.    Private healthcare insurers operating in Illinois do not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to Illinois insurers, and is therefore liable under the IICFPA.

476.    This is a claim for treble damages and penalties under the IICFPA.

477.    Pursuant to 740 Ill. Comp. Stat. § 92/5(a):

A person who violates any provision of this Act, . . . or Section 17-10.5 of the Criminal Code . . . shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

478.   720 Ill. Comp. Stat. § 5/17-10.5 provides, in pertinent part:

(a)  Insurance fraud.

(1)  A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property.

(2)  A person commits health care benefits fraud against a provider, other than a governmental unit or agency, when he or she knowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider.

* * *

(c)  Conspiracy to commit insurance fraud. . . .

479.   By virtue of the acts described above, Vanda knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois that those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

480.   By virtue of the acts described above, Vanda knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in Illinois, or for patients in Illinois covered by those insurers, to approve or pay such false and fraudulent claims.

481.   Vanda knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

482.   By virtue of the acts described above, Vanda knowingly utilized a scheme by

which it presented, or caused to be presented, false or fraudulent claims to private insurers in Illinois, or for patients in Illinois that those insurers covered (i.e., patients who hold private insurance contracts and against whom Vanda could file claims for payment or approval) in violation of each patient's private health insurance contract.

483. By virtue of the acts described above, Vanda conspired to violate the IICFPA and each patient's private health insurance contract.

484. The private insurers in Illinois, or those insurers that covered patients in Illinois, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be presented by Vanda, paid and continue to pay the claims that are non-payable as a result of Vanda's illegal conduct.

485. Vanda knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments to these private insurance companies.

486. By reason of Vanda's acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

487. Each claim for reimbursement that was a result of Vanda's scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

488. State of Illinois is entitled to the maximum penalty of $10,000 per violation, plus an assessment of three times the amount of each false or fraudulent claim for compensation made, used, presented, or caused to be made, used, or presented by Vanda.

## COUNT XII

**(Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7-1 to 5-11-5.7-18)**

489.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

490.    This is a *qui tam* action brought by Relator on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7-2 which imposes liability on:

> (b) A person who:
>
>> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>>
>> (2) knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim;
>>
>> (3) has possession, custody, or control of property or money used, or to be used, by the state, and knowingly delivers, or causes to be delivered, less than all of the money or property;
>>
>> (4) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the state and, with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;
>>
>> (5) knowingly buys or receives, as a pledge of an obligation or debt, public property from an employee who is not lawfully authorized to sell or pledge the property;
>>
>> (6) knowingly:
>>
>>> (A) makes, uses, or causes to be made or used, a false record or statement concerning an obligation to pay or transmit money or property to the state; or
>>>
>>> (B) conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

(7)  conspires  with  another  person  to  perform  an  act  described  in
subdivisions (1) through (6); or

(8)  causes or induces another person to perform an act described in
subdivisions (1) through (6) . . . .

491.    Defendant  violated  the  Indiana  Medicaid  False  Claims  and  Whistleblower
Protection Act and knowingly caused false claims to be made, used and presented to the State of
Indiana by its deliberate and systematic violation of federal and state laws and by virtue of the
fact that none of the claims submitted in connection with its conduct were even eligible for
reimbursement by the government-funded healthcare programs.

492.    The Indiana Medicaid program does not reimburse for drugs that are prescribed
for uses that are not their medically accepted use, nor does it reimburse for drugs that are not
medically  reasonable  or  necessary.  As  discussed  herein,  Vanda  caused  such  claims  to  be
submitted to the Indiana Medicaid program, and is therefore liable under the Indiana Medicaid
False Claims and Whistleblower Protection Act.

493.    The State of Indiana, by and through the Indiana Medicaid program and other
state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by
healthcare providers and third party payers in connection therewith.

494.    Compliance with applicable Medicare, Medicaid and the various other federal and
state laws cited herein was a condition of payment of claims submitted to the State of Indiana in
connection with Defendant's conduct. Compliance with applicable Indiana statutes was also a
condition of payment of claims submitted to the State of Indiana.

495.    Had the State of Indiana known that Defendant was violating the federal and state
laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed
to  meet  the  reimbursement  criteria  of  the  government-funded  healthcare  programs  or  were

premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

496. As a result of Defendant's violations of Indiana's Medicaid False Claims and Whistleblower Protection Act, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

497. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Indiana Medicaid False Claims and Whistleblower Protection Act on behalf of himself and the State of Indiana.

498. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF INDIANA: a civil penalty per violation of at least five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note, Public Law 101-410), and for up to three (3) times the amount of damages sustained by the state as well as such further relief as this Court deems equitable and just.

To Relator:

(1) The maximum amount allowed pursuant to the Indiana Medicaid False Claims and Whistleblower Protection Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XIII
### (Iowa False Claims Law, I.C.A. § 685.1 *et seq.*)

499.     Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

500.     This is a *qui tam* action brought by Relator on behalf of the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Law, I.C.A. § 685.1 *et seq*.

501.     Iowa False Claims Law, I.C.A. § 685.2, in pertinent part provides for liability for any person who:

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

> (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

> (c) Conspires to commit a violation of paragraph "a", "b" . . . .

502.     Defendant violated the Iowa False Claims Law, I.C.A. § 685.1 *et seq*. and knowingly caused false claims to be made, used and presented to the State of Iowa by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

503.     The Iowa Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Iowa Medicaid program, and is therefore liable under the Iowa False Claims Act.

504.    The State of Iowa, by and through the Iowa Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

505.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Iowa in connection with Defendant's conduct. Compliance with applicable Iowa statutes was also a condition of payment of claims submitted to the State of Iowa.

506.    Had the State of Iowa known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

507.    As a result of Defendant's violations of the Iowa False Claims Law, I.C.A. § 685.1 *et seq.*, the State of Iowa has been damaged in an amount far in excess of millions of dollars exclusive of interest.

508.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.*, on behalf of himself and the State of Iowa.

509.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF IOWA:

    (1) Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendant's conduct;

    (2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Iowa, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

    (3) Pre- and post-judgment interest; and

    (4) All costs incurred in bringing this action.

To Relator:

    (1) The maximum amount allowed pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.* and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT XIV
**(Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.*)**

510.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

511.    This is a *qui tam* action brought by Relator on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*

512.    La. Rev. Stat. Ann. § 46:438.3 provides:

    (A) No person shall knowingly present or cause to be presented a false or fraudulent claim.

    (B) No person shall knowingly engage in misrepresentation or make, use,

or cause to be made or used, a false record or statement material to a false or fraudulent claim.

(C) No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

(D) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

513.    Defendant further violated La. Rev. Stat. Ann. § 46:438.3 and knowingly caused false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

514.    The Louisiana Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Louisiana Medicaid program, and is therefore liable under the Louisiana Medical Assistance Programs Integrity Law.

515.    The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

516.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and  also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendant's conduct.  Compliance with

applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

517.     Had the State of Louisiana known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

518.     As a result of Defendant's violations of La. Rev. Stat. Ann. § 46:438.3, the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

519.     Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. § 46:439.1(A) on behalf of himself and the State of Louisiana.

520.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF LOUISIANA:

(1) Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Louisiana, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XV

**(Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*)**

521. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

522. This is a *qui tam* action brought by Relator on behalf of the State of Michigan to recover treble damages and civil penalties under Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.603, which provides in pertinent part:

(1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits.

(2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit. . . .

523. Defendant violated Michigan law and knowingly caused false claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

524. The Michigan Medicaid program does not reimburse for drugs that are prescribed

for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Michigan Medicaid program, and is therefore liable under the Michigan Medicaid False Claims Act.

525.    The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

526.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Michigan in connection with Defendant's conduct.  Compliance with applicable Michigan statutes was also a condition of payment of claims submitted to the State of Michigan.

527.    Had the State of Michigan known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

528.    As a result of Defendant's violations of the Medicaid False Claims Act, the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

529.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Medicaid False Claims Act on behalf of himself and the State of Michigan.

530.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF MICHIGAN:

(1) Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Michigan;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to the Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVI
### (Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*)

531. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

532. This is a *qui tam* action brought by Relator on behalf of the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*

533. Minnesota False Claims Act, M.S.A. § 15C.02, provides for liability for any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7);

(4) has possession, custody, or control of property or money used, or to be used, by the state or a political subdivision and knowingly delivers or causes to be delivered less than all of that money or property;

(5) is authorized to make or deliver a document certifying receipt for money or property used, or to be used, by the state or a political subdivision and, intending to defraud the state or a political subdivision, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state or a political subdivision who lawfully may not sell or pledge the property; or

(7) knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision.

534. Defendant violated the Minnesota False Claims Act and knowingly caused false

claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

535.    The Minnesota Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Minnesota Medicaid program, and is therefore liable under the Minnesota False Claims Act.

536.    The State of Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

537.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Minnesota in connection with Defendant's conduct. Compliance with applicable Minnesota statutes was also a condition of payment of claims submitted to the State of Minnesota.

538.    Had the State of Minnesota known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

539.    As a result of Defendant's violations of the Minnesota False Claims Act, the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of

interest.

540.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Minnesota False Claims Act on behalf of himself and the State of Minnesota.

541.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF MINNESOTA:

(1) Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Minnesota;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Minnesota False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVII
### (Montana False Claims Act, MCA § 17-8-401 *et seq.*)

542.    Relator realleges and incorporates by reference the prior paragraphs as though

fully set forth herein.

543.    This is a *qui tam* action brought by Relator on behalf of the State of Montana to recover treble damages and civil penalties under the Montana False Claims Act, MCA § 17-8-401 *et seq.*

544.    Montana's False Claims Act, MCA § 17-8-403, provides for liability for any person who:

> (a) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;
>
> (b) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
>
> (c) conspires to commit a violation of this subsection (1);
>
> (d) has possession, custody, or control of public property or money used or to be used by the governmental entity and knowingly delivers or causes to be delivered less than all of the property or money;
>
> (e) is authorized to make or deliver a document certifying receipt of property used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, makes or delivers a receipt without completely knowing that the information on the receipt is true;
>
> (f) knowingly buys or receives as a pledge of an obligation or debt public property of the governmental entity from any person who may not lawfully sell or pledge the property;
>
> (g) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity; or
>
> (h) as a beneficiary of an inadvertent submission of a false or fraudulent claim to the governmental entity, subsequently discovers the falsity of the claim or that the claim is fraudulent and fails to disclose the false or fraudulent claim to the governmental entity within a reasonable time after discovery of the false or fraudulent claim.

545.    Defendant violated the Montana False Claims Act and knowingly caused false claims to be made, used and presented to the State of Montana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

546.    The Montana Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Montana Medicaid program, and is therefore liable under the Montana False Claims Act.

547.    The State of Montana, by and through the Montana Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

548.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Montana in connection with Defendant's conduct. Compliance with applicable Montana statutes was also a condition of payment of claims submitted to the State of Montana.

549.    Had the State of Montana known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

550.    As a result of Defendant's violations of the Montana False Claims Act, the State

of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

551.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Montana False Claims Act on behalf of himself and the State of Montana.

552.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF MONTANA:

(1) Three times the amount of actual damages which the State of Montana has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Montana;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Montana False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVIII
**(Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*)**

553.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

554.    This is a *qui tam* action brought by Relator on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*

555.    N.R.S. § 357.040(1) provides liability for any person who:

(a) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(b) Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.

(c) Has possession, custody or control of public property or money used or to be used by the State or a political subdivision and knowingly delivers or causes to be delivered to the State or a political subdivision less money or property than the amount of which the person has possession, custody or control.

(d) Is authorized to prepare or deliver a document that certifies receipt of money or property used or to be used by the State or a political subdivision and knowingly prepares or delivers such a document without knowing that the information on the document is true.

(e) Knowingly buys, or receives as a pledge or security for an obligation or debt, public property from a person who is not authorized to sell or pledge the property.

(f) Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision.

(g) Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

(h) Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the State or political subdivision within a reasonable time.

(i) Conspires to commit any of the acts set forth in this subsection.

556.    Defendant violated N.R.S. § 357.040(1) and knowingly false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

557.    The Nevada Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Nevada Medicaid program, and is therefore liable under the Nevada False Claims Act.

558.    The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

559.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Nevada in connection with Defendant's conduct. Compliance with applicable Nevada statutes was also a condition of payment of claims submitted to the State of Nevada.

560.    Had the State of Nevada known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

561.    As a result of Defendant's violations of N.R.S. § 357.040(1), the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

562.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on behalf of himself and the State of Nevada.

563.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NEVADA:

(1) Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Nevada, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.R.S. § 357.040 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XIX
### (New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*)

564.    Relator realleges and incorporates by reference the prior paragraphs as though

fully set forth herein.

565.    This is a *qui tam* action brought by Relator on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*

566.    N.J.S.A. § 2A:32C-3, provides for liability for any person who:

(a) Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

(d) Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

(e) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;

(f) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property; or

(g) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

567.    Defendant violated the New Jersey False Claims Act and knowingly caused false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded

healthcare programs.

568.    The New Jersey Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the New Jersey Medicaid program, and is therefore liable under the New Jersey False Claims Act.

569.    The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

570.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Jersey in connection with Defendant's conduct. Compliance with applicable New Jersey statutes was also a condition of payment of claims submitted to the State of New Jersey.

571.    Had the State of New Jersey known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

572.    As a result of Defendant's violations of the New Jersey False Claims Act, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

573.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the New Jersey False

Claims Act on behalf of himself and the State of New Jersey.

574. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NEW JERSEY:

(1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act for each false claim which Defendant caused to be presented to the State of New Jersey;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to New Jersey False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XX
**(New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*;**
**New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*)**

575. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

576. This is a *qui tam* action brought by Relator on behalf of the State of New Mexico

to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, which provides in pertinent part:

A person shall not:

    (1)   knowingly present, or cause to be presented, to an employee, officer or agent of the state or a political subdivision or to a contractor, grantee, or other recipient of state funds or political subdivision funds a false or fraudulent claim for payment or approval;

    (2)   knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim; or

    (3)   conspire to defraud the state or a political subdivision by obtaining approval or payment on a false or fraudulent claim . . . .

N.M. Stat. Ann. § 44-9-3(A)(1)-(3).

577.    Defendant violated N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Mexico by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

578.    The New Mexico Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the New Mexico Medicaid program, and is therefore liable under N.M. Stat. Ann. §§ 27-14-1 et seq. and N.M. Stat. Ann. § 44-9-1 *et seq*.

579.    The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendant' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

580.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Mexico in connection with Defendant's conduct. Compliance with applicable New Mexico statutes was also a condition of payment of claims submitted to the State of New Mexico.

581.    Had the State of New Mexico known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

582.    As a result of Defendant's violations of N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.*, the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

583.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* on behalf of himself and the State of New Mexico.

584.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NEW MEXICO:

    (1) Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendant's conduct;

    (2) A civil penalty of not less than $5,000 and not more than $10,000 for each

false claim which Defendant caused to be presented to the State of New Mexico;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

<u>**COUNT XXI**</u>
**(New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq*.)**

585.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

586.    This is a *qui tam* action brought by Relator on behalf of the State of New York to recover treble damages and civil penalties under the New York State False Claims Act, N.Y. State Fin. Law § 189, which imposes liability on any person who:

(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(c) conspires to commit a violation of paragraph (a), (b) . . . .

587.    Defendant violated the New York State False Claims Act, and knowingly caused false claims to be made, used and presented to the State of New York, by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the

government-funded healthcare programs.

588.   The New York Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the New York Medicaid program, and is therefore liable under the New York State False Claims Act.

589.   The State of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

590.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New York in connection with Defendant's conduct. Compliance with applicable New York statutes was also a condition of payment of claims submitted to the State of New York.

591.   Had the State of New York known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

592.   As a result of Defendant's violations of the New York State False Claims Act, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

593.   Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the New York State False

Claims Act, on behalf of himself and the State of New York.

594.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NEW YORK:

(1) Three times the amount of actual damages which the State of New York has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New York;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to the New York State False Claims Act, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXII**
**(North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*)**

595.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

596.    This is a *qui tam* action brought by Relator on behalf of the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*

597.    North Carolina's False Claims Act, N.C.G.S.A. § 1-607(a), provides for liability for any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

(4) Has possession, custody, or control of property or money used or to be used by the State and knowingly delivers or causes to be delivered less than all of that money or property.

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true.

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any officer or employee of the State who lawfully may not sell or pledge the property.

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

598.    Defendant violated the North Carolina False Claims Act, and knowingly caused

180

false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

599.    The North Carolina Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the North Carolina Medicaid program, and is therefore liable under the North Carolina False Claims Act.

600.    The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

601.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendant's conduct.  Compliance with applicable North Carolina statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of North Carolina.

602.    Had the State of North Carolina known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

603.    As a result of Defendant's violations of the North Carolina False Claims Act, the

State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

604.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the North Carolina False Claims Act on behalf of himself and the State of North Carolina.

605.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NORTH CAROLINA:

(1) Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of North Carolina;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to North Carolina False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## **COUNT XXIII**

**(Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*)**

606.     Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

607.     This is a *qui tam* action brought by Relator on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*

608.     Oklahoma's Medicaid False Claims Act, 63 Okl. St. Ann. § 5053.1, provides for liability for any person who:

> (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (3) Conspires to commit a violation of the Oklahoma Medicaid False Claims Act;
>
> (4) Has possession, custody, or control of property or money used, or to be used, by the state knowingly delivers, or causes to be delivered, less than all of such money or property;
>
> (5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;
>
> (6) Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the state who lawfully may not sell or pledge the property; or
>
> (7) Knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

609.     Defendant violated the Oklahoma Medicaid False Claims Act and knowingly

caused false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

610.    The Oklahoma Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Oklahoma Medicaid program, and is therefore liable under the Oklahoma Medicaid False Claims Act.

611.    The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

612.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendant's conduct.  Compliance with applicable Oklahoma statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Oklahoma.

613.    Had the State of Oklahoma known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

614.    As a result of Defendant's violations of the Oklahoma Medicaid False Claims

Act, the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

615.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Oklahoma Medicaid False Claims Act on behalf of himself and the State of Oklahoma. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF OKLAHOMA:

    (1) Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendant's conduct;

    (2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Oklahoma;

    (3) Pre- and post-judgment interest; and

    (4) All costs incurred in bringing this action.

To Relator:

    (1) The maximum amount allowed pursuant to Oklahoma Medicaid False Claims Act and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

### COUNT XXIV
**(Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*)**

616. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

617. This is a *qui tam* action brought by Relator on behalf of the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*

618. Rhode Island's False Claims Act, Gen. Laws 1956, § 9-1.1-3, provides for liability for any person who:

> (1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (3) Conspires to commit a violation of subdivisions 9-1.1-3(1), (2), (3), (4), (5), (6) or (7);
>
> (4) Has possession, custody, or control of property or money used, or to be used, by the state and knowingly delivers, or causes to be delivered, less property than all of that money or property;
>
> (5) Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;
>
> (6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, or a member of the guard, who lawfully may not sell or pledge the property; or
>
> (7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

619. Defendant violated the Rhode Island False Claims Act and knowingly caused false claims to be made, used and presented to the State of Rhode Island by its deliberate and

systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

620.    The Rhode Island Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Rhode Island Medicaid program, and is therefore liable under the Rhode Island False Claims Act.

621.    The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

622.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendant's conduct.  Compliance with applicable Rhode Island statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Rhode Island.

623.    Had the State of Rhode Island known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

624.    As a result of Defendant's violations of the Rhode Island False Claims Act, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars

exclusive of interest.

625.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Rhode Island False Claims Act on behalf of himself and the State of Rhode Island.

626.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF RHODE ISLAND:

(1) Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Rhode Island;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Rhode Island False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXV
**(Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)**

627.    Relator realleges and incorporates by reference the prior paragraphs as though

fully set forth herein.

628.    This is a *qui tam* action brought by Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

629.    Section 71-5-182(a)(1) provides liability for any person who:

   a.   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the medicaid program;

   b.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the medicaid program;

   c.   Conspires to commit a violation of subdivision (a)(1)(A), (a)(1)((B), or (a)(1)((D); or

   d.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the medicaid program.

630.    Defendant violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused false claims to be made, used and presented to the State of Tennessee by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

631.    The Tennessee Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Tennessee Medicaid program, and is therefore liable under the Tennessee Medicaid False Claims Act.

632.    The State of Tennessee, by and through the Tennessee Medicaid program and

other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

633.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Tennessee in connection with Defendant's conduct.  Compliance with applicable Tennessee statutes was also a condition of payment of claims submitted to the State of Tennessee.

634.     Had the State of Tennessee known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

635.     As a result of Defendant's violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

636.     Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of himself and the State of Tennessee.

637.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF TENNESSEE:

(1) Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $25,000 for each false claim which Defendant caused to be presented to the State of Tennessee, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT XXVI</u>
### (Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*)

638.     Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

639.     This is a *qui tam* action brought by Relator on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

640.     V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who:

(1)     knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2)     knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3)     knowingly applies for and receives a benefit or payment on behalf of

another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

(4)     knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

a.  the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification as . . . .

b.  information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5)     except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(6)     knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who:

a.  is not licensed to provide the product or render the service, if a license is required; or

b.  is not licensed in the manner claimed;

(7)     knowingly makes or causes to be made a claim under the Medicaid program for:
a.  a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner;

b.  a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

c.  a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

(8)     makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;

(9)    conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13);

(10)    is a managed care organization that contracts with the commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly:

    a.  fails to provide to an individual a health care benefit or service that the organization is required to provide under the contract;

    b.  fails to provide to the commission or appropriate state agency information required to be provided by law, commission or agency rule, or contractual provision; or

    c.  engages in a fraudulent activity in connection with the enrollment of an individual eligible under the Medicaid program in the organization's managed care plan or in connection with marketing the organization's services to an individual eligible under the Medicaid program;

(11)    knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

(12)    knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13)    knowingly engages in conduct that constitutes a violation under Section 32.039(b).

641.    Defendant violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

642.    The Texas Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not

medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Texas Medicaid program, and is therefore liable under the Texas False Claims Act.

643.    The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

644.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Texas in connection with Defendant's conduct. Compliance with applicable Texas statutes was also a condition of payment of claims submitted to the State of Texas.

645.    Had the State of Texas known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

646.    As a result of Defendant's violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

647.    Defendant did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and has not otherwise furnished information to the State regarding the claims for reimbursement at issue.

648.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

649.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF TEXAS:

(1) Two times the amount of actual damages which the State of Texas has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $11,000 pursuant to V.T.C.A. Hum. Res. Code § 36.025(a)(3) for each false claim which Defendant caused to be presented to the state of Texas, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## **COUNT XXVII**
### **(Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*)**

650.    Relator realleges and incorporates by reference the prior paragraphs as though

fully set forth herein.

651.    This is a *qui tam* action brought by Relator on behalf of the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*

652.    Vt. Stat. Ann. tit. 32, § 631(a) in pertinent part provides for liability for any person who:

> (1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;
>
> (2) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (3) knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of 13 V.S.A. chapter 21 or section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b;
>
> (4) knowingly present, or cause to be presented, a claim that includes items or services for which the State could not receive payment from the federal government due to the operation of 42 U.S.C. § 1396b(s) because the claim includes designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) furnished to an individual on the basis of a referral that would result in the denial of payment under 42 U.S.C. chapter 7, subchapter XVIII (the "Medicare program"), due to a violation of 42 U.S.C. § 1395nn;
>
> * * *
>
> (9) knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;
>
> (10) knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State; or
>
> * * *
>
> (12) conspire to commit a violation of this subsection.

653.    Defendant violated the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Vermont by its deliberate and

systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

654. The Vermont Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Vermont Medicaid program, and is therefore liable under the Vermont False Claims Act.

655. The State of Vermont, by and through the Vermont Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

656. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Vermont in connection with Defendant's conduct. Compliance with applicable Vermont statutes and regulations was also an express condition of payment of claims submitted to the State of Vermont.

657. Had the State of Vermont known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

658. As a result of Defendant's violations of the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, the State of Vermont has been damaged in an amount far in excess of millions of dollars

exclusive of interest.

659.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, on behalf of himself and the State of Vermont.

660.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF VERMONT:

(1) Three times the amount of actual damages which the State of Vermont has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Vermont, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in investigating and bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XXVIII
**(Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*)**

661.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

662.    This is a *qui tam* action brought by Relator on behalf of the State of Washington to recover treble damages and civil penalties under the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*

663.    RCWA 74.66.020(1) in pertinent part provides for liability for any person who:

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

> (c) Conspires to commit one or more of the violations in this subsection (1).

664.    Defendant violated the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Washington by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

665.    The Washington Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Washington Medicaid program, and is therefore liable under the Washington Medicaid Fraud Act.

666.    The State of Washington, by and through the Washington Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

667.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Washington in connection with Defendant's conduct.  Compliance with applicable Washington statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Washington.

668.     Had the State of Washington known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

669.     As a result of Defendant's violations of the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*, the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

670.     Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.* on behalf of himself and the State of Washington.

671.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF WASHINGTON:

(1) Three times the amount of actual damages which the State of Washington has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Washington;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT XXIX</u>
### (Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*)

672.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

673.    This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*

674.    Mass. Gen. Laws Ann. Ch. 12 § 5B(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; or

(3) conspires to commit a violation of this subsection; or

\* \* \*

(10) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, or is a beneficiary of an overpayment from the commonwealth or a political subdivision thereof, and who subsequently discovers the falsity of the claim or the receipt of overpayment, and fails to disclose the false claim or receipt of overpayment to the commonwealth or a political subdivision by the later of:

    (i) the date which is 60 days after the date on which the false claim or receipt of overpayment was identified; or

    (ii) the date any corresponding cost report is due . . . .

675. Defendant violated Mass. Gen. Laws Ann. Ch. 12 § 5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

676. The Massachusetts Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Massachusetts Medicaid program, and is therefore liable under the Massachusetts False Claims Act.

677. The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

678. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendant's conduct. Compliance with applicable

Massachusetts statutes was also a condition of payment of claims submitted to the Commonwealth of Massachusetts.

679.    Had the Commonwealth of Massachusetts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

680.    As a result of Defendant's violations of Mass. Gen. Laws Ann. Ch. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

681.    Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Mass. Gen. Laws Ann. Ch. 12 § 5(c)(2) on behalf of himself and the Commonwealth of Massachusetts.

682.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the Commonwealth OF MASSACHUSETTS:

(1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each

false claim which Defendant caused to be presented to the Commonwealth of Massachusetts, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Ch. 12, § 5F and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT XXX</u>
**(Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*)**

683.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

684.    This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A), which provides liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7; or

\* \* \*

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly

and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth.

685.    Defendant furthermore violated Virginia's Fraud Against Tax Payers Act, § 8.01-216.3(A), and knowingly caused false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

686.    The Virginia Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the Virginia Medicaid program, and is therefore liable under the Virginia Fraud Against Taxpayers Act.

687.    The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

688.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendant's conduct. Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

689.    Had the Commonwealth of Virginia known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have

paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

690.    As a result of Defendant's violations of Virginia's Fraud Against Tax Payers Act, §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

691.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia's Fraud Against Tax Payers Act, §8.01-216.3, on behalf of himself and the Commonwealth of Virginia.

692.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the COMMONWEALTH OF VIRGINIA:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the Commonwealth of Virginia;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to VA Code Ann. § 32.1-315 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXXI
### (District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-381.02 *et seq.*)

693.     Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

694.     This is a *qui tam* action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-381.02 *et seq.*

695.     D.C. Code § 2-381.02(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Has possession, custody, or control of property or money used, or to be used, by the District and knowingly delivers, or causes to be delivered, less than all of that money or property;

(4) Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the District and, intending to defraud the District, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(5) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the District who lawfully may not sell or pledge property;

(6) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District;

(7) Conspires to commit a violation of paragraph (1), (2), (3), (4), (5), or (6) of this subsection;

(8)  Is a beneficiary of an inadvertent submission of a false or fraudulent claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false or fraudulent claim to the District; or

(9)  Is the beneficiary of an inadvertent payment or overpayment by the District of monies not due and knowingly fails to repay the inadvertent payment or overpayment to the District.

696.    Defendant violated D.C. Code § 2-381.02 and knowingly caused false claims to be made, used and presented to the District of Columbia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the government-funded healthcare programs.

697.    The District of Columbia Medicaid program does not reimburse for drugs that are prescribed for uses that are not their medically accepted use, nor does it reimburse for drugs that are not medically reasonable or necessary. As discussed herein, Vanda caused such claims to be submitted to the District of Columbia Medicaid program, and is therefore liable under the District of Columbia Procurement Reform Amendment Act.

698.    The District of Columbia, by and through the District of Columbia Medicaid program and other District healthcare programs, and unaware of Defendant's illegal conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

699.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the District of Columbia in connection with Defendant's conduct.  Compliance with applicable District of Columbia statutes was also a condition of payment of claims submitted to the District of Columbia.

700.    Had the District of Columbia known that Defendant was violating the federal and

state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

701.    As a result of Defendant's violations of D.C. Code § 2-308.14(a), the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

702.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

703.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the DISTRICT OF COLUMBIA:

(1) Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendant's illegal conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the District of Columbia, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMANDED

704.    Relator demands a jury trial as to all issues.


DATED: June 9, 2020                      Respectfully submitted,

                                         **STONE & MAGNANINI LLP**

                                         By: *s/ Robert A. Magnanini*
                                               Robert A. Magnanini (DC Bar #995425)
                                               Bradford W. Muller (DC Bar #996307)
                                               rmagnanini@stonemagnalaw.com
                                               bmuller@stonemagnalaw.com
                                               100 Connell Drive, Suite 2200
                                               Berkeley Heights, NJ 07922
                                               Telephone: (973) 218-1111
                                               Facsimile: (973) 218-1106

                                               **THE WEISER LAW FIRM, P.C.**
                                               Christopher L. Nelson (DC Bar #219178)
                                               cln@weiserlawfirm.com
                                               James M. Ficaro
                                               jmf@weiserlawfirm.com
                                               Ross M. Wolfe (DC Bar #219206)
                                               rmw@weiserlawfirm.com
                                               22 Cassatt Avenue
                                               Berwyn, PA 19312
                                               Telephone: (610) 225-2677
                                               Facsimile: (610) 408-8062


                                               *Attorneys for Plaintiff-Relator*