**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————

**UNITED STATES OF AMERICA,**
*ex rel.* **RICHARD GARDNER,**

    **Plaintiffs,**

       **v.**

**VANDA PHARMACEUTICALS, INC.,**

    **Defendant.**

———————————————————————

      **Case No. 17-cv-00464 (APM)**

—

**MEMORANDUM OPINION AND ORDER**

**I.   INTRODUCTION**

After the court dismissed his First Amended Complaint, Relator Richard Gardner filed a Second Amended Complaint re-alleging that Defendant Vanda Pharmaceuticals, Inc. caused the submission of numerous false claims to the Medicare and Medicaid programs via the promotion and marketing of two of its drugs, Fanapt and Hetlioz.   Relator asserts claims under the federal False Claims Act and 31 analogous state laws.   Neither the United States nor any state chose to intervene.   Before the court is Defendant's motion to dismiss the Second Amended Complaint. For the reasons that follow, the court denies the motion.

**II.   BACKGROUND**

    **A.   Factual Background**

Defendant Vanda Pharmaceuticals, Inc. ("Vanda") is a pharmaceutical manufacturer based in Washington, D.C.   Second Am. Compl., ECF No. 47 [hereinafter SAC], ¶ 9.   Relator worked for Vanda as a regional business leader from November 2015 until August 2016.   *Id.* ¶ 6. Relator's territory included Illinois, Wisconsin, Michigan, Ohio, western Pennsylvania, West

Virginia, and Indiana.   *Id.*   Regional business leaders are responsible for managing Vanda's sales force.   *Id.* ¶ 110.   Relator asserts that his claims are confirmed by another regional business leader, Jeff Bourgeois.   *Id.* ¶ 105.   Bourgeois worked at Vanda from November 2015 through June 2018.   *Id.*   At different times during his tenure at Vanda, Bourgeois's territory included Louisiana, Arkansas, Texas, and Oklahoma.   *Id.*

Vanda owns and markets the two drugs at issue in this case, Fanapt and Hetlioz.   *Id.* ¶ 9. Fanapt is an "atypical antipsychotic agent" approved for "the acute treatment of schizophrenia in adults."   *Id.*   Hetlioz is a circadian regulator, which the FDA approved as a treatment for Non-24-Hour Sleep-Wake Disorder ("Non-24"), *id.* ¶ 12, a circadian rhythm sleep disorder found mostly in blind individuals, *id.* ¶¶ 12–13.   In the main, Relator alleges that "[Vanda] has, since at least November 2015, engaged in a scheme to promote . . . Fanapt and Hetlioz for off-label uses." *Id.* ¶ 104.   "Off-label" refers to uses other than the ones for which the drug was approved.   *See Wash. Legal Found. v. Henney*, 202 F.3d 331, 332 (D.C. Cir. 2000).

       *1.      Fanapt*

The FDA approved Fanapt solely to treat adult schizophrenia patients.   *Id.* ¶¶ 9, 116. Other antipsychotics, by contrast, have a wider variety of uses.   *Id.* ¶ 116.   Relator's off-label promotion and messaging allegations regarding Fanapt mirror those in his First Amended Complaint.   To increase sales, Relator alleges, Vanda's senior management implemented a plan to promote Fanapt for bi-polar disorder and "other conditions treated by competitors' antipsychotic medications."   *Id.* ¶ 117.   "Specifically . . . , Vanda trained its sales force to market Fanapt to providers as an effective substitute for other atypical antipsychotics that have more expansive indications and are commonly prescribed for bipolar disorder rather than schizophrenia."

*Id.* ¶ 118; *see also id.* ¶¶ 120–146.   According to Relator, Vanda was aware that "a significant portion of the prescriptions secured by its sales force were for off-label uses."   *Id.* ¶ 119.

Vanda also allegedly "targeted" competitors' atypical antipsychotic drugs by setting its representatives' sales goals for Fanapt on par with other antipsychotic drugs.   *Id.* ¶¶ 147–172. As part of that strategy, Vanda provided "target lists" to its sales representatives, which featured providers who prescribed other atypical antipsychotics.   *Id.* ¶ 163.   All the providers on the target lists had at least a few schizophrenic patients, *id.* ¶ 164, but according to Relator, "the target lists were not useful, as they were in place solely to shield [] Vanda from liability, and as a result nearly all of the sales representatives relied almost exclusively on the target lists they personally created," as Vanda's provided lists would not allow representatives to meet sales expectations, *id.* ¶ 166. Vanda's target lists did not differentiate between providers prescribing atypical antipsychotics for schizophrenia versus other conditions.   *Id.* ¶¶ 167–168.   Vanda also declined to remove physicians with no schizophrenic patients from its target lists, even when provided the means to do so, and continued to compensate its sales representatives for off-label prescriptions.   *Id.* ¶ 168. Vanda incentivized and encouraged its sales force to call on doctors to prescribe Fanapt for off-label purposes.   *Id.* ¶¶ 169–171.   Finally, internal Fanapt sales projections included off-label prescriptions, Relator says, and Vanda refused to change those projections even when, for example, the Indiana Medicaid program changed its coverage policy so that it no longer reimbursed for off-label uses.   *Id.* ¶¶ 173–175.

Additionally, Vanda allegedly promoted Fanapt for off-label use in pediatric patients. *See id.* ¶¶ 177–190.   As evidence, Relator points to target lists, which include child psychiatrists. *See id.*   "The fact that Vanda included child psychiatrists in its targets lists demonstrates that [Vanda] intended its sales representatives to promote Fanapt to child psychiatrists," as did its

failure to remove them from those lists or to stop sales representatives from calling on them to prescribe Fanapt.  *Id.* ¶¶ 184, 186.

2.    *Hetlioz*

Hetlioz is a circadian regulator that is FDA-approved to treat only Non-24.  *Id.* ¶ 12.  Non-24 is a serious, rare circadian rhythm disorder ("CRD") that affects a significant portion of totally blind individuals who, due to their lack of light perception, cannot reset their body clocks to the 24-hour day.  *Id.* ¶ 244.  Approximately 90,000 totally blind individuals suffer from Non-24.  *Id.*  Among sighted individuals, Non-24 is extremely rare.  *Id.* ¶ 246.  In 2010, the FDA granted "orphan drug" status to Hetlioz to treat Non-24 in blind patients without light perception.  *Id.* ¶ 242.[1]  On January 31, 2014, Vanda announced that the FDA had approved Hetlioz 20 mg capsules for treatment of Non-24.  *Id.*  Although initially limiting Hetlioz's approval to treatment for Non-24 in blind populations, the FDA later corrected that limitation, allowing Hetlioz to be prescribed to treat sighted individuals with Non-24.  *Id.* ¶ 15.

In his Second Amended Complaint, Relator emphasizes a new, alternative theory of false claims liability regarding Hetlioz.  Previously, Relator alleged that Vanda created a marketing scheme intended to produce off-label prescriptions "beyond Hetlioz's sole indication of Non-24."  First Am. Compl., ECF No. 20, ¶ 207.  "Vanda positioned Hetlioz as a treatment option for *all* sleep disorders caused by circadian rhythm disruption."  *Id.* (emphasis added).  The court rejected that theory for lack of falsity "due to pervasive pre-authorization requirements for the

---

[1] The Orphan Drug Act grants special status to a drug or biological product used to treat a rare disease or condition upon request of a sponsor.   This status is referred to as "orphan designation," or "orphan status."   A drug will qualify for orphan status only if it meets certain criteria under the Orphan Drug Act and the FDA's implementing regulations. *Designating an Orphan Product: Drugs and Biological Products*, FOOD & DRUG ADMIN., https://www.fda.gov/industry/developing-products-rare-diseases-conditions/designating-orphan-product-drugs-and-biological-products (last visited Mar. 17, 2021).

drug," which require physicians to identify the diagnosis for which Non-24 is being prescribed before payment is authorized. *United States ex rel. Gardner v. Vanda Pharms., Inc.* (*Gardner I*), No. 17-cv-00464 (APM), 2020 WL 2542121, at *12 (D.D.C. May 19, 2020). Put another way, the court found that claims approving the off-label use of Hetlioz—i.e., for diseases other than Non-24—were not plausibly false if physicians were required as part of a pre-approval process to disclose a patient's diagnosis. Now, Relator has amended his Complaint to allege a theory in the alternative: that Vanda "illegally promoted Hetlioz by misrepresenting Non-24 to encompass several additional CRDs, thereby expanding the potential patient population, to mislead prescribers, mainly psychiatrists, into believing their patients had Non-24, when in actuality they did not." SAC ¶ 243. In other words, Relator's new theory is one of fraudulent inducement: Vanda caused physicians to incorrectly diagnose patients with Non-24 and prescribe them Hetlioz.[2] Relator alleges that Vanda "misled prescribers to believe that if certain broad criteria were met (*i.e.*, the criteria for any one of a host of [Circadian Rhythm Sleep-Wake Disorders] generally), then a Non-24 diagnosis (and prescription for Hetlioz) was proper." *Id.* ¶ 275. "As a result, unsuspecting clinicians misdiagnosed patients and prescribed Hetlioz, thinking they had Non-24, when they did not." *Id.*

To achieve this end, Relator alleges, Vanda focused heavily on "educating" prescribers, particularly psychiatrists, in the hope that this "education" would hoodwink them into concluding that their *sighted* patients suffered from Non-24, notwithstanding the low incidence of Non-24 among sighted individuals. *Id.* According to Vanda's CEO, "2 out of every 3 Hetlioz prescriptions come from psychiatrists and are written for sighted patients." *Id.* ¶ 262. Vanda

---

[2] Because Relator's briefing with respect to Hetlioz focuses exclusively on this alternative theory of liability, *see generally* Relator's Opp'n to Mot. to Dismiss, ECF No. 54, the court addresses only that theory in its discussion below.

provided its sales team with educational materials purporting to contain the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") identification and diagnostic criteria for Non-24. *Id.* ¶ 276. The DSM-5 is a manual published by the American Psychiatric Association and is one of the primary resources used in the field of psychology to classify and define mental health disorders. *See id.* The DSM-5 discusses 22 broad categories of disorders that are broken down into numerous diagnostic groups. *Id.* Within each diagnostic group are various applicable conditions. *Id.* Circadian rhythm sleep-wake disorders ("CRSWDs") are a diagnostic group in the "Sleep-Wake Disorders" category of the DSM-5. *Id.* ¶ 277. There are six specific conditions categorized as CRSWDs, including Non-24. *Id.* ¶ 279.

Relator submits that Vanda trained its sales team to use excerpts from the DSM-5's CRSWD section to mislead providers into thinking that their patients had Non-24 if they met the three general diagnostic criteria applicable to *all* CRSWDs rather than the criteria specific to Non-24. *Id.* ¶ 281. Relator reproduces a slide from a March 2018 sales training that prompts sales representatives first to ask a series of general questions about patients with sleep issues and then to tell providers that the patients "fit the DSM-5 criteria for Non-24" and that "Hetlioz is the only product approved to treat Non-24." *Id.* ¶ 312. According to a Confidential Witness ("CW"), Vanda also sent out flash cards containing the general DSM-5 criteria and asking providers to prescribe Hetlioz if their patients satisfied the general criteria for all CRSWDs. *Id.* ¶ 318. Relator alleges that "misleading prescribers using the DSM-5 criteria is the primary sales pitch for Hetlioz, and [Vanda] requires sales representatives to make this pitch on every sales call." *Id*. ¶ 312; *see also id.* ¶ 314 ("[I]n a May 24, 2019 power point presentation, a slide titled 'Q2 Business Plan' under 'Hetlioz' states 'Stronger focus on patient identification and profiling through DSM 5.'").

According to Relator, Vanda aimed its scheme primarily at psychiatrists for multiple reasons. First, the DSM-5 did not recognize Non-24 as an actual disease state until 2013, so it has not been well-studied and reviewed over decades. *Id.* ¶ 304. "Second, even after Non-24 became recognized, prior to Hetlioz, psychiatrists did not treat the condition." *Id.* ¶ 305. To treat Non-24, "patients would almost always see a pulmonologist or other doctor specializing in sleep issues," not a psychiatrist. *Id.* Thus, psychiatrists had no reason to become educated on the topic. *Id.* Third, psychiatrists were willing to accept Vanda's false statements regarding Non-24 diagnosis because those statements "appeared to be supported by the DSM-5," a well-known resource with credibility in the field. *Id.* ¶ 307. And finally, Vanda's CEO is himself a psychiatrist and was therefore "keenly aware that such professionals were not trained on Non-24." *Id.* ¶ 309.

Other factors permitted Vanda to deceive providers, says Relator. According to CW, the majority of Vanda's Hetlioz sales force is young and inexperienced, so unlike seasoned sales representatives who have undergone multiple compliance trainings, they "have no clue that they are illegally broadening the indication for Non-24." *Id.* ¶ 310–311. "Vanda tells sales representatives that if [the ICD-10 code for Non-24]"—that is, the proper international classification disease code for Non-24—"is not on the claim . . . [they] will not receive sales credit for the prescription." *Id.* ¶ 326. In addition, Vanda created an "internal reimbursement hub" to assist securing preapprovals for Hetlioz prescriptions from government payors. *Id.* ¶ 330; *see also id.* ¶ 12 ("In 2019, a year supply of Hetlioz cost[] approximately $188,000."). Vanda's internal hub contacts the doctor to obtain the necessary information, fills out the prior authorization form, and submits it directly to the insurer. *Id.* ¶ 332.

As a result of Vanda's conduct, Medicare and Medicaid government payors dramatically increased their approvals of Hetlioz.   In 2015, Medicare and Medicaid paid just north of $12 million for over 1,200 prescriptions.   *Id.* ¶¶ 334–335.   Those numbers jumped dramatically in only three years.   In 2018, Medicare and Medicaid paid almost $105 million for nearly 6,500 Hetlioz prescriptions, a nearly nine-fold increase in payments and an over five-fold increase in prescriptions.   *Id.* ¶¶ 340–341.   Recall, Vanda's CEO attributed this rise to an increase in prescriptions among sighted patients.   *Id.* ¶ 262.

### 3.   *Medicare and Medicaid*

The federal Medicare and Medicaid programs are the putative victims of Vanda's alleged fraud scheme.[3]   Medicare is a federal health insurance program for individuals ages 65 and older and individuals under 65 with certain disabilities.   *Id.* ¶ 29.   Medicare is administered by the Department of Health and Human Services ("HHS") and its Centers for Medicare & Medicaid Services ("CMS").   *Id.* ¶ 7.   Medicare Part D pays for prescription drug benefits.   *Id.* ¶ 30 (citing 42 U.S.C. § 1395w-101 *et seq.*).   Persons enrolled in Medicare Part A or Part B are eligible to enroll in a prescription drug plan under Part D.   *Id.*   Medicare contracts with private companies, or "sponsors," who are authorized to sell Part D insurance coverage.   *Id.*   Sponsors submit bids to Medicare with estimates of the actual cost of providing prescriptions to beneficiaries. *Id.* ¶¶ 37–38.   The government then makes "interim payments [to the sponsor] . . . based on the Secretary [of HHS]'s best estimate of amounts that will be payable after obtaining all of the

---

[3] In the Second Amended Complaint, Relator also discusses TRICARE, a healthcare program established by the Department of Defense, SAC ¶ 51 (citing 10 U.S.C. §§ 1071–1110), and the Federal Employees Health Benefits Program ("FEHBP"), a federally funded program that provides health insurance coverage for certain federal employees, retirees, and their dependents, *id.* ¶ 53 (citing 5 U.S.C. § 8901).   But the court does not include TRICARE or FEHBP in its discussion because Relator mentions those two programs only in passing.   As opposed to Medicare and Medicaid, Relator makes no well-pleaded factual assertions as to any claims submitted to or paid out by TRICARE or FEHBP.   *See, e.g.*, *id.* ¶¶ 333–350 (alleging specific amounts reimbursed by Medicare and Medicaid for Fanapt and Hetlioz).

information." *Id.* ¶ 37 (quoting 42 U.S.C. § 1395w-115(d)(1)).   Beneficiaries are also responsible for some amount of out-of-pocket prescription costs.   *See id.* ¶¶ 34–36.   Overall, the federal government aims to cover "74.5% of the actual costs of basic prescription drug coverage." *Id.* ¶ 33 (citing 42 U.S.C. § 1395w-115(a)).

Medicaid is a joint federal-state program that provides healthcare benefits for certain low-income and disabled individuals.   *Id.* ¶ 45.   The percentage of a state's Medicaid payments covered by the federal government—the "Federal Medical Assistance Percentage"—is determined using the state's per capita income.   *Id.* (citing 42 U.S.C. § 1396d(b)).   States develop Medicaid programs, which are subject to approval by the Secretary of HHS.   *Id.* ¶ 46 (citing 42 U.S.C. § 1396a(a)–(b)).   The Secretary then pays each state "an amount equal to the Federal medical assistance percentage . . . of the total amount expended during such quarter as medical assistance under the State plan."   42 U.S.C. § 1396b(a)(1); *see also* SAC ¶ 46.   State Medicaid programs reimburse drug providers for prescription drugs, often through private companies that evaluate and process claims on behalf of Medicaid recipients.   SAC ¶ 48.   Every quarter, a state submits to CMS "an estimate of its Medicaid federal funding needs," and CMS then determines the amount of federal funding that the state may draw down as it incurs expenditures during the quarter.   *Id*. States then draw down federal funding based on actual provider claims, including pharmacies seeking payment for prescription drugs, before submitting a final expenditure report to CMS.   *Id.* Adjustments are made to the quarterly federal funding amount as necessary based on actual expenditures.   *Id.* (citing 42 U.S.C. § 430.30).

### B.   Relevant Procedural Background

On May 19, 2020, the court dismissed all of Relator's claims but gave him the opportunity to amend his First Amended Complaint.   *See Gardner I*, 2020 WL 2542121, at *16.   Relator filed

his Second Amended Complaint on June 9, 2020.   SAC at 210.   On July 30, 2020, Vanda filed a corresponding motion to dismiss, which is now before the court.   *See* Def.'s Statement of P. & A. in Supp. of Def.'s Mot. to Dismiss the Second Am. Compl., ECF No. 50 [hereinafter Def.'s Br.]. Although the United States declined to intervene, it submitted a Statement of Interest to clarify its views on certain issues raised in Vanda's motion.   United States' Statement of Interest Regarding Def.'s Mot. to Dismiss, ECF No. 58 [hereinafter U.S. Statement].   The United States did not take a position on either the merits of Vanda's motion or Relator's ability to prove actionable violations if the case proceeds.   *Id.* at 2.

## III.   LEGAL STANDARD

### A.   Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.* (citing *Twombly*, 550 U.S. at 556).   The factual allegations in the complaint need not be "detailed"; however, the Federal Rules demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."   *Id.* (citing *Twombly*, 550 U.S. at 555).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.* (citing *Twombly*, 550 U.S. at 555).   If the facts as alleged fail to establish that a plaintiff has stated a claim upon which relief can be granted, a court must grant the defendant's Rule 12(b)(6) motion.   *See Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.,* 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

In ruling on a motion to dismiss, the court may consider "not only the facts alleged in the complaint, but also . . . any documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and are integral to a claim." *Douglas v. D.C. Hous. Auth.*, 981 F. Supp. 2d 78, 85 (D.D.C. 2013). So long as the "plaintiff's complaint necessarily relies" on the document produced by a defendant in its motion to dismiss, *Hinton v. Corrs. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (cleaned up), and the plaintiff does not dispute its authenticity, the court may consider the document without converting the defendant's motion into one for summary judgment, *see Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 323 (D.D.C. 2012).

### B. Rule 9(b) Standard

Fraud claims, like those asserted here by Relator, are subject to the heightened pleading requirement of Rule 9(b). That Rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015) (applying Rule 9(b) to claims filed pursuant to the False Claims Act); *United States ex rel. Lott v. Not-For-Profit Hosp. Corp.*, 296 F. Supp. 3d 143, 151 (D.D.C. 2017) ("Substantive FCA claims, like common law fraud claims, must satisfy the heightened pleading standard of Rule 9(b)."). "Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b)," *United States ex rel. Tran v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 128 (D.D.C. 2014), which include "ensur[ing] that defendants have notice of the charges against them adequate to prepare a defense," *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 34 (D.D.C. 2003).

"Rule 9(b) is not an antithesis of Rule 8(a)'s 'short and plain statement' requirement, but rather a supplement to it." *Baker v. Gurfein*, 744 F. Supp. 2d 311, 315 (D.D.C. 2010). Although the rule does not require a complaint "to contain a detailed allegation of all facts supporting each and every instance of submission of a false claim," *Barrett*, 251 F. Supp. 2d at 35, a plaintiff "must . . . provide a defendant with notice of the who, what, when, where, and how with respect to the circumstances of the fraud," *Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 114 (D.D.C. 2009) (internal quotation marks and citation omitted). In order to satisfy Rule 9(b), a plaintiff must "set forth an adequate factual basis for his [FCA] allegations," including a "detailed description of the specific falsehoods that are the basis for his suit." *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002).

## IV.   DISCUSSION

### A.   Statutory Framework

Before addressing the parties' merits arguments, the court discusses the two key statutes underpinning Relator's claims: the Food, Drug, and Cosmetic Act and the False Claims Act.

#### 1.   *Food, Drug, and Cosmetic Act*

Pharmaceutical manufacturers in the United States such as Vanda are regulated by the FDA under the Food, Drug, and Cosmetic Act ("FDCA"). The FDCA sets forth a process for the approval of new drugs by the FDA. 21 U.S.C. § 355. "To secure [FDA] approval for a drug or medical device, a manufacturer must demonstrate that its product is safe and effective for each of its intended uses." *Wash. Legal Found.*, 202 F.3d at 332 (footnote omitted) (citing 21 U.S.C. § 355(d)). Uses other than those for which a drug has been approved are considered "off-label uses." *Id.* "[N]either Congress nor the FDA has attempted to regulate the off-label use of drugs by doctors and consumers," and so physicians are free to prescribe drugs for off-label uses as they

see fit.  *Id.* at 333.  And "it is undisputed that the prescription of drugs for unapproved uses is commonplace in modern medical practice and ubiquitous in certain specialties."  *Id.*

The FDCA, however, prohibits drug manufacturers "from marketing drugs for . . . 'off-label' uses," *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 723 (1st Cir. 2007) (citing 21 U.S.C. § 321 *et seq.*), *overruled on other grounds by Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008), and from misbranding drugs, and imposes criminal penalties for doing so, 21 U.S.C. §§ 331(a), 333(a).  A drug is considered misbranded if it lacks "adequate directions for use," *id.* § 352(f)—in other words, if it lacks "directions under which the layman can use a drug safely and for the purposes for which it is intended," 21 C.F.R. § 201.5.  The FDA takes the position that "[a]n approved drug that is marketed for an unapproved use (whether in labeling or not) is misbranded because the labeling of such drug does not include 'adequate directions for use.'"  *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices, Guidance for Industry*, U.S. FOOD & DRUG ADMIN. (Jan. 2009), https://perma.cc/XP3Z-SQE7.

### 2.  False Claims Act

The FDCA does not contain a private right of action.  21 U.S.C. § 337(a); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001) ("The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance . . . .").  Relator therefore brings his claims under the FCA, which, in relevant part, imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or

fraudulent claim," *id.* § 3729(a)(1)(B).   A "claim . . . includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs."   *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (citing 31 U.S.C. § 3729(b)(2)(A)) (internal quotation marks omitted).

To make out an FCA claim, a relator must show not only that the defendant submitted a claim, but also that the claim was false and that the defendant knew the claim was false.   *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 98 (D.D.C. 2017) (quoting *United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 26 (D.D.C. 2010)).   And courts have read a materiality component into the element of falsity.   *Id.* at 98–99; *see also Escobar*, 136 S. Ct. at 2002–04.   Thus, an FCA claim requires the trifecta of falsity, materiality, and scienter.

The FCA is not, however, "an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations."   *Escobar*, 136 S. Ct. at 2003 (internal quotation marks and citation omitted).   "FCA liability does not attach to violations of federal law or regulations, such as marketing of drugs in violation of the FDCA, that are independent of any false claim."   *Rost*, 507 F.3d at 727.

**B.      Vanda's Materiality and Falsity Challenges to Relator's Claims**

Relator alleges primarily that Vanda violated the FCA by (1) marketing and promoting Fanapt for off-label use and (2) inducing providers to prescribe Hetlioz for patients improperly diagnosed with Non-24.   SAC ¶¶ 118, 243.   That conduct, Relator avers, caused providers to submit fraudulent claims to government payors under the Medicare and Medicaid programs.   *See id.* ¶ 104; 31 U.S.C. §§ 3729(a)(1)(A), (B).   Relator's claims fall under an "implied false certification theory" of FCA liability.   Where "a defendant makes representations in submitting a

claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Escobar*, 136 S. Ct. at 1999.   In this case, Relator's implied false certification theory is once removed, in that Vanda itself is not alleged to have made any "representation[] in submitting a claim"; rather, it is alleged to have caused providers to do so falsely.   Because Relator characterizes his claims as advancing an implied false certification theory, the court does the same.   Relator's Opp'n to Mot. to Dismiss, ECF No. 54 [hereinafter Relator Opp'n], at 5.

Two conditions must be satisfied for any implied false certification theory to be viable: (1) "the claim does not merely request payment, but also makes specific representations about the goods or services provided"; and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001.   Vanda disputes only the second of these conditions. In particular, it contends that Relator has not plausibly alleged either the materiality or falsity elements of its FCA claims.   Def.'s Br. at 8, 26.

The court first addresses the materiality requirement before turning to falsity.[4]

### 1.   *Materiality*

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 136 S. Ct. at 2002.  Generally, for something to be considered material, it must have "a natural tendency to influence, or be capable of influencing,

---

[4] The elements for claims brought under subsections 3729(a)(1)(A) and 3729(a)(1)(B) are "practically identical," so the court does not distinguish between the two in its discussion.   *See United States ex rel. Scott v. Pac. Architects and Eng'rs (PAE), Inc.*, 270 F. Supp. 3d 146, 154 (D.D.C. 2017).

the payment or receipt of money or property." *Id.* (quoting 31 U.S.C. § 3729(b)(4)).   The Supreme Court has emphasized that because the FCA is "not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations," the materiality standard is "demanding." *Id.* at 2003 (quoting *Allison Engine Co.*, 553 U.S. at 672).   Materiality is also not "too fact intensive" for courts to resolve on a motion to dismiss. *Id.* at 2004 n.6.

In *Escobar*, the Supreme Court made clear that not every failure to disclose an act of noncompliance connected to a government payment meets the materiality standard.   The Court rejected the government's "expansive" position that "any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id.* at 2004.   Instead, the Court noted that "materiality cannot rest on a single fact or occurrence as *always* determinative." *Id.* at 2001 (emphasis added) (cleaned up).   The Court stated that proof of materiality or lack thereof "can include, but is not necessarily limited to" certain considerations. *Id.* at 2003.   Among them are (1) "the Government's decision to expressly identify a provision as a condition of payment," *id.*; (2) "evidence that the defendant knows the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement," *id*; (3) whether the Government "pays a particular claim in full despite its actual knowledge that certain requirements were violated," *id.*; (4) whether the Government "regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position," *id.* at 2003–04; and (5) whether the "noncompliance is minor or insubstantial," *id.* at 2003.

In *Gardner I*, the court concluded that Relator could not establish materiality as to any of his FCA claims. *Gardner I*, 2020 WL 2542121, at *9–11. For one, although the court acknowledged that Medicare's statutory language clearly excluded coverage for off-label uses, it found that the same was not true for Medicaid. *See id.* at *9 (noting that for Medicaid a "State *may* exclude or otherwise restrict coverage of a covered outpatient drug if . . . the prescribed use is not for a medically accepted indication." (quoting 42 U.S.C. § 1396r-8(d)(1)(B)(i) (emphasis added))). More importantly, other than condition of payment, Relator's complaint "address[ed] none of the[] other considerations" flagged in *Escobar*. *Id.* at *10; *see also id.* ("The inclusion of *some* allegations addressing these considerations is critical to plausibly pleading materiality.").

This time, however, Relator has met his burden.

### i.     Fanapt

Relator's case for materiality as to his Fanapt claims rests chiefly on three sets of allegations. *First*, he repeats his contention that a medically accepted indication is a condition of payment under Medicare and Medicaid. Relator Opp'n at 7–8; *see also* SAC ¶¶ 39–44, 49–50, 81–87. Just as in *Gardner I*, the court agrees as to Medicare. *Gardner I*, 2020 WL 2542121, at *9 (noting that courts have not, for the most part, expressed "doubts about the exclusion of coverage for off-label uses under the *Medicare* program"); *see also United States ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1049 (C.D. Cal. 2016) ("Medicare Part D may only reimburse 'covered part D drugs,' which must be 'used for a medically accepted indication.'" (citing 42 C.F.R. § 423.100)). As for Medicaid, although the statutory language gives states flexibility to exclude or restrict coverage for off-label use, *see* 42 U.S.C. § 1396r-8(d)(1)(B)(i), Relator quotes CMS policy as stating that "[m]ost, if not all, State Medicaid programs exclude coverage for drugs that are used for off-label indications that are not medically accepted."

17

SAC ¶ 83 (quoting Ctrs. for Medicare & Medicaid Servs., Off-Label Pharmaceutical Marketing: How to Recognize and Report It (2015), https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/off-label-marketing-factsheet.pdf).   For present purposes, therefore, Relator has established that, as a policy matter, on-label use is a condition of payment under Medicaid.

*Second*, Relator identifies several government enforcement actions that resulted in settlements against pharmaceutical manufacturers for conduct similar to what he alleges here.   *See* Relator Opp'n at 9 (citing SAC ¶¶ 88–91).   Each settlement involved the promotion of prescription drugs for unapproved uses in violation of the FDCA and claims submitted to Medicare and Medicaid for drugs not used for their medically accepted indications.   *See* SAC, Ex. A, ECF No. 54-2, at 3–4; Ex. B, ECF No 54-3, at 3; Ex. C, ECF No. 54-4, at 3; Ex. D, ECF No. 54-5, at 4; Ex. E, No. 54-6, at 2; Ex. F, No. 54-7, at 2–3; Ex. G, No. 54-8, at 2–3; Ex. H, No. 54-9, at 3. Relator contends that these prior actions support "a reasonable inference that the Government would deny payment if it knew about Defendant['s] alleged violations."   Relator Opp'n at 9 (quoting *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 162 (5th Cir. 2019)). The court agrees.   At the motion-to-dismiss stage, these enforcement actions "raise[] a reasonable inference that the Government would deny payment if it knew about [Vanda's] alleged violations." *Lemon*, 924 F.3d at 162.

Vanda, of course, sees things differently.   It argues that some of Relator's cases are distinguishable from the present controversy because they "resolved *criminal* liability along with . . . FCA claims against drug manufacturers."   Def.'s Br. at 30–31.   But that distinction does not necessarily undercut materiality.   In *Lemon*, for example, the relators "alleged that the U.S. Department of Health and Human Service's Office of the Inspector General ha[d] taken criminal

and civil enforcement actions" against other similarly situated defendants, which the court found supported a showing of materiality for purposes of the FCA's materiality element.  *Lemon*, 924 F.3d at 162 (finding the allegations enough to satisfy the government enforcement considerations outlined in *Escobar*).

Vanda further contends that "because all but one of the off-label settlements predate *Escobar*, they have especially little probative value."  Def.'s Br. at 31.  Yet Vanda does not adequately explain why this is so.   Even if the settlements predate *Escobar*, they may still support the view that the government, if it had knowledge, would deny payment for off-label uses of Fanapt.  *Escobar* expounded the legal framework for determining materiality under the FCA; nothing in the Court's opinion suggests that pre-*Escobar* enforcement actions ought to be given less weight in the materiality analysis.

Vanda also asserts that the settlements merely reflect a litigation position and thus are not "evidence that the *payor*—as opposed to government counsel—viewed the [misrepresentation] to be material."  Def.'s Br. at 32.   The United States concurs, noting that enforcement decisions and payment decisions "do not line up perfectly."   U.S. Statement at 6.   While the court sees this as a reason not to give the settlement evidence undue weight in the greater materiality analysis, it does not undermine the reasonable inference, when considered with other factors, that the government would have denied payment for Fanapt had it known of Vanda's alleged violations. *See United States v. Strock*, 982 F.3d 51, 63–64 (2d Cir. 2020) ("Thus, while purely post hoc enforcement actions can carry some weight in a materiality analysis, they are less probative than

allegations that the government actually refuses to make payments once it determines that the [condition of payment] has been violated.").[5]

*Third*, Relator argues that Vanda's noncompliance is not insubstantial or minor but rather "goes to the essence of the bargain" for Medicare and Medicaid reimbursement.   Relator Opp'n at 10–11 (quoting *Escobar*, 136 S. Ct. at 2003 n.5).   Put differently, he contends that the on-label requirement sits at the heart of the reimbursement schemes of both programs.   Reaching beyond Medicare's statutory language, Relator cites Medicare CMS guidance emphasizing that only drugs used for a medically accepted indication are reimbursable.   SAC ¶¶ 39, 81 (citing Ctrs. for Medicare & Medicaid Servs., Medicare Prescription Drug Benefit Manual, Ch. 6, Part D Drugs and Formulary Requirements, § 10.6 (2016)).   And as referenced earlier, Relator quotes CMS guidance stating that "most, if not all" state Medicaid plans "exclude[] from coverage" drugs not used for a medically accepted indication because those prescriptions can "waste Medicaid funds on ineffective treatments."   SAC ¶ 83.   Preventing fraud by means of off-label reimbursement has been "the subject of significant health care fraud enforcement efforts by the United States Department of Justice (DOJ) and the States' attorneys general using the False Claims Act."   *Id.* (quoting Ctrs. for Medicare & Medicaid Servs., Off-Label Pharmaceutical Marketing:   How to Recognize and Report It (2015)).   At this stage in the litigation, such guidance demonstrates the centrality of the on-label requirement to both the Medicare and Medicaid programs.   *See United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 836 (6th Cir. 2018) (finding materiality where guidance emphasized the importance of an expressed condition of

---

[5] Vanda asserts that Relator's settlements are too small a sample to be illustrative of "the mine run of cases," Def.'s Br. at 29 (quoting *Escobar*, 136 S. Ct. at 2002), but on a motion to dismiss the court views the settlements as enough evidence to render plausible the notion that the government would have denied payment for Fanapt had it known of Vanda's alleged violations.   *See Kareem v. Haspel*, 986 F.3d 859, 865 (D.C. Cir. 2021) (drawing all reasonable inferences in plaintiff's favor).

payment); *see also United States ex rel. Herman v. Coloplast Corp.*, 327 F. Supp. 3d 300, 309 (D. Mass. 2018) (relevant billing regulation went "straight to the essence of the bargain" because "it deal[t] precisely with the amount that providers [could] bill." (cleaned up)).   Vanda provides no argument to the contrary.   *See* Def.'s Reply in Supp. of Mot. to Dismiss, ECF No. 57 [hereinafter Def.'s Reply], at 15–19.

Instead, Vanda emphasizes allegations *not* made by Relator—in this case, allegations concerning whether the government "pays a particular claim in full despite its actual knowledge that certain requirements were violated," *Escobar*, 136 S. Ct. at 2003, or "regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position," *id*. at 2003–04.   *See* Def.'s Reply at 18–19.   Vanda seizes on language from *Gardner I* to suggest that, absent allegations addressing those two considerations, Relator cannot plead materiality.   *Id.* at 19 ("The inclusion of *some* allegations addressing these considerations is critical to plausibly pleading materiality, but the Amended Complaint is silent as to them." (quoting *Gardner I*, 2020 WL 2542121, at *10)).   Thus, Vanda insists, Relator's Second Amended Complaint fails to plausibly allege materiality.   *Id.*

But Vanda overreads *Escobar* and this court's prior decision.   The *Escobar* factors are illustrative criteria to establish materiality; they are not an exhaustive list that renders fatal the failure to allege facts that support one or more of them.   *See Escobar*, 136 S. Ct. at 2001 ("[M]ateriality cannot rest on a single fact or occurrence as always determinative" (cleaned up)); *id.* at 2003 (noting that proof of materiality or lack thereof "*can* include, but is not necessarily limited to" the listed considerations (emphasis added)); *see also Prather*, 892 F.3d at 831 ("The analysis of materiality is 'holistic.'"); *United States ex rel. Escobar v. Universal Health Servs., Inc.* (*Escobar III*), 842 F.3d 103, 109 (1st Cir. 2016) ("The language that the Supreme Court used

. . . makes clear that courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive."); *id.* at 110 (noting the Court in *Escobar* "laid out several specific factors that *might* contribute to determining materiality" (emphasis added)).   So, the fact that the Second Amended Complaint does not include allegations addressing the third and fourth *Escobar* considerations does not automatically sink Relator's claims.   If anything, in cases like this one prosecuted solely by a relator, because the relator rarely will have access to government payment decisions, a complaint is unlikely to contain allegations concerning the payor's "actual knowledge" and response to claimed violations. *See Escobar III*, 842 F.3d at 112 ("We see no reason to require Relators at the Motion to Dismiss phase to learn, and then to allege, the government's payment practices for claims unrelated to [those at issue] in order to establish the government's views on the materiality of the violation. Indeed, given applicable federal and state privacy regulations in the healthcare industry, it is highly questionable whether Relators could have even accessed such information."); *see also United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 907 (9th Cir. 2017) (holding that although discovery may reveal "that the government regularly pays this particular type of claim in full despite actual knowledge that certain requirements were violated, such evidence is not before [the court]" and that the relator had alleged facts sufficient to establish materiality).[6]

Thus, the court finds that, taken together, Relator's allegations establish materiality for his off-label Fanapt claims.

---

[6] Vanda's insistence that the law of case doctrine controls here is misplaced.   Def.'s Reply at 19.   Contrary to what Vanda seems to contend, the court did not interpret *Escobar* as requiring some factual pleading as to each factor discussed in that case to establish materiality.   Rather, the court simply highlighted the absence of relevant allegations as to the *Escobar* third and fourth factors to underscore the inadequacy of Relator's pleading.   *See Gardner I*, 2020 WL 2542121, at *10.   For the reasons discussed, Relator has now cured pleading deficiencies to the court's satisfaction.

*ii.*        *Hetlioz*

Relator has also established materiality for his Hetlioz claims, albeit in a more straightforward manner.   Relator alleges that "Hetlioz typically requires prior authorization before [] prescriptions will be approved."   SAC ¶ 330.   Vanda agrees.   *See* Def.'s Br. at 1 (calling Hetlioz prior authorization "robust").   After all, stringent pre-approval is entirely expected when a year's supply of Hetlioz costs approximately $188,000.   *See* SAC ¶ 12; *see also Gardner I*, 2020 WL 2542121, at *12 ("Given its breathtaking cost, it should come as no surprise that government payors would insist on prior authorization before agreeing to cover the medication.").

Consistent with *Escobar*, the court concludes that the pervasive prior authorization requirements for Hetlioz are enough to establish materiality.   Recall that for something to be considered material, it must have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."   *Escobar*, 136 S. Ct. at 2002 (quoting 31 U.S.C. § 3729(b)(4)).   The prior authorization regimes for Hetlioz demonstrate that on-label use is clearly material to the government's decision to cover a prescription.   *See* Def.'s Mot. to Dismiss First Am. Compl., ECF No. 40, Ex. B, ECF No. 40-3 (listing Non-24 as a "precertification requirement" and stating that that Hetlioz "is only covered under Medicare Part D when it is used for a medically accepted indication").   As Relator notes, "the entire purpose of implementing [prior authorization] under Medicare and Medicaid is to ensure that drugs are only covered when used for a medically accepted indication."   Relator Opp'n at 14 (citing 81 Fed. Reg. 5,170, 5,189 (Feb. 1, 2016)). Accordingly, the pervasive prior authorization schemes for Hetlioz, when combined with the centrality of a medically indicated use as an alleged condition of payment, is sufficient to establish materiality of the allegedly false claims at the pleadings stage.

*      *      *

In sum, Relator's allegations give rise to a plausible inference that the misrepresentations Vanda caused providers to make to Medicare and Medicaid payors were material to those payors' decisions to cover Fanapt and Hetlioz prescriptions.

### 2.      Falsity

#### i.      Hetlioz[7]

In *Gardner I*, "due to pervasive [prior authorization] requirements for the drug," the court concluded that Relator could not plausibly allege falsity for his Hetlioz claims.  *Id.* at *12. Relator's falsity theory was premised on Vanda convincing physicians to prescribe Hetlioz to treat CRDs other than Non-24.  *See id.* at *3.   But because providers were required to clearly indicate on prior authorization forms the use for which they had prescribed Hetlioz, the court found that the "pre-approval systems significantly diminishe[d] the plausibility that government payors were duped into paying for off-label uses" of the drug.  *Id.*   The analysis might have been different, the court offhandedly suggested, if Relator had claimed, for instance, that Vanda "induced doctors to falsely represent a patient's diagnosis on pre-authorization forms to secure pre-approval."  *Id.* Relator appears to have taken that dicta to heart.

Relator's new theory of liability states that Vanda "illegally promoted Hetlioz by misrepresenting Non-24 to encompass several additional CRDs, thereby . . . mislead[ing] [providers], mainly psychiatrists, into believing their patients had Non-24, when in actuality they did not."  SAC ¶ 243.   Specifically, Relator avers that Vanda trained its sales team to use excerpts from the DSM-5's CRSWD section to mislead providers into thinking that their patients had

---

[7] In *Gardner I*, the court's falsity analysis addressed Relator's Hetlioz claims before his Fanapt claims.  *See Gardner I*, 2020 WL 2542121, at *11–14.   Because the following discussion refers to that analysis, the court addresses Hetlioz first before turning back to Fanapt.

Non-24 if they satisfied the three general diagnostic criteria applicable to *all* CRSWDs, as opposed to the criteria specific to Non-24.  *Id.* ¶ 281.  After improperly diagnosing Non-24, providers prescribed Hetlioz to their patients and listed Non-24 as the indication on prior authorization forms. *See* Relator Opp'n at 24.  As far as the government payors could tell, the use was on-label, even though the patients did not actually suffer from Non-24 and the drug had effectively been prescribed for an off-label indication (i.e., a different CRSWD).  *See id.*

Vanda does not dispute that Relator's new theory—that a pharmaceutical company could induce providers unwittingly to submit false claims—could give rise to liability under the FCA. *See* Hr'g Tr., ECF No. 61, at 7–8 ("[I]t is certainly not part of our argument that [Relator's alternative theory] is never cognizable.").  The United States takes the same view. *See* U.S. Statement at 9 ("Regardless of whether Relator has plausibly alleged [his alternative theory] with the requisite particularity or could adduce sufficient evidence to prove such claims, this is a cognizable theory under the FCA, particularly at the pleading stage.").

Vanda contends, however, that Relator's allegations in this case are implausible.  Its argument focuses on the allegation that Vanda gave its sales representatives an excerpt of the DSM-5 as an "educational piece" to present to providers.  *See* Def.'s Br. at 10–11.  The DSM-5 handout used by its sales representatives reproduces verbatim excerpts from the DSM-5. *Compare* SAC, Ex. M, ECF No. 47-3 [hereinafter SAC Ex. M], *with* SAC, Ex. L, ECF No. 47-2, at 390–91, 396–97.  It includes the three general CRSWD diagnostic criteria as well as instructions that the provider must "specify" the relevant subtype (e.g., Non-24) among six possibilities.  Def.'s Br. at 11–12 (reproducing the first page of the handout); *see* SAC Ex. M at 1.  "The handout is thus facially clear that the three diagnostic criteria common to [CRSWDs] apply to all six species, and that the doctor must therefore undertake further evaluation to 'specify'

the CRSWD subtype . . . in order to make a diagnosis." Def.'s Br. at 12. The next two pages of the handout are a reproduction of the DSM-5 text specific to Non-24. *Id.* at 13 (reproducing the second and third pages of the handout); *see* SAC Ex. M at 2–3. But, as Vanda emphasizes, even that language helps providers distinguish Non-24 from the other recognized CRSWDs. Def.'s Br. at 13. For example, providers are reminded that "[i]n sighted individuals, non-24-hour sleep-wake type should be differentiated from delayed sleep phase type, as individuals with delayed sleep phase type may display a similar progressive delay in sleep period for several days." *Id.* (quoting SAC Ex. M at 3). "It is simply not plausible," Vanda asserts, that it would "'tell prescribers [that] if the general CRSWD criteria [were] met, [then] the patient had Non-24' . . . when the supporting documentation [it] provided to doctors says the opposite." *Id.* at 14 (quoting SAC ¶ 284). "Relator's theory . . . requires the [c]ourt to believe that the [prescribers] involved would credit the word of pharmaceutical 'sales representatives with no real experience,' 'a majority of whom are under the age of 24' and right 'out of college' ([SAC ¶¶ 309–310]) over one of 'the leading diagnostic manuals' which 'offer[s] the best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Id.* at 17 (quoting *Moore v. Texas*, 137 S. Ct. 1039, 1048, 1053 (2017)).

Although Vanda makes a reasonable argument, Relator has provided enough well-pleaded factual allegations to overcome a motion to dismiss. Most compelling is the dramatic increase in Hetlioz prescriptions among *sighted* patients. Non-24 is prevalent among the blind and, though its incidence among the sighted population is unknown, it is widely acknowledged as rare. *See* SAC ¶¶ 17, 244, 246, 264. Nevertheless, according to Vanda's CEO, (1) after the company launched its "Hetlioz to Psychiatrists Initiative" in 2017, the "monthly new [prescriptions] increas[ed] by approximately three-fold," *id.* ¶ 261, and (2) "2 out of every 3 Hetlioz prescriptions

c[a]me from psychiatrists and [we]re written for sighted patients," *id.* ¶ 262.   Taken together, these allegations prompt an obvious question:   how do these numbers make sense when Non-24 is rare to begin with and even rarer in sighted individuals?   *See* Relator Opp'n, Ex. 10, ECF No. 54-11, at 3 (FDA estimates "approximately 100,000 people" in the United States have Non-24); SAC ¶ 246 ("[T]here have been fewer than 100 cases of sighted people with Non-24 . . . reported in the scientific literature.").   Vanda's explanation is that it "has been educating providers about the existence of a rare disorder, and that increased awareness resulted in additional prescriptions based on the *indisputably correct* diagnostic information Vanda provided to doctors."   Def.'s Reply at 7.   But given that two-thirds of Hetlioz prescriptions are for patients who ostensibly represent but a fraction of the already small Non-24 population, the court sees Relator's "misleading diagnosis" theory as more than just "'merely consistent with' [Vanda's] liability." *See Ashcroft*, 556 U.S. at 678.   At this stage, because Relator's theory of liability can be reasonably inferred from his assumed-to-be-true allegations, he has satisfied plausibility as to his Hetlioz claims.   *See LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011).

Additionally, Vanda's laser focus on the accuracy of the DSM-5 handout misses Relator's broader contention that Vanda's "educational program" as a whole was designed to mislead clinicians and succeeded in doing so.   Two individuals with knowledge (Jeff Bourgeois and CW) corroborate critical aspects of Vanda's alleged scheme to increase the number of Hetlioz prescriptions written by psychiatrists.   *See, e.g.*, SAC ¶ 310 (validating use of the general DSM-5 diagnostic criteria as a primary sales tool).   Relator also includes screenshots of sales training slides that support the plausibility of his theory.   One slide encourages sales representatives to "[w]ith confidence *educate* Psychiatrists on Non24 and the DSM 5."   *Id.* ¶ 308 (emphasis added). Another presents a multi-layered question script that seemingly instructs representatives to ask

general questions about patients' sleep issues before stating, "[b]ased on everything you have told

me it sounds like these patients fit the DSM-5 criteria for Non-24 . . . ."   *Id.* ¶ 312.   A third slide

instructs representatives to "[e]xplain the DSM-5 Criteria Needed for Proper Diagnosis of Non

24" and to "[g]o to the DSM handout and read the criteria."   *Id.* ¶ 313.   And according to CW,

"Vanda is sending out flash cards containing the DSM-5 diagnostic criteria" and telling doctors to

prescribe Hetlioz if patients satisfy the criteria.   *Id.* ¶ 318.   All of these references to "criteria,"

Relator contends, are about the three diagnostic criteria common to all six CRSWD subtypes.   *See*

Relator Opp'n at 32.   Vanda replies that "criteria" refers to the Non-24 specific diagnostic criteria

and thus is completely consistent with the DSM-5 itself.   *See* Def.'s Br. at 16.   On a motion to

dismiss, however, the court "accept[s] the well-pleaded factual allegations as true and draw[s] all

reasonable inferences from those allegations in the plaintiff's favor."   *Kareem v. Haspel*, 986 F.3d

859, 865 (D.C. Cir. 2021) (cleaned up).

Finally, Vanda argues that even if Rule 8 pleading requirements are satisfied, Relator's

allegations are not specific enough to satisfy the additional Rule 9(b) requirements associated with

pleading fraud.   Def.'s Reply at 8–10.   "Relator never identifies *who* was giving [the misleading

diagnostic instruction] or *when* and *how* it was supposedly communicated."   *Id.* at 8.   But as to

"who," it is enough that Relator has identified Vanda generally.   *See Heath*, 791 F.3d at 124

(requirement satisfied when Relator identified AT&T the company).   And as to the "when" and

"how," Vanda acknowledges that "[t]he SAC describes Vanda's Hetlioz training from before it

launched the drug to nearly the present day, identifying specific individuals involved, time periods,

Vanda training materials, as well as a host of other information."   Def.'s Reply at 9 (quoting

Relator Opp'n at 35–36).   The problem, Vanda nevertheless asserts, is that "those allegations

relate to a *different* alleged fraud:   Relator's original theory that Vanda was promoting Hetlioz

*off*-label for sleep disorders other than Non-24." *Id.*   Vanda is incorrect.   The Second Amended Complaint explains in detail when Vanda began targeting psychiatrists and how the company went about training its sales force to use the DSM-5's common CRSWD criteria to convince well-intentioned psychiatrists that their patients had Non-24 and thus could benefit from Hetlioz. SAC ¶¶ 275–284, 303–318.   Those allegations are specific to Relator's alternative theory of fraud. Ultimately, and critically, Relator's allegations are "particular enough to guarantee [Vanda] sufficient information to allow for preparation of a response," which is all that is required under Rule 9(b).   *See Heath*, 791 F.3d at 123.

Relator has adequately pleaded the falsity element of his alternative Hetlioz claims.

> ii.    Fanapt

In *Gardner I*, the court found falsity satisfied for Relator's Fanapt claims because "[Vanda] offer[ed] no judicially noticeable facts establishing that government payors broadly adopted pre-approval requirements for Fanapt."   *Gardner I*, 2020 WL 2542121, at *13.   Put differently, the pervasive prior authorization requirements that had previously sunk Relator's Hetlioz claims for lack of falsity were not substantiated for Fanapt.

Recognizing its earlier failure, Vanda now attaches to its motion a document identifying 49 Medicare or Medicaid payors that require prior authorization for Fanapt.   *See* Def.'s Br., Ex. 1, ECF No. 50-2.   "This material demonstrates how, if it is integral to their approval criteria, plans request the doctor's specific diagnosis in connection with a Fanapt prescription."   Def.'s Br. at 25. Thus, Vanda concludes, the court's view that "[t]he widespread use of pre-approval systems significantly diminishes the plausibility that government payors were duped into paying for off-label uses," *Gardner I*, 2020 WL 2542121, at *12, "applies with full force to Fanapt."   *Id.* at 26.

Not quite.   The key reason the court in *Gardner I* considered prior authorization robust enough to undercut falsity as to Hetlioz was that a year's supply of the drug cost approximately $188,000.   *See Gardner I*, 2020 WL 2542121, at *12 ("Given its breathtaking cost, it should come as no surprise that government payors would insist on prior authorization before agreeing to cover the medication.").   Relator did not directly demonstrate that nearly all Medicare and Medicaid payors had in fact implemented a prior authorization requirement, but the sheer cost of reimbursement permitted the court to make that inference.   *See id.*   Here, because neither Relator nor Vanda makes any allegation or argument suggesting a comparable cost for Fanapt, Vanda's evidence of a mere 49 payors employing a preauthorization requirement is insufficient by itself to convince the court that Fanapt prescriptions are consistently subject to prior authorization requirements.   As Relator points out in his brief, 49 payors constitutes a small fraction—less than one percent—of the overall number of Medicare payors operating in the United States.   *See* Relator Opp'n at 23.   The court finds that Relator has adequately pleaded falsity with respect to his off-label Fanapt claims.

*      *      *

To summarize, the court concludes that the Second Amended Complaint adequately alleges the materiality and falsity elements for Relator's off-label Fanapt claims and his alternative Hetlioz claims.

### C.      Submission of False Claims to Government Payors

Aside from materiality and falsity, Vanda also contends that Relator's claims are defective because he "has failed to adequately plead the submission of false claims to government payors." *See* Def.'s Br. at 34.   Because Vanda concedes that its argument is identical to one the court

considered and rejected in *Gardner I*, *id.* at 35, the court once again rejects it here for the same reasons, *see Gardner I*, 2020 WL 2542121, at *14–15.

### D.     Relator's State Law Claims

Lastly, the court holds that Relator's state law claims also survive Vanda's motion to dismiss.   As Vanda admits, "each of the state false claims statutes is self-evidently patterned after the federal FCA, and the body of law applicable to the federal act . . . is therefore applicable to the state acts as well."   Def.'s Br. at 36.   Because Relator's federal FCA claims satisfy materiality, falsity, and the pleading requirements for Rules 8 and 9(b), so, too, do his state law claims.

## V.     CONCLUSION AND ORDER

For the foregoing reasons, the court denies Vanda's Motion to Dismiss, ECF No. 50. Vanda shall answer Plaintiff's Second Amended Complaint within the time provided by Rule 12(a)(4)(A).

Dated:   March 25, 2021

_____
Amit P. Mehta
United States District Court Judge
